WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Sunny Singh

*Proposed Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
                                             :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **DITECH HOLDING CORPORATION**, *et al.*, | : | **Case No. 19-[_____] (___)** |
| | : | |
| **Debtors.**[1] | : | **(Joint Administration Pending)** |
| | : | |

------------------------------------------------------------X

**DECLARATION OF GERALD A. LOMBARDO**
**PURSUANT TO RULE 1007-2 OF LOCAL BANKRUPTCY**
**RULES FOR SOUTHERN DISTRICT OF NEW YORK**

I, Gerald A. Lombardo, make this declaration under 28 U.S.C. §1746.

1.      I am the Chief Financial Officer of Ditech Holding Corporation

("**DHCP**") and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and

debtors in possession (collectively, the "**Debtors**").  I have served in this role since February

2018, having previously served in other financial leadership positions at other companies with

over 25 years of experience.

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Ditech Holding Corporation (0486), DF Insurance Agency LLC (6918), Ditech Financial LLC (5868), Green Tree Credit LLC (5864), Green Tree Credit Solutions LLC (1565), Green Tree Insurance Agency of Nevada, Inc. (7331), Green Tree Investment Holdings III LLC (1008), Green Tree Servicing Corp. (3552), Marix Servicing LLC (6101), Mortgage Asset Systems, LLC (8148), REO Management Solutions, LLC (7787), Reverse Mortgage Solutions, Inc. (2274), Walter Management Holding Company LLC (9818), and Walter Reverse Acquisition LLC (8837).  The Debtors' principal offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania 19034.

2.      On the date hereof (the "**Commencement Date**"), the Debtors

commenced with this court (the "**Bankruptcy Court**") voluntary cases under chapter 11 of title

11 of the United States Code (the "**Bankruptcy Code**").  I am knowledgeable and familiar with

the Debtors' day-to-day operations, business and financial affairs, books and records, and the

circumstances leading to the commencement of these chapter 11 cases.

3.      I submit this Declaration pursuant to Rule 1007-2 of the Local Bankruptcy

Rules for the Southern District of New York (the "**Local Rules**") to assist the Bankruptcy Court

and parties in interest in understanding the events and circumstances that led to the

commencement of these chapter 11 cases and in support of the motions and applications that the

Debtors have filed with the Bankruptcy Court, including the "first-day pleadings" (the "**First-

Day Pleadings**").[2]  I am authorized to submit this Declaration on behalf of the Debtors.  Except

as otherwise indicated herein, the facts set forth in this declaration (this "**Declaration**") are based

upon my personal knowledge, my review of relevant documents, information provided to me the

Company, or advisors to the Debtors, or my opinion based upon my experience, knowledge, and

information concerning the Company and the mortgage originating and servicing industry.  If

called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.      The Debtors have requested a variety of relief in the First-Day Pleadings

to minimize the adverse effects of the commencement of these chapter 11 cases.  I am familiar

with the contents of each First-Day Pleading, and I believe the relief sought therein is necessary

to permit the Debtors an effective transition into and out of chapter 11.  I further believe that the

relief requested in the First-Day Pleadings will preserve the value of the Debtors' estates.

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the respective First Day Pleadings.

5.      This Declaration is organized in six (6) sections:

- Section I is an Overview of these Chapter 11 Cases;

- Section II describes the Debtors' business, both in terms of their history, as well as their current operations;

- Section III summarizes the Company's organizational and capital structure;

- Section IV describes the circumstances that led to the commencement of the chapter 11 cases;

- Section V provides a summary of the First-Day Pleadings, the factual bases for the relief requested therein and other information related to these chapter 11 cases;

- Section VI identifies the attached schedules of information required by Local Rule 1007-2.

## I.
## OVERVIEW OF THESE CHAPTER 11 CASES

6.      The Debtors, together with their non-Debtor subsidiaries (collectively, the "**Company**"), operate as an independent servicer and originator of mortgage loans and servicer of reverse mortgage loans.  For more than 50 years, the Company has offered a wide array of loans across the credit spectrum for its own portfolio and for GSEs (as defined below), government agencies, third-party securitization trusts, and other credit owners.  The Company originates and purchases residential loans through consumer, correspondent and wholesale lending channels that are predominantly sold to GSEs and government entities.  The Company also operates two complimentary businesses: (i) asset receivables management and (ii) real estate owned property management and disposition.

7.      In recent years, the Debtors' business has been impacted by significant operational challenges and industry trends that have severely constrained its liquidity and ability to implement much needed operational initiatives.  In an effort to address the burden of its overleveraged capital structure—a remnant of its historical acquisitions—the Company

3

consummated a fully consensual prepackaged chapter 11 plan on February 8, 2018.  Given the significant liquidity and operational headwinds facing the Company in 2019, it became clear to the Company's new senior management team that additional relief was needed.

8.      Beginning in June 2018, the Company began its formal review of strategic alternatives, including a potential merger or sale of all or substantially all of the assets of the Company.  As explained in more detail in Section IV of this Declaration, the Company was not able to consummate an out-of-court transaction with a third party purchaser.  Accordingly, facing increased uncertainty in 2019, and an anticipated end-of-first-quarter going-concern qualification from its auditors, the Company turned its focus toward planning for an in-court recapitalization transaction that would maximize value for its creditors and preserve the enterprise as a going concern.  To that end, in December 2018, the Company began in earnest negotiating with groups of holders of its corporate debt on the terms and implementation of an acceptable recapitalization structure, culminating in a restructuring support agreement (the "**Restructuring Support Agreement**") with the Ad Hoc Group of Term Lenders (as defined below)—the Company's senior creditors—holding, in the aggregate, approximately $736.6 million of Term Loans (as defined below).  A copy of the Restructuring Support Agreement is attached hereto as Annex II.

## A.      Restructuring Support Agreement

9.      By virtue of the Restructuring Support Agreement, the Company has commenced these chapter 11 cases with a clear path to a confirmable chapter 11 plan of reorganization and a viable recapitalization—in which, among other things, over $800 million in funded debt would be extinguished, leaving a significantly deleveraged reorganized Company wholly owned by the Term Lenders, with $400 of term loan debt and an appropriately sized exit working capital facility or consummation of another liquidity enhancing transaction

4

(the "**Reorganization Transaction**").    As a toggle to the Reorganization Transaction, the Restructuring Support Agreement also provides for the continuation of the Company's Prepetition Marketing Process (as defined below) whereby any and all bids for the Company or its assets will be evaluated as a precursor to confirmation of any chapter 11 plan of reorganization (the "**Marketing Process**").

10.    Specifically, the Marketing Process will provide a public and comprehensive forum in which the Debtors seek bids or proposals for three (3) potential transactions that, if representing higher or better value, will either be incorporated into a Reorganization Transaction or pursued as an alternative to the Reorganization Transaction in consultation with and subject to the rights of the Term Loan Ad Hoc Group under the Restructuring Support Agreement and the DIP Lenders under the DIP Warehouse Facility Agreements, including:

- "**Sale Transaction**" meaning, a sale of substantially all of the Company's assets," in each case, as provided in the Restructuring Support Agreement; and

- "**Asset Sale Transaction**" meaning, the sale of a portion of the Company's assets other than a Sale Transaction consummated after the Commencement Date but prior to the Effective Date; provided such sale shall only be conducted with the consent of the Requisite Term Lenders.

- "**Master Servicing Transaction**" meaning, as part of a Reorganization Transaction to the extent the terms thereof are acceptable to the Requisite Term Lenders, entry by the Company into an agreement or agreements with an approved subservicer or subservicers (the "**New Subservicer**") whereby, following the Effective Date, all or substantially all of the Company's mortgage servicing rights are subserviced by the New Subservicer;

11.    Although the Debtors will pursue the Marketing process in earnest, the Reorganization Transaction will serve as a backstop and provide the Company the optionality to enter into such other transactions that can either augment the Reorganization Transaction (such as the Master Servicing Transaction) or, if representing higher or better value, replace the

5

Reorganization Transaction (such as the Sale Transaction). Further, if during the Marketing Process the Debtors receive separate bids for certain of their assets that represent higher or better value for the estate, the Debtors can elect to proceed with such Asset Sale Transaction in conjunction with either a Reorganization Transaction or a Sale Transaction (as applicable). *See Figure* below.



12.     Accordingly, upon completion of the Marketing Process, not only will the Reorganization Transaction be fully market tested, the Debtors will also be in the best position to compare their options against the Reorganization Transaction before proceeding to confirmation of their chapter 11 plan of reorganization.

13.     In recognition of the Term Lenders' position as the Debtors' fulcrum creditors, under the Restructuring Support Agreement, within five (5) business days following the earlier of (a) the conclusion of the Company's post-Commencement Date marketing and sale process and (b) 95 days after the Commencement Date (the earliest such date, the "**Election Date**"), holders of at least $66^{2/3}$% in aggregate principal amount outstanding of the Term Loans (the "**Electing Term Lenders**") may deliver a notice (the "**Election Notice**") to the Company stating that the Electing Term Lenders wish to consummate a transaction (the "**Elected Transaction**"), being a: (i) Reorganization Transaction, or (ii) Master Servicing Transaction (as

6

part of a Reorganization Transaction), or (iii) Sale Transaction, and, if applicable, (iv) in connection and together with an election of (i), (ii), or (iii), including any Asset Sale Transaction(s).  If the Debtors do not proceed with the Elected Transaction, the Consenting Term Lenders can terminate the Restructuring Support Agreement.

14.    The Restructuring Support Agreement presently contemplates the following treatment for certain key classes of creditors under the Reorganization Transaction:

- Term Loan Claims. On the effective date, the holders of Term Loan Claims will receive their pro rata share of new term loans under the Amended and Restated Credit Facility Agreement in the aggregate principal amount of $400 million, and 100% of the New Common Stock;

- Second Lien Notes Claims. On the effective date, the holders of Second Lien Notes Claims will not receive any distribution;

- Go-Forward Trade Claims. On the effective date, holders of all Go-Forward Trade Claims (i.e., trade creditors identified by the Company (with the consent of the Requisite Term Lenders) as being integral to and necessary for the ongoing operations of New Ditech) will receive a distribution in Cash in an amount equaling a certain percentage of their Claim, subject to an aggregate cap; and

- Existing Equity Interests. On the effective date, holders of Existing Equity Interests will have their claims extinguished.

15.    If the Debtors proceed to confirmation of a Sale Transaction, the Debtors will distribute proceeds of such transaction in accordance with the priority scheme under the Bankruptcy Code.

## B.    DIP Financing and Cash Collateral

16.    To address the working capital needs of the Debtors and support the transactions contemplated by the Restructuring Support Agreement, the Debtors have secured commitments for, and will seek the authority to enter into, DIP Warehouse Facility Agreements, which will enable the Debtors to enter into the DIP Warehouse Facility Agreements that will

provide the Debtors up to $1.9 billion in available financing to refinance their existing warehouse and servicer advance facilities (the "**DIP Warehouse Financing**").

17.     The DIP Warehouse Facilities will provide the Debtors the flexibility to use the commitment amount in the manner that best suits their capital needs.  Specifically, during the chapter 11 cases, (i) up to $650 million will be available to fund Ditech Financial's (as defined below) origination business, (ii) up to $1.0 billion will be available to RMS (as defined below), and (iii) up to $250 million will be available to finance the advance receivables related to Ditech Financial's servicing activities.  In addition, the lenders under the DIP Facilities (as defined below) have agreed to provide Ditech Financial up to $1.9 billion in notional trading capacity required by Ditech Financial to hedge its interest rate exposure with respect to the loans in Ditech Financial's origination pipeline, as well as those loans that will be subject to repurchase obligations with the DIP Warehouse Facilities lenders prior to being securitized.

18.     The entry into the DIP Warehouse Facilities will be subject to certain conditions precedent, including: (i) the applicable Debtors' continued status as an approved issuer and servicer with the GSEs or Ginnie Mae (as defined below), as applicable; (ii) no material disruption of claim payments on FHA insured loans; and (iii) the entry by the Bankruptcy Court of an interim DIP Order approving the DIP Warehouse Financing (the "**DIP Financing**").

19.     In addition, the Debtors will seek authorization to use consensually the cash collateral of the Prepetition Term Lenders for the duration of the Chapter 11 Cases.  In exchange, the Debtors will seek to provide the Prepetition Term Lenders, with the consent of the Prepetition Administrative Agent, acting at the direction of the Required Term Lenders:

(a)     <u>Adequate Protection Lien</u>. Prepetition Administrative Agent will receive replacement security interests and lien on all prepetition collateral of the

8

Term Loans subject only to the negotiated carve-out, other permitted liens and otherwise subject to the DIP Facilities;

(b)    507(b) Claim.    The Prepetition Administrative Agent will receive an administrative expense claim pursuant to section 507(b) of the Bankruptcy Code, subject to a negotiated carve-out and the priorities set out in the DIP Facilities;

(c)    Adequate Protection Payments. The Debtors will make prompt payments on account of the reasonable fees and expenses incurred by the First Lien Ad Hoc Group and the Prepetition Administrative Agent;

(d)    Financial Reporting. The Debtors will, until the Effective Date, continue to provide First Lien Ad Hoc Group and the Prepetition Administrative Agent, and their advisors, financial and other reporting on a monthly basis is a form and substance reasonably acceptable to them.

20.    The Company's ability to continue as a going concern, and thereby maximize value for stakeholders, is currently constrained by its highly-leveraged position and assorted amortization and interest payments.   Upon the commencement of these chapter 11 cases, the Company will be in default under its warehouse facilities.   It is critical for the Company to have access to a continued flow of liquidity during these chapter 11 cases so that the Company can continue operating its business in the ordinary course.   Without access to the DIP Facilities, the Company will be unable to fund the day-to-day operations of its business, including:  (a) originating or purchasing new mortgage loans, (b) repurchasing reverse mortgage loans from Ginnie Mae-guaranteed securitizations, (c) providing servicing advances pursuant to the Company's mortgage servicing agreements, (d) repaying amounts outstanding under the Prepetition Repo Facilities, (e) funding operational expenses of the Company, including required property maintenance and foreclosure activities, and (f) paying customary fees and closing costs in connection with the DIP Facilities.

9

**C.    Proposed Timeline**

21.    The Debtors believe that accomplishing a speedy and efficient resolution of the chapter 11 cases is essential to maximizing the value of the Company.  As experience has shown, it is extremely challenging to reorganize a mortgage originator and servicer in chapter 11, especially over a prolonged basis.  Under the terms of the DIP Financing and the Restructuring Support Agreement, the Debtors are obligated to meet certain milestones.  Specifically, the Restructuring Support Agreement and the DIP Financing may be terminated if, among other things, the Debtors fail to satisfy the following milestones:

| Event | RSA Milestone |
| --- | --- |
| File the Plan, Disclosure Statement, and Bidding Procedures Motion | February 26, 2019 |
| Entry of orders approving Disclosure Statement and Bid Procedures | April 2, 2019 |
| Commence Auction (if necessary) | May 17, 2019 |
| Commence Confirmation Hearing | June 6, 2019 |
| Effective Date | June 16, 2019 |

10

**D.     GSE, Ginnie Mae, and Regulator Communications**

22.     The ongoing support of the GSEs, Ginnie Mae, and the Company's regulators is critical to its ability to continue to operate as a going concern.   Accordingly, throughout its strategic alternatives review process and in the lead up to these chapter 11 cases, the Company has maintained a constant and open line of communication with the GSEs, Ginnie Mae, and its regulators, seeking their feedback and position on key aspects of the Restructuring Support Agreement and the relief sought in the First Day Pleadings; both reflect the input of those parties, which the Debtors believe is critical to their ability to operate in the ordinary course of business during these chapter 11 cases and to effect any chapter 11 plan of reorganization contemplated by the Restructuring Support Agreement.

## II.
## OVERVIEW OF THE COMPANY'S OPERATIONS

23.     The Debtors' business was established in 1958 and operated as a captive financing business of Walter Energy, Inc. ("**Walter Energy**"), originating and purchasing residential loans and then servicing those loans to maturity.   In 1997, DHCP's predecessor, Walter Investment Management Corporation ("**WIMC**"), was incorporated in Maryland.   In April 2009, WIMC spun off from Walter Energy, merged with Hanover Capital Mortgage Holdings, Inc., qualified as a real estate investment trust, and began to operate as an independent, publicly traded company.   After the spin-off, WIMC acquired Marix Servicing LLC, a high-touch specialty mortgage servicer, in 2010 and GTCS Holdings LLC ("**Green Tree**"), a leading independent mortgage loan servicer providing high-touch servicing of GSE, government agency, and third-party mortgage loans in 2011.   As a result of the Green Tree acquisition, the Company no longer qualified as a real estate investment trust.   WIMC subsequently acquired Reverse Mortgage Solutions, Inc. ("**RMS**"), which resulted in the addition of 330 employees and four

11

offices in three states. WIMC commenced a chapter 11 case in the United States Bankruptcy Court for the Southern District of New York on November 30, 2017 and emerged from chapter 11 on February 9, 2018 as Ditech Holding Corporation.

24.     The Company's businesses are comprised of three primary segments: (i) forward mortgage originations; (ii) forward mortgage servicing; and (iii) reverse mortgage servicing.

## A.     Forward Mortgage Origination Business (Ditech Financial)

25.     As more fully explained in the Ditech OCB Motion (as defined below) and incorporated fully by reference herein, the Company originates forward mortgage loans exclusively through Ditech Financial LLC ("**Ditech Financial**"). Beginning in 2016, the Company combined the consumer retention and consumer direct call centers to pursue a more streamlined consumer lending process. In January 2016, the Company exited activities associated with the consumer retail channel, which originated mortgage loans through loan officers. Virtually all of the loans that Ditech Financial originates are conventional conforming loans eligible for securitization by government-sponsored enterprises, such as Fannie Mae and Freddie Mac,[3] or guarantees by government agencies, such as Ginnie Mae mortgage-backed securities ("**MBS**").[4] Ditech Financial sells substantially all of the mortgage loans it originates

---

[3]   As used herein, "**Fannie Mae**" means the Federal National Mortgage Association, and "Freddie Mac" means the Federal Home Loan Mortgage Corporation. Fannie Mae and Freddie Mac are government-sponsored enterprises (each a "**GSE**" and collectively the "**GSEs**") chartered by Congress that buy and securitize mortgage loans originated by mortgage lenders, enabling the lenders quick access to liquidity fueled by the market demand for residential mortgage backed securities.

[4]   As used herein, "**Ginnie Mae**" means the Government National Mortgage Association. Ginnie Mae is a federal corporation within the Department of Housing and Urban Development ("**HUD**"), a federal agency, that guarantees investors the timely payment of principal and interest on MBS backed by federally insured or guaranteed loans, primarily loans insured by the Federal Housing Administration ("**FHA**") or guaranteed by the Department of Veterans Affairs ("**VA**") or the Department of Agriculture ("**USDA**").

12

into Fannie Mae- and Freddie Mac-sponsored securitizations or into mortgage pools insured by

Ginnie Mae.

26.     Ditech Financial originates or acquires mortgage loans through the

following channels:

(a)     *Consumer Lending*:  Contacts and solicits (i) consumers within its existing
servicing portfolio, and (ii) referrals and leads generated through direct
mail, internet, telephone, and general advertising campaigns.

(b)     *Correspondent Lending*:  purchases mortgage loans from a network of
lenders in the marketplace; and

(c)     *Wholesale Lending*:  originates mortgage loans identified through a
network of approved brokers.  Ditech Financial reentered this origination
segment in the third quarter of 2016 and is looking to expand this method
of origination.

27.     In 2018, Ditech Financial originated or purchased over $12.6 billion in

mortgage loans.  Of these loans approximately 30% were originated through the direct consumer

outreach channel, approximately 6% were originated through the wholesale lending channel, and

approximately 64% were purchased in the correspondent lending channel.  Based on the unpaid

principal balance ("**UPB**") of the loans originated by Ditech Financial during this time period,

approximately 30% were guaranteed by Fannie Mae, approximately 13% were eligible for

securitization by Freddie Mac, and approximately 57% were guaranteed by Ginnie Mae.  To the

extent that Ditech Financial identifies a loan ineligible for GSE securitizations and/or Ginnie

Mae guarantees during its retail origination process, it may elect to close and fund such loan as

long as it lines up a private buyer for such loan at the pre-closing stage of the process.  Such

loans constitute a relatively small percentage of all loans originated by Ditech Financial.

28.     The Company's consumer originations operations offer a range of home

purchase and refinance mortgage loan options, including fixed and adjustable rate conventional

conforming, Ginnie Mae, FHA, VA, USDA and jumbo products.  A conventional conforming loan is a mortgage loan that conforms to GSE guidelines, which include, but are not limited to, limits on loan amount, loan-to-value ratios, debt-to-income ratios, and minimum credit scores. The mortgage loans the Company funds are generally eligible for sale to GSEs or insured by government agencies.

29.    The Company underwrites the mortgage loans it originates generally to secondary market standards, including the standards set by Fannie Mae, Freddie Mac, Ginnie Mae, the FHA, the USDA, the VA, and jumbo loan investor programs. Loans are reviewed by the Company's underwriters in an attempt to ensure each mortgage loan is documented according to, and its terms comply with, the applicable secondary market standard.  The Company's underwriters determine loan eligibility based on specific loan product requirements, such as loan-to-value, FICO, or maximum loan amount.  Third-party diligence tools are utilized by the Company's underwriters to validate data supplied by the potential borrower and to uncover potential discrepancies.  The Company conducts audits on its underwriters to confirm proper adherence to its internal guidelines and polices, which audits are in addition to the Company's standard quality control review. These audits are designed to provide an additional layer of internal review in an attempt to further mitigate quality defects and repurchase risk in the originations process.

30.    Within the Company correspondent lending channel, the Company generally purchases the same types of loans that the Company originates in its consumer originations channel, although the mix varies among these channels.  Correspondent lenders with which the Company does business agree to comply with the Company's client guide, which sets forth the terms and conditions for selling loans to the Company and generally governs the

14

business relationship.  The Company monitors and attempts to mitigate counterparty risk related

to loans that the Company acquires through its correspondent lending channel by conducting

quality control reviews of correspondent lenders, reviewing compliance by correspondent

lenders with applicable underwriting standards and the Company's client guide, and evaluating

the credit worthiness of correspondent lenders on a periodic basis.  In 2018, the Company

correspondent lending channel purchased loans from 452 lenders in the marketplace, of which 38

were associated with approximately half of the Company's purchases.

31.    Within its wholesale lending channel, the Company originates loans

through mortgage brokers.  Loans sourced by mortgage brokers are underwritten and funded by

the Company and generally close in the Company's name.  Through the wholesale channel, the

Company generally originates the same types of loans that the Company originates in its

consumer originations channel, although the mix varies among these channels.  The Company

underwrites and processes all loan applications submitted by the mortgage brokers in a manner

consistent with that described above for the consumer originations channel.  Mortgage brokers

with whom the Company does business agree to comply with its client guide, which sets forth

the terms and conditions for brokering loans to the Company and generally governs the business

relationship.  The Company monitors and attempts to mitigate counterparty risk related to loans

that the Company originates through its wholesale lending channel by conducting quality control

reviews of mortgage brokers, reviewing compliance by brokers with applicable underwriting

standards and the Company's client guide, and evaluating the credit worthiness of brokers on a

periodic basis.

32.    The Company's capital markets group is responsible for pricing loans and

managing the interest rate risk through the time a loan is sold to third parties and managing the

15

risk (which the Company calls the "pull-through risk") that loans the Company has locked will not be closed and funded in an attempt to maximize loan sale profitability through the Company's various originations channels. The capital markets group uses models and hedging analysis in an attempt to maximize profitability while minimizing the risks inherent in the originations business.

33.    The Company's originations segment revenue, which is primarily net gains on sales of loans, is impacted by interest rates and the volume of loans locked and sold. The margins earned by the Company's originations segment are impacted by its cost to originate the loans including underwriting, fulfillment and lead costs.

34.    As a Fannie Mae- and Freddie Mac-approved seller/servicer of mortgages, Ditech Financial is a party to certain agreements with each GSE, which agreements generally incorporates the applicable GSE selling and servicing guidelines (such agreements, together with the addenda and amendments thereto, respectively, the "**Fannie Sales Agreements**" and "**Freddie Sales Agreements**," and collectively, the "**GSE Sales Agreements**"). In general, when Ditech Financial originates a mortgage loan it funds the loan utilizing borrowings under master repurchase agreements ("**MRAs**"), pledges the loan as security for such borrowings, subsequently sells the loans into a GSE-sponsored securitization, and uses the proceeds for the sale of the mortgage backed securities to repay the borrowings under the MRAs.

35.    As a Ginnie Mae issuer, Ditech Financial pools and securitizes certain mortgage loans conforming to the requirements of the Ginnie Mae Mortgage-Backed Securities Guide and all special announcements, agreements, and other written communications made by Ginnie Mae to Ditech Financial (collectively, the "**Ginnie Agreements**," and together with the GSE Agreements, the "**GA Agreements**"). The Ginnie Agreements employ a custodial account

16

mechanism whereby the issuer, such as Ditech Financial, forwards to an eligible document custodian approved by Ginnie Mae all of the loan documentation. After the pool of mortgages is approved by a Ginnie Mae pool processing agent, it directs Ditech Financial to issue MBS to third-party investors. In connection with the approval process, Ditech Financial remits guarantee fees and base servicing fees to Ginnie Mae.

36.    The Ginnie Agreements provide for continuing recourse obligations on Ginnie Mae-approved issuers, such as Ditech Financial. Specifically, upon the discovery of a defective loan within four months after the mortgage origination date, the issuer is required either to cure the defect or purchase the loan from the mortgage pool at the outstanding principal balance.

37.    For the year ended December 31, 2018, Ditech Financial sold mortgage loans of $12.4 billion in UPB, consisting of approximately (i) $5.4 billion in Fannie Mae/Freddie Mac conventional conforming loans, (ii) $7.0 billion of Ginnie Mae loans, and (iii) $28.3 billion of jumbo and other loans. On average, Ditech Financial sells or securitizes loans funded through warehouse borrowings in approximately 20 days from the date of origination. As of December 31, 2018, the total UPB of the warehoused loans held by Ditech Financial and awaiting securitization was approximately $746.2 million.

B.    **Forward Mortgage Servicing Business**

38.    As more fully explained in the Ditech OCB Motion and are incorporated fully by reference herein, Ditech Financial performs loan servicing of mortgage loans that fall into two categories: (i) mortgage loans for which Ditech Financial owns the mortgage servicing rights ("**MSRs**"), and (ii) subservicing for third party owners of MSRs. With respect to mortgage loans for which Ditech Financial owns the MSRs, Ditech Financial performs mortgage

17

servicing primarily in accordance with Fannie Mae, Freddie Mac, and Ginnie Mae servicing guidelines, as applicable. Ditech Financial typically originates the mortgage loans associated with such MSRs and sells them into securitization trusts owned by Fannie Mae or Freddie Mac or into mortgage pools insured by Ginnie Mae. The servicing segment also operates complementary businesses including a collections agency that performs collections of post charge-off deficiency balances for third parties and the Company. The subservicing contracts pursuant to which the Company is retained to subservice mortgage loans generally provide that the customer, the owner of the subserviced MSR, can terminate the Company as subservicer with or without cause. Each such subservicing contract has unique terms establishing the fees that the Company will be paid for the Company's work under the contract or upon the termination of the contract, if any. The standards of performance the Company is required to meet in servicing the relevant mortgage loans and the profitability of the subservicing activity may vary among different contracts.

39.    As of December 31, 2018, Ditech Financial serviced approximately 1.4 million residential loans with UPB of $176.1 billion. Of those, Ditech Financial was the subservicer for 0.7 million accounts with an unpaid principal loan balance of $104.3 billion. These subserviced accounts represented approximately 58% of its total servicing portfolio based on unpaid principal loan balance at that date. Ditech Financial's largest subservicing customer, New Residential Mortgage LLC ("**NRM**"), represented approximately 78% of its total subservicing portfolio and 48% of its total servicing portfolio based on unpaid principal loan balance on December 31, 2018. The Company's next largest subservicing customer represented approximately 17% of its total subservicing portfolio based on unpaid principal loan balance on December 31, 2018.

18

C.        **Reverse Mortgage Servicing Business**

40.        As more fully explained in the RMS OCB Motion (as defined below),
RMS, a debtor in these chapter 11 cases, primarily focuses on servicing and subservicing reverse
mortgage loans, the majority of which are home equity conversion mortgages ("**HECMs**") that
are insured by FHA.   A HECM is a loan that allows homeowners to borrow money against the
equity value of their homes.   Unlike traditional home equity loans, HECMs are non-recourse
loans without a fixed term with balances increasing over time as interest and other fees are added
to the borrowers' total obligations.

41.        A reverse mortgage borrower typically is not required to remit monthly
mortgage payments.   Instead, the borrower receives cash in monthly installments, a lump sum or
a line of credit up to a principal limit, which limit is calculated based on, among other things, the
age of the borrower, the appraised value of the borrower's home, and the loan interest rate.
HECM loan borrowers must be age 62 or over and typically rely on the proceeds of such loan to
fund their living expenses.   Indeed, the average age of borrowers under the HECM loans in
RMS's portfolio is approximately seventy-five (75) years of age.   The loans generally become
due and payable when one of the following events of default occur:   (i) the death of the
borrower, (ii) the borrower no longer utilizes the home as his or her principal residence, (iii) title
to the property is transferred to a non-borrower, (iv) the borrower fails to meet other
requirements of the loans, (*e.g.*, paying property taxes, insurance, and homeowner's association
fees), or (v) the end of a deferral period for an eligible non-borrowing spouse.

42.        Reverse mortgage loan servicing accounts for approximately 13% of the
Debtors' revenue.[5]   RMS performs servicing for mortgage loans that fall into two categories:

---

[5]    Although RMS exited the reverse mortgage origination business in early 2017, RMS continues to have ongoing

WEIL:\96914025\1\41703.0010

(i) mortgage loans that RMS owns or owns the mortgage servicing rights and (ii) mortgage loans for which RMS performs servicing and subservicing for third-party owners of loans.

43.     RMS sold virtually all of the loans that it originated to securitizations guaranteed by Ginnie Mae. RMS now serves as an issuer of MBS in connection with such securitizations in accordance with the Ginnie Mae Agreements.[6] RMS periodically issues securitizations to finance subsequent borrower draws and other amounts.

44.     As of December 31, 2018, RMS serviced or subserviced approximately 88,000 loans with an unpaid principal balance of $17.1 billion.

### III.
### ORGANIZATIONAL AND CAPITAL STRUCTURE

**A.     Organizational Structure**

45.     DHCP owns, directly or indirectly, 100% of the ownership interest in each of the Debtors and their non-debtor affiliates. The organizational chart, attached hereto as Exhibit A, illustrates the Debtors' organizational structure, as of the date hereof.

---

obligations in connection with mortgage loans that it originated, such as funding subsequent borrower draws.

[6]    As used herein, the "**Ginnie Mae Agreements**" means, collectively, the Ginnie Mae securitization guide (the "**Ginnie Mae Guide**") and those certain Master Servicing Agreements, dated as of March 6, 2014 (together with all Guarantee Agreements, MBS prospectus documents, cross default agreements, escrow agreements, Tri-Party agreement, corporate guaranty, acknowledgement agreement, supplements, addendums, amendments, and related agreements, the "**Ginnie Mae Servicing Agreements**").

WEIL:\96914025\1\41703.0010

## B.    Leadership

46.    The following table sets forth the names of the members of the DHCP's current board of directors:

| Name | Director Since | Position |
|------|----------------|----------|
| Thomas F. Marano | February 2018 | CEO, President and Chairman of the Board |
| David S. Ascher | February 2018 | Director |
| George M. Awad | June 2016 | Director |
| Seth L. Bartlett | February 2018 | Lead Independent Director |
| Daniel G. Beltzman | December 2015 | Director |
| John R. Brecker | February 2018 | Director |
| Neal P. Goldman | January 2017 | Director |
| Thomas G. Miglis | February 2018 | Director |
| Samuel T. Ramsey | February 2018 | Director |

47.    The following table sets forth the names of the DHCP's current executive officers:

| Name | Position |
|------|----------|
| Thomas F. Marano | CEO and President |
| Gerald A. Lombardo | Chief Financial Officer |
| John J. Haas | General Counsel, Chief Legal Officer and Secretary |
| Alfred W. Young, Jr. | Chief Risk and Compliance Officer |
| Elizabeth F. Monahan | Chief Human Resources Officer |
| Jeffrey P. Baker | President of Reverse Mortgage Solutions, Inc. |

## C.    Existing Capital Structure

48.    <u>Prepetition Credit Agreement</u>.    As of the Commencement Date, the Debtors have outstanding first lien secured debt obligations in the aggregate principal amount of approximately $961.4 million, which amount consists of secured term loan borrowings (the "**Term Loans**") under the Second Amended and Restated Credit Agreement (as amended by

21

that certain Amendment No. 1 to Second Amended and Restated Credit Agreement, dated as of March 29, 2018) among DHCP, each of the other loan parties named therein, Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent, and other lenders party thereto, dated as of February 9, 2018 (the "**Prepetition Credit Agreement**"), plus interest, fees and other expenses arising thereunder. The Prepetition Credit Agreement is secured by a lien on substantially all the assets of the Debtors.

49.    Prepetition Second Lien Notes Indenture.  As of the Commencement Date, the Debtors have outstanding second lien note obligations consisting of $253.9 million plus accrued and unpaid interest in aggregate outstanding principal of 9.0% Second Lien Senior Subordinated PIK Toggle Notes Due 2024 issued pursuant to that certain Second Lien Notes Indenture by and between DHCP (f/k/a WIMC), certain other debtors as guarantors, and Wilmington Savings Fund Society, FSB, a national banking association, as trustee and collateral agent, dated as of February 9, 2018 (the "**Second Lien Notes Indenture**").  The Second Lien Notes Indenture is secured on a second-lien basis on substantially all of the assets of the Debtors.

50.    Intercreditor Agreement.  The Prepetition Credit Agreement and Second Lien Notes Indenture is subject to that certain First Lien/Second Lien Intercreditor Agreement dated as of February 9, 2018 among Credit Suisse AG, Cayman Islands Branch, as Senior Collateral Agent for the Senior Secured Parties and Wilmington Savings Fund Society, FSB, as Junior Collateral Agent for the Junior Secured Parties (the "**Intercreditor Agreement**"). Pursuant to the Intercreditor Agreement, holders of Second Lien Notes are subject to a 180 day standstill before they are entitled to commence any enforcement, among other things, action against the shared collateral.  Further, the Intercreditor Agreement includes a "Cooperation" provision whereby each junior representative, on behalf of itself and each junior secured party

WEIL:\96914025\1\41703.0010

agrees that, unless and until discharge of the senior obligations has occurred, it will not

commence, or join with any person in commencing any enforcement, collection, execution, levy

or foreclosure action or proceeding with respect to any lien held by it or otherwise in respect of

the junior obligations. *See* §3.02, Intercreditor Agreement.

      51.    <u>Warehouse Facilities and Financing Arrangements</u>.  The Debtors are also

party to the following agreements with respect to the following warehouse facilities:

    A.    *Mortgage Loan Warehouse Facility*:

- Amended and Restated Master Repurchase Agreement, dated as of November 18, 2016, between Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, Credit Suisse AG, as committed buyer, Alpine Securitization Ltd, as a buyer, Barclays Bank PLC, as a buyer and other Buyers from time to time, and Ditech Financial LLC, as seller, with a committed capacity level of $1 billion, subject to a combined maximum capacity level of $1.9 billion.

    B.    *Reverse Mortgage Facilities*:

- Second Amended and Restated Master Repurchase Agreement, dated as of November 30, 2017 and effective as of December 5, 2018, between Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, Credit Suisse AG, as committed buyer, Alpine Securitization Ltd, as a buyer, Barclays Bank PLC, as a committed buyer and other Buyers from time to time, and Reverse Mortgage Solutions, Inc., as a seller, RMS REO CS, LLC, and RMS REO BRC, LLC, with a committed capacity level of $800 million, subject to a combined maximum capacity level of $1.9 billion; and

- Master Repurchase Agreement, dated April 23, 2018 (as may be amended, restated, supplemented, or otherwise modified), between Barclays Bank PLC, as purchase and agent and Reverse Mortgage Solutions, Inc., as seller, with a committed capacity level of $412 million.[7]

    C.    *Mortgage Loan Servicing Facilities*:

- Ditech PLS Advance Trust II Advance Receivables Backed Notes, Issuable in Series  issued pursuant to that certain Indenture between Ditech PLS Advance

---

[7]   $200 million of the stated amount matures in February 2019, and $212 million matures in April 2019.

Trust II, as issuer, Wells Fargo Bank N.A, as indenture trustee, calculation agent, paying agent and securities intermediary, Ditech Financial, as servicer and administrator, and Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, dated as of February 9, 2018 and effective as of February 12, 2018, with a committed capacity level of $85 million, subject to a combined maximum capacity level of $1.9 billion (the "**DPAT II Facility**");

- Ditech Agency Advance Trust Advance Receivables Backed Notes, Issuable in Series issued pursuant to that certain Indenture between Ditech Agency Advance Trust, as issuer, Wells Fargo Bank N.A, as indenture trustee, calculation agent, paying agent and securities intermediary, Ditech Financial, as servicer and administrator, and Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, dated as of February 9, 2018 and effective as of February 12, 2018, with a committed capacity level of $465 million, subject to a combined maximum capacity level of $1.9 billion (the "**DAAT Facility**"); and

- Participation Interest Sale and Contribution Agreement, dated as of October 1, 2018, by and among RMS and a non-debtor subsidiary, and the related Note Purchase Agreement of even date therewith, between such subsidiary and National Founders LP (the "**National Founders Facility**").

52.    <u>General Unsecured Claims</u>.    In the ordinary course of business, the Debtors incur trade credit and varying terms, but generally pursuant to medium- to long-term contracts.  As of the Commencement date, the Debtors estimate that there is approximately $85 million in general unsecured claims, excluding lease rejection claims.

53.    <u>Equity Ownership</u>.  The Company is a public company that files annual reports with, and furnishes other information to, the SEC.  As of December 31, 2018, 90 million shares of DHCP $0.01 par value common stock had been authorized with 5,328,417 shares of common stock issued and outstanding.  As of December 31, 2018, there were 87 record holders of the common stock.  As of December 31, 2018, 91,408 shares of mandatorily convertible preferred stock were issued and outstanding.  The common stock was delisted on the New York Stock Exchange on December 1, 2018.

24

**IV.**
**CIRCUMSTANCES LEADING TO THE CHAPTER 11 CASES**

**A.     Background and Prior Restructuring**

54.     On November 30, 2017, Walter Investment Management Corp. ("**WIMC**"), the Company's parent company, commenced a prepackaged chapter 11 case (*In re Walter Investment Management Corp.*, 17-13446 (JLG) (Bankr. S.D.N.Y. Nov. 30, 2017) (the "**WIMC Chapter 11 Case**") with this Court to address its overleveraged capital structure. In less than two months, WIMC confirmed its plan of reorganization eliminating more than $800 million in funded debt.  On February 9, 2018, WIMC emerged from the WIMC Chapter 11 Case as Ditech Holding Corporation, and a final decree was entered closing the WIMC Chapter 11 Case on August 14, 2018.  The goal of the WIMC Chapter 11 Case was to deleverage the capital structure sufficiently to enable the reorganized debtor to implement its business plan.  As set out herein, due to circumstances, largely out of the control of the Debtors, the Company has faced significant hardships and must again address its capital structure through these Chapter 11 Cases.

**B.     Events Leading to the Commencement of These Chapter 11 Cases**

55.     Notwithstanding the Company's efforts to implement its business plan, which included further cost reductions, operational enhancements and streamlining of its business, following emergence from the WIMC Chapter 11 Case, the Company continued to face liquidity and performance challenges that were more persistent and widespread than anticipated. Coupled with the industry and market factors, these performance challenges have resulted in less liquidity, making the implementation of key operational enhancements more difficult—resulting in their postponement.

56.     In addition, a number of industry factors have caused Ditech increased uncertainty with respect to its future performance, including the projected decrease in total

25

originations, and for reverse mortgages, the impact of changes in HUD regulations, among other things.  The increase in interest rates has also negatively impacted mortgage originators and servicers generally—the Debtors are no exception.  As interest rates have risen, less borrowers are refinancing loans in a higher interest rate environment, resulting in lower origination volume for the Company.

57.    The Company's liquidity has also suffered from a burdensome interest and amortization obligations on its corporate debt and tightening of rates from its lending counterparties.  In the normal course of business, the Company utilizes its mortgage loan servicing advance facilities and master repurchase agreements to finance, on a short-term basis, mortgage loan related servicing advances, the repurchase of HECMs out of Ginnie Mae securitization pools, and funding of newly originated mortgage loans.  These facilities are typically subject to annual renewal requirements and typically contain provisions that, in certain circumstances, prevent the Company from utilizing unused capacity under the facility and/or accelerate the repayment of amounts under the facility.

58.    The Company's ability to fund its business operations is a significant factor that affects its liquidity and ability to operate and grow.  The Company is dependent on the ability to secure these types of arrangements on acceptable terms and to renew, replace or resize existing financing facilities as they expire.  Continued growth in Ginnie Buyouts activity will require the Company to continue to seek additional financing for Ginnie Buyouts or to otherwise sell or securitize Ginnie Mae buyout assets.

59.    The Company has taken a number of measures to address forecasted reductions in liquidity and compliance with its various facilities, including entry into

26

amendments under its Prepetition Credit Agreement, the DAAT Facility, the DPAT II Facility, and each of Ditech Financial's and RMS's master repurchase agreements.

60.     The Company has entered into new agreements or transactions to generate additional liquidity.  In April 2018, the Company entered into an additional master repurchase agreement that provides up to $212 million in total capacity, and a minimum of $200 million in committed capacity to fund the repurchase of certain HECMs and real estate owned from Ginnie Mae securitization pools for a period of one year.  In June 2018, pursuant to the National Founders Facility, the Company sold a pool of defaulted reverse Ginnie Buyouts owned by the Company and financed under an existing master repurchase agreement for a sales price of $241.3 million.  The proceeds from the sale were used to repay the related amount financed under the master repurchase agreement and to fund additional Ginnie Buyouts.  The Company continues to service these loans on behalf of the purchaser under a servicing agreement.  In addition, in June 2018, the Company agreed to sell to New Penn Financial additional MSRs relating to mortgage loans having an aggregate unpaid principal balance of approximately $4.7 billion, and received approximately $56.7 million in cash proceeds.  The proceeds from the sale were used primarily to make mandatory principal payments under the Prepetition Credit Agreement.

61.     Notwithstanding these liquidity initiatives, the Company still faced scheduled amortization payments of approximately $110 million in 2019.  Accordingly, the Company was at a significant risk of receiving a going-concern qualification from its auditors, which would have triggered a domino effect of defaults and terminations throughout its corporate debt and working capital facilities.  Instead, the Company has sought to forge a different path with the cooperation of the Term Loan Ad Hoc Group and its major stakeholders—a path that will lead either to a significantly deleveraged and recapitalized

27

Company through a Reorganization Transaction or, if it provides higher or better return to creditors, a Sale Transaction; consistent with the goals of the Company's strategic alternatives review process discussed below.

## C.      The Prepetition Marketing Process and Negotiations with Stakeholders

62.      In June 2018, the Company initiated a process to evaluate strategic alternatives to enhance value and re-engaged Houlihan Lokey Capital, Inc. ("**Houlihan**") and Weil, Gotshal & Manges LLP ("**Weil**") to assist in such process.  Subsequently, in October 2018, the Company engaged AlixPartners, LLP to assist and advise in its contingency planning process, acknowledging at that time, that it may ultimately become necessary to implement a transaction through an in-court process.

63.      The Company's efforts were overseen by the Board of Directors of DHCP and a Special Committee of the board of directors (the "**Special Committee**"), which is composed of DHCP's five (5) independent directors.  The Special Committee, with the assistance of Houlihan and Weil, evaluated a range of potential strategic alternatives, including (i) a sale of the entire Company; (ii) a sale of certain assets and business platforms; (iii) a merger; or (iv) continuing as a standalone entity.  The Board of Directors of DHCP ultimately delegated decision-making authority over the marketing and sale process (the "**Prepetition Marketing Process**") to the Special Committee.

64.      The Company undertook an extensive marketing effort, including soliciting interest from thirty-three (33) potentially interested parties including strategic and financial buyers with the financial and operational wherewithal to complete a transaction.  The Company formally engaged with multiple potential bidders, executing ten (10) confidentiality

28

agreements and providing a Confidential Information Memorandum, financial projections and data room access to such potential bidders.

65.    The deadline for interested parties to submit initial bids was July 17, 2018. The Company received four (4) indications of interest ("**IOIs**").    Following extensive discussions with the Special Committee and its legal and financial advisors, the Company selected three (3) bidders to proceed to a second round of negotiations and diligence, including onsite management presentations during the last week of July 2018.  Following the management presentations, the Company and its advisors continued to facilitate due diligence with the remaining bidders in advance of the second round of IOIs.  The Company received three (3) second round IOIs on or about August 21, 2018, two (2) of which were bids for the sale of certain servicing and reverse assets with subservicing retained by the Company (the "**Alternative Bids**") and one (1) of which was a bid for substantially all of the Company's net assets as a going concern (the "**All-Company Bid**").  Over the course of September and October 2018, the Company and its advisors engaged in extensive discussions with the final three bidders.

66.    In October 2018, it became clear that (i) the Alternative Bids would require additional capital and liquidity to fund the restructured business plan and (ii) the proposed valuation levels of the All-Company Bid would not exceed the outstanding amount of the Company's Second Lien Notes.  As a result, the Company decided to engage with an ad hoc group of second lien noteholders (the "**Second Lien Ad Hoc Group**") to explore the Company's strategic alternatives and solicit input with respect to the All-Company Bid and the Alternative Bids.  On October 8, 2018, the Second Lien Ad Hoc Group signed a confidentiality agreement and began engaging with the Company to evaluate the sale alternatives and develop a competing

29

potential recapitalization transaction.  The Company continued to have periodic discussions with the Second Lien Ad Hoc Group as it analyzed the sale options and various recapitalization scenarios.  In November 2018, the Second Lien Ad Hoc Group retained Centerview Partners ("**Centerview**") and Milbank, Tweed, Hadley & McCloy LLP ("**Milbank**") to assist with its analysis of the potential strategic alternatives and to assist in preparing a recapitalization transaction proposal supported by the Second Lien Ad Hoc Group.

67.    The Company's financial and legal advisors engaged with the Second Lien Ad Hoc Group's advisors to develop potential viable alternatives to an All-Company Bid. Among other things, the Second Lien Ad Hoc Group proposed equitizing a portion of the Second Lien Notes and obtaining amortization relief from the Term Lenders under the Prepetition Credit Agreement (the "**Second Lien Proposal**").

68.    In December 2018, the Company engaged in parallel discussions with an ad hoc group of prepetition secured term loan lenders (the "**Term Loan Ad Hoc Group**") to discuss the Prepetition Marketing Process and the Second Lien Proposal.  The Term Loan Ad Hoc Group retained FTI Consulting ("**FTI**") and Kirkland & Ellis LLP ("**Kirkland**") as its advisors.  The Debtors and their advisors held in-person meetings in December 2018 with each of the Term Loan Ad Hoc Group and the Second Lien Ad Hoc Group and their respective advisors to discuss strategic alternatives, including analyzing the All-Company Bid.

69.    Despite extensive negotiations with the bidder who submitted the All-Company Bid, such bidder ultimately rescinded the All-Company Bid in late December 2018, immediately after the Company had utilized the grace period with respect to its Second Lien Notes (explained in more detail below).  Following such rescission, the Company re-engaged a previous bidder in connection with a potential bid for substantially all of the Company's assets.

30

After several weeks of negotiations with such bidder, the Company ultimately decided not to pursue the sale transaction.

70.     In early January 2019, the Term Loan Ad Hoc Group submitted a proposal for a recapitalization transaction, pursuant to which a portion of the Prepetition Term Loan would be equitized and incremental liquidity would be provided through, among other things, a new revolving credit facility and a reduction in scheduled amortization payments.  Shortly thereafter, the Second Lien Ad Hoc Group submitted a revised Second Lien Proposal.  Over the course of several weeks, the Company, with the assistance of its financial and legal advisors, engaged in extensive discussions with the Term Loan Ad Hoc Group and the Second Lien Ad Hoc Group regarding the competing recapitalization transactions proposed by such parties. Following extensive diligence and numerous meetings with the Company's management and advisors, the advisors to the Term Loan Ad Hoc Group provided the Company with a proposal for the recapitalization of the Company.  As precondition to seeking the approval of the Board for such terms, the Company agreed with the Term Loan Ad Hoc Group to share the proposal with certain of the Company's key counterparties, including NRM.

## D.     NRM Termination Notice

71.     Notwithstanding the Debtors' good faith efforts to cooperate with NRM throughout its strategic review process, NRM repeatedly threatened to issue a termination notice under its Subservicing Agreement with the Company, dated August 8, 2016 (as amended) (the "**Subservicing Agreement**") while simultaneously participating as a bidder in the Company's sale process. Ultimately, on January 17, 2019—the morning after the Company shared with NRM a recapitalization proposal from the Term Loan Ad Hoc Group—NRM issued a notice purporting to terminate ("**Termination Notice**") the Subservicing Agreement.  The

31

Debtors have disputed NRM's basis for termination and intend to explore all legal remedies against NRM in connection with the timing and issuance of the Termination Notice. The Debtors are, however, cooperating with NRM to transition the servicing of the loans under the Subservicing Agreement.

**E.      Employee Programs**

72.      Immediately following receipt of the Termination Notice, the Debtors learned that their employees were being contacted by competitors who were offering material hiring incentives to the Debtors' employees. Further, Fannie Mae advised the Company that it was concerned about possible increased employee attrition given the upcoming planned chapter 11 cases. In response, the Company immediately implemented a rank and file employee retention program to ward-off employee attrition and reward its existing employees for their loyalty and service during the transformative chapter 11 cases.

73.      The importance of the Debtors' employees cannot be overstated, particularly in the servicing segment of their business. Without employees to maintain standards of servicing, the Debtors may default on their obligations to the GSEs, Ginnie, regulators, and under the terms of the DIP Warehouse Financing, National Founders Facility, and the Restructuring Support Agreement.

74.      Furthermore, even before the rank and file employee retention program, the Company took steps to vitiate employee attrition throughout its organization. Among other things, this has included its 2018 Key Employee Retention Program and its Transaction Incentive Bonus. The Company made payments to eligible employees, including certain insiders, under each program, including, on February 8, 2019, payments under the Transaction Incentive Bonus, recognizing the milestone of signing the Restructuring Support Agreement. Importantly, these

32

payments are subject to claw-back, should an employee voluntarily terminate their employment before consummation of the transactions contemplated by the Restructuring Support Agreement. Additional details regarding the employee programs are contained in the Wages Motion.

**F.**    **Utilization of Grace Period, Forbearance, and Expiration of Certain Warehouse Facilities**

75.    On December 17, 2018, the Company elected not to make the approximately $9 million cash interest payment (the "**Interest Payment**") due and payable on December 17, 2018 with respect to the Company's outstanding Second Lien Notes and entered the 30-day grace period. Although the Company had sufficient liquidity to make the Interest Payment, the Company elected not to make the payment as discussions were still ongoing with various stakeholders regarding the Company's strategic alternatives. The Company's failure to make the Interest Payment within thirty days after it was due and payable would constitute an "event of default" under the Indenture. An event of default under the Indenture also constitutes an "event of default" under the Prepetition Credit Agreement and certain of the Company's Warehouse Facility Agreements, among others.

76.    On January 16, 2019, the Company and, as applicable, certain of its subsidiaries, entered into forbearance agreements (each a "**Forbearance Agreement**" and collectively the "**Forbearance Agreements**") with (i) certain holders of greater than 75% of the aggregate principal amount of the outstanding Second Lien Notes (the "**Notes Forbearing Parties**"), (ii) certain lenders holding greater than 50% of the sum of (a) the Term Loans outstanding, (b) letter of credit exposure and (c) unused commitments under the Prepetition Credit Agreement at such time and the administrative agent and collateral agent under the Prepetition Credit Agreement (collectively, the "**Credit Agreement Forbearing Parties**") and

33

(iii) the requisite buyers and variable funding noteholders, as applicable, under the Warehouse Facility Agreements (collectively, the "**Warehouse Lenders Forbearing Parties**").

77.     Pursuant to the Forbearance Agreements, subject to certain terms and conditions, the Notes Forbearing Parties, Credit Agreement Forbearing Parties and Warehouse Lenders Forbearing Parties agreed to temporarily forbear from the exercise of any rights or remedies they may have in respect of the aforementioned events of default or other defaults or events of default arising out of or in connection therewith.

78.     The deadline of the Forbearance Agreements was tied to the maturity date of certain of the Company's repurchase loan agreements with the Warehouse Lenders Forbearing Parties.  Without a viable recapitalization of the Company in hand, the Warehouse Lenders Forbearing Parties were not in a position to commit to a significant extension of their facilities with the Company.  As noted above, these facilities are critical to the Company's ordinary course of business operations.  Accordingly, the Company focused instead on obtaining the DIP Financing to take out such obligations, and will, during the Marketing Process, continue to seek commitments for postpetition facilities.

79.     Before the termination of the Forbearance Agreements on February 8, 2019, the Company entered into new forbearance agreements with the Credit Agreement Forbearing Parties and the Warehouse Lenders Forbearing Parties (the "**Forbearance Extension**").  The Forbearance Extension was scheduled to terminate on February 11, 2019.

## V.
## FIRST-DAY PLEADINGS

80.     The Debtors have filed their First-Day Pleadings contemporaneously herewith to facilitate a smooth transition into these chapter 11 cases and minimize disruption to

34

the Debtors' business operations.  I am familiar with the contents of each First-Day Pleadings

and believe that the relief sought in each First-Day Pleading is necessary to enable the Debtors to

operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a

critical element connection with the Debtors' chapter 11 strategy and best serves the Debtors'

estates and creditors' interests.  The facts set forth in each First-Day Pleading are incorporated

herein by reference.  Capitalized terms used, but not otherwise defined in this section, shall have

the meanings ascribed to such terms in the relevant First-Day Pleading.

**A.      Administrative Motions**

> **i.      Motion of Debtors for Entry of Order Directing Joint Administration
> of Related Chapter 11 Cases (the "Joint Admin Motion")**

81.      The Debtors request entry of an order directing joint administration of

these chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and

that the Bankruptcy Court maintain one file and one docket for all of the chapter 11 cases under

the lead case, Ditech Holding Corporation.

82.      Joint administration of the chapter 11 cases will provide significant

administrative efficiencies without harming the substantive rights of any party in interest. Many

of the motions, hearings and orders that will be filed in the chapter 11 cases almost certainly will

affect each of the Debtors.  The entry of an order directing joint administration of the chapter 11

cases will reduce fees and costs by avoiding duplicative filings, objections, notices, and hearings,

and will allow all parties in interest to monitor the chapter 11 cases with greater ease and

efficiency.  The relief requested in the Joint Administration Motion is in the best interests of the

Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to

continue to operate their businesses in chapter 11 with the least disruption.

35

**ii.**   **Motion of Debtors for Entry of Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (the "Schedules and SOFAS Motion")**

83.   The Debtors request entry of an order granting additional time to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "**Schedules**"). As a consequence of the size and complexity of the Debtors' business operations, the number of creditors likely to be involved in these chapter 11 cases, and the numerous critical operational matters that the Debtors' management and employees must address, a 45-day extension (without prejudice to further extensions) is necessary and appropriate.

84.   To prepare the Schedules, the Debtors must compile information from books, records, and other documents relating to, among other things, accounts payable and receivable, real estate and capital leases, employee wages and benefits, intercompany transactions, and contracts in connection with their loan origination and servicing operations. Collecting the necessary information to prepare the Schedules requires an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professionals. While the Debtors, with the assistance of their professional advisors, are mobilizing their employees to work diligently and expeditiously on preparing the Schedules, the Debtors' resources are strained. I believe an extension of the time to file the Schedules will ultimately maximize the value of the Debtors' estates for the benefit of their creditors and all other parties in interest.

**iii.**   **Motion of Debtors for Entry of an Order (I) Authorizing Debtors to (A) File a Consolidated List of Creditors and (B) File a Consolidated List of Debtors' 40 Largest Unsecured Claims, (II) Authorizing Debtors to Redact Certain Personal Identification Information for Individual Creditors and Interest Holders, (III) Approving Form and Manner of Notifying Creditors of Commencement of These Chapter**

36

**11 Cases; and (IV) Approving Publication Notice to Borrowers (the "Creditor Matrix Motion")**

85.     The Debtors request entry of an order (i) authorizing the Debtors to (a) file a consolidated list of creditors in lieu of submitting separate mailing matrices for each individual Debtor (the "**Creditor Matrix**") and (b) file a consolidated list of the Debtors' forty (40) largest unsecured claims; (ii) authorizing the Debtors to redact certain personal identification information for individual creditors and interest holders; (iii) approving the form and manner of notifying creditors of commencement of these chapter 11 cases , and (iv) authorizing the Debtors to provide publication notice to the individual borrowers whose loans are serviced by the Debtors (the "**Borrowers**").

86.     Permitting the Debtors to maintain one single consolidated list of creditors in lieu of filing a separate creditor matrix for each Debtor entity is warranted under the circumstances of these chapter 11 cases.  Specifically, maintaining a single consolidated Creditor Matrix will benefit the Debtors and their estates by allowing the Debtors to more efficiently provide required notices to parties in interest and reduce the potential for duplicate mailings.

87.     Cause exists to authorize the Debtors to redact address information of individual creditors and interest holders—many of whom are the Debtors' employees—and interest holders from the creditor list because such information is sensitive and could be used to perpetrate identity theft.  It is also unnecessary to disclose.  The Debtors propose to provide, under seal, an unredacted version of the Creditor Matrix to the Bankruptcy Court, the United States Trustee, and any official committee of unsecured creditors appointed in the Chapter 11 Cases, upon request.

88.     Providing publication notice to the Borrowers is appropriate in these chapter 11 cases.  The Debtors currently service over 1.4 million mortgages.  Copying and

37

mailing multiple notices and otherwise serving documents filed with the Bankruptcy Court on all

Borrowers is impracticable, will costs millions of dollars, and will impose an extraordinary

administrative burden on the Debtors and their estates.   Authorizing publication notice to

Borrowers will substantially reduce administrative burdens, and moreover, no parties in interest

will be prejudiced by the relief requested in the motion as it only applies to the claims of

Borrowers.   In the event any Borrower has filed a notice of appearance or a proof of claim in

these chapter 11 cases, the Debtors will provide such party with notice as required under

Bankruptcy Rule 2002.

> ### iv.    Motion of Debtors for Entry of Order Implementing Certain Notice and Case Management Procedures

89.    The Debtors request entry of an order approving and implementing the

notice, case management, and administrative procedures therein (collectively, the "**Case**

**Management Procedures**").

90.    Given the size and scope of these cases, the Case Management Procedures

will facilitate service of notices, motions, applications, declarations, objections, responses,

memoranda, briefs, supporting documents, and other papers filed in these chapter 11 cases that

will be less burdensome and costly than serving such documents on every potentially interested

party.  This, in turn, will maximize the efficiency and orderly administration of these chapter 11

cases, while at the same time ensuring that appropriate notice is provided.

### B.    Operational Motions Requesting Immediate Relief

> ### i.    Motion of Debtors Requesting Authority to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Changes to the Cash Management System in the Ordinary Course of Business, (III) Continue Intercompany Transactions, (IV) Provide Administrative Expense Priority for Postpetition Intercompany Claims, (V) Extend Time to Comply with,

**or Seek Wavier of, 11 U.S.C. § 345(b), and (VI) Granting Related Relief (the "Cash Management Motion")**

91.    The Debtors request authority to (i) continue their existing cash management system, including the continued maintenance of their existing bank accounts and business forms; (ii) implement changes to their cash management system in the ordinary course of business, including opening new or closing existing bank accounts; (iii) continue to perform under and honor intercompany transactions in the ordinary course of business, in their business judgment and at their sole discretion; (vi) provide administrative expense priority for postpetition intercompany claims; and (v) extend the time to comply with section 345(b) of the Bankruptcy Code by forty-five (45) days (or such later time as may be agreed to by the U.S. Trustee (as defined herein) or as approved by the Court) or seek a waiver thereof.

92.    The Cash Management System is comprised of 1,196 bank accounts (collectively, the "**Bank Accounts**") maintained at various financial institutions (the "**Banks**"),[8] of which (i) 24 are operating accounts, (ii) 1,171 are custodial accounts maintained in the name of a Debtor whereby such Debtor merely holds the account (and the funds in it) in trust or as custodian for a third party, and (iii) 1 account that holds restricted cash[9] (such as principal and interest payments that serve as collateral for the Warehouse Lenders (as defined in the motion)). The majority of the Bank Accounts are in the name of Ditech Financial and RMS. 1,194 of the Bank Accounts are located at Banks designated as authorized depositories by the Office of the

---

[8]    The Debtors' Banks include:  Bank of America, N.A. ("**Bank of America**"), Bank of New York Mellon Corporation ("**BNY Mellon**"), Citibank, N.A. ("**Citibank**"), EverBank, N.A. ("**Everbank**"), Texas Capital Bank, N.A. ("**Texas Capital Bank**"), U.S. Bank, N.A. ("**U.S. Bank**"), and Wells Fargo Bank, N.A. ("**Wells Fargo**").

[9]    Ditech Financial maintains the restricted account at U.S. Bank.  Such account holds principal and interest payments that are remitted from a borrower to Ditech Financial <u>before</u> the underlying loan that Ditech Financial originated has been sold.  Once the underlying loan is sold by Ditech Financial, such principal and interest payments are transferred to the Ditech Origination Account (as defined herein).

WEIL:\96914025\1\41703.0010

United States Trustee for Region 2 (the "**U.S. Trustee**") pursuant to the U.S. Trustee's Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "**UST Guidelines**"), with the remaining 2 Bank Accounts located at EverBank, which is not designated as an authorized depository under the UST Guidelines.

93.    The Cash Management System is an ordinary course, customary, and essential business system which allows for the flow of cash between Bank Accounts and between Company affiliates as required or needed, in accordance with the Company's cash management practices.  Most of the Company's obligations are paid by Ditech Financial from the Ditech Servicing Account (as defined in the Cash Management Motion).  When Ditech Financial makes disbursements on behalf of its affiliates, such disbursements are tracked electronically in the Company's accounting system and are concurrently recorded on the applicable entity's balance sheet and income statement.  The accounting system requires that all general ledger entries be balanced at the legal entity level, and therefore, when the accounting system enters an intercompany receivable on an entity's balance sheet, it also automatically creates a corresponding intercompany payable on the applicable affiliate's balance sheet.

94.    The Debtors receive and collect cash, wires, and pre-authorized drafts through various entry points in the Cash Management System, including lockboxes (where they receive borrower payments), custodial accounts (where they receive borrower payments, advances, and reimbursement funds from Fannie Mae, Freddie Mac, Ginnie Mae, and HUD), and clearing accounts (where they receive payments and sale proceeds from servicers and buyers). The Debtors primarily receive operating cash through the collection of fees and other amounts related to servicing mortgage loans on behalf of third parties and from the sale of originated loans.

40

95.    The Debtors further request that the Court authorize the financial institutions at which the Debtors maintain various bank accounts to (i) continue to maintain, service, and administer the Debtors' bank accounts; (ii) debit the bank accounts in the ordinary course of business on account of (a) electronic transfers (including wire transfers, book transfers, and automated clearinghouse transfers) or checks drawn on the bank accounts, provided that any payments drawn, issued or made prior to the Commencement Date shall not be honored by the Banks absent receipt of direction from the Debtors and entry of a separate order of the Court authorizing such prepetition payment or (b) undisputed service charges owed to the Banks for maintenance of the Debtors' cash management system, if any.

ii.    **Debtors' Motion for Interim and Final Orders (A) Authorizing Debtors to Enter Into Repurchase Agreement Facilities, Servicer Advance Facilities and Related Documents; (B) Authorizing Debtors to Sell Mortgage Loans and Servicer Advance Receivables in the Ordinary Course of Business; (C) Granting Back-Up Liens and Superpriority Administrative Expense Claims; (D) Authorizing Use of Cash Collateral and Granting Adequate Protection; (E) Modifying the Automatic Stay; (F) Scheduling a Final Hearing; and (G) Granting Related Relief (the "DIP Motion")**

96.    The relief sought in the DIP Motion will enable the Debtors' two main operating entities, Ditech Financial and RMS, as applicable, (a) to obtain up to $1.9 billion in warehouse financing under three master repurchase agreements and two advance facilities and (b) to obtain access to $1.9 billion in hedging capacity under certain master securities forward transaction agreements and related netting agreement (collectively, the "**DIP Facilities**").  The DIP Facilities will ensure that the Company's financing needs will continue to be met and access to such financing will not be abruptly interrupted.

97.    In addition, in exchange for certain agreed upon adequate protection (the "**1L/2L Adequate Protection**") to the Debtors' prepetition First Lien Term Loan Lenders

41

(distinct from the lenders providing the DIP Facilities (the "**DIP Lenders**")) and to the Debtors'

prepetition Second Lien Noteholders, the Debtors' request authorization to use the Prepetition

1L/2L Collateral, including Cash Collateral. Such authorization will allow the Company to

continue to have access to its cash management system and to incur intercompany obligations in

the ordinary course of business during the pendency of these cases.

98.    The Debtors, through their investment banker, Houlihan, ran a marketing

process for their debtor in possession financing. The Debtors negotiated the DIP Facilities and

the 1L/2L Adequate Protection with the DIP Lenders and the First Lien Term Loan Lenders,

respectively, in good faith and at arm's length, and believe that the terms of the DIP Facilities

and 1L/2L Adequate Protection are competitive and the best that could be obtained under the

circumstances. Further the DIP Facilities have been market tested and represent the best of three

offers received by the Company. For these reasons, and as more fully explained in the DIP

Motion, I believe the relief requested is in the best interest of the Debtors' estates, their creditors,

and all other parties in interest, and will enable the Debtors to continue to operate their business

in these chapter 11 cases.

        a.    **It is in the Best Interests of the Debtors' Estates to Continue Financing Arrangements Entitled to the "Safe Harbor" Protections of the Bankruptcy Code**

99.    Ditech Financial and RMS finance their mortgage origination operations

via certain master repurchase agreements pursuant to which they sell to buyer counterparties

various mortgage obligations that Ditech Financial and RMS originate or purchase from others,

and pursuant to which they are obligated to repurchase such mortgage obligations in the future

(the "**Prepetition Repo Facilities**," and the counterparties thereunder, the "**Prepetition Repo**

**Facility Parties**"). The Debtors propose to continue such financing activities pursuant to new

and/or amended and restated master repurchase agreements entered into pursuant to the Interim

WEIL:\96914025\1\41703.0010

Order that are substantially similar to the Prepetition Repo Facilities (the "**DIP Repo Facilities**;"
the counterparties under the DIP Repo Facilities, the "**DIP Repo Facility Parties**").

100.    Ditech Financial also hedges certain of its financing operations via certain
master securities forward transaction agreements with Barclays Capital Inc. and Nomura
Securities International Inc. (the "**Prepetition MSFTA Counterparties**") pursuant to which it
buys and sells mortgage-backed and other securities for future delivery (the "**Prepetition
MSFTAs**").  The Debtors propose to continue such hedging activities post-petition under the
same agreements (the "**DIP MSFTAs**") with the same parties or any other applicable
counterparties (the "**DIP MSFTA Counterparties**").

101.    In addition, certain Debtors entered into a margin, setoff and netting
agreement to allow the Debtors and counterparties to the Prepetition Repo Facilities and the
Prepetition MSFTAs (the "**Prepetition Netting Counterparties**") to net, setoff and margin their
obligations to one another (the "**Prepetition Netting Agreement**"). The Debtors propose to
enter into a substantially similar agreement post-petition with Barclays Capital Inc. and Nomura
Securities International Inc. (the "**DIP Netting Counterparties**") that will afford the parties the
same obligations and protections as under the Prepetition Netting Agreement (the "**DIP Netting
Agreement**").

102.    In my experience, it is customary in the mortgage origination and servicer
industry to enter into financing arrangements such as the DIP Repo Facilities, the DIP MSFTAs
and the DIP Netting Agreement.  Such arrangements afford mortgage originators, servicers and
borrowers more advantageous borrowing rates and terms as compared to other potential
financing structures (such as secured lending facilities).  It is also industry custom to structure
such arrangements so that they qualify as "repurchase agreements," "securities contracts,"

43

"forward agreements," "swap agreements," and "master netting agreements" and/or "master netting agreements" entitled to the protections of the so-called "safe harbor" provisions of the Bankruptcy Code. The Debtors' financing sources and counterparties are not willing to provide the Debtors with the liquidity and financial support necessary for the Debtors to reorganize if the safe harbor protections are not assured.

103.   I believe that it is in the best interests of the Debtors' estates that the Debtors enter into the DIP Repo Facilities, the MSFTAs and the Netting Agreement and that each agreement qualify for the safe harbor protections afforded under the Bankruptcy Code. Indeed, I believe that the failure to obtain safe harbor protections for such agreements would be detrimental to the Debtors' business. It is my understanding that each agreement was carefully structured to satisfy the applicable statutory criteria. Therefore, I believe that this Court should grant the relief requested in the DIP Motion and find that the DIP Repo Facilities, the DIP MSFTAs and the DIP Netting Agreement each qualify for the Bankruptcy Code's safe harbor protections.

### b. The DIP Servicer Advance Facilities Constitute "Bankruptcy Remote" Financing Structures

104.   Ditech Financial in its capacity as mortgage servicer provides advances to various trusts that hold mortgages that secure mortgage-backed securities (the "**Servicer Advances**"). Ditech Financial obtains additional liquidity for its operations by selling its rights to receive reimbursements of the Servicer Advances (the "**Servicer Advance Receivables**") to two "bankruptcy-remote" securitization vehicles, Ditech Agency Advance Depositor LLC and Ditech PLS Advance Depositor LLC (together, the "**Depositors**"), which subsequently transfer such rights to two non-debtor special purpose vehicles, Ditech Agency Advance Trust and Ditech PLS Advance Trust II (together, the "**Non-Debtor SPVs**"), which in turn issue variable funding notes

44

backed by such Servicer Advance Receivables (the "**Servicer Advance Facility VFNs**") to Barclays and others.

105.    The Debtors propose to enter into substantially similar agreements post-petition that will allow them to sell Servicer Advance Receivables generated post-petition to the Depositors, which will subsequently transfer such Servicer Advance Receivables to the Non-Debtor SPVs, which will in turn issue Servicer Advance Facility VFNs to Barclays and others backed by such Servicer Advance Receivables.  Such post-petition arrangements will also repay and refinance in whole the Servicer Advance Facility VFNs.

106.    In my experience, it is customary in the mortgage origination and servicer industry to structure such arrangements so that the sales of servicer advances constitute so-called "true sales," and not mere secured financings, and to structure the depositors and special purpose vehicle issuers so that their affairs are kept separate from the sellers and hence, will not be substantively consolidated into the estate of the seller if it becomes a debtor under the Bankruptcy Code.  This structure is critical to lenders, who rely on it in extending credit so that in the event of a default, they will be able to easily exercise their remedies.

### c.    Sales of DIP Servicer Advance Receivables Constitute "True Sales" and Not Secured Financings

107.    Based on my knowledge of the Debtors' business and industry custom, I believe it is in the best interests of the Debtors' and their estates that the transfers under the Receivables Sale Agreements be construed as "true sales."  The Debtors' counterparties rely on the fact that the transfer of Servicer Advance Receivables are in fact true sales and not secured financings.  If this were not so, I believe that the Debtors' counterparties and indirect financing sources may not provide critical liquidity on favorable terms and the Debtors' ability to fund its Servicer Advances could be severely impaired.  I also believe that structuring servicer advance

WEIL:\96914025\1\41703.0010

financing arrangements as true sales is customary in the mortgage servicer industry as well as in other businesses that generate significant receivables. Therefore, I believe that this Court should grant the relief requested in the DIP Motion and find that the transfers of Servicer Advance Receivables constitute "true sales" and not secured financings.

### d. There Is No Basis for the Substantive Consolidation of the Depositors Or the Non-Debtor SPV's Into the Debtors' Bankruptcy Estates

108.    I am familiar with the special purpose vehicles and other entities that participate in structuring the Servicer Advance facilities. In particular, it is my understanding that each Non-Debtor SPV Issuer is (and has been since its formation) a special purpose trust, while each Depositor is (and has been since its formation) a special purpose limited liability company.[10] I also understand that the activities of each Non-Debtor SPV Issuer and Depositor have been (and Ditech Financial will cause them to continue to be) limited to activities relating to the purchase and sale of Servicer Advance receivables, the issuance of Servicer Advance VFNs, and the administration of the respective entity's assets. I understand from counsel that the organization documents of each entity contain representations, covenants, and agreements relating to the separateness of each entity's operations from those of any other entity, including requirements that each Non-Debtor SPV Issuer be managed by an owner trustee and that each Depositor have at least one independent manager.[11] To the best of my knowledge, the corporate separateness covenants have been observed in all respects prior to the Petition Date, and Ditech Financial will continue, and will cause the Depositors and Non-Debtor SPVs to continue, to observe them during these Chapter 11 Cases.

---

[10]   Ditech Financial owns 100% of the equity interests in the Depositors. Each Depositor owns 100% of the equity interest in its respective Non-Debtor SPV.

[11]   *See, e.g.,* Sections 2.4, 2.6, and 2.7 and Article VI of each Trust Agreement and Sections 9(b)iii. and 10 of each LLCA.

WEIL:\96914025\1\41703.0010

109.    In addition, I believe that each entity's assets have not been and will not be commingled with those of any direct, indirect, or ultimate parent or affiliate and that each entity has kept and will continue to keep correct and complete separate records, bank accounts, and books of account.  I also understand that each entity has taken since its creation and will take during these Chapter 11 Cases all reasonable steps to maintain its respective identity as a separate legal entity and to make it manifest to third parties that it is an entity with assets and liabilities distinct from any other entities, and that each entity has provided, and will continue to provide, for its own operating expenses and liabilities from its own funds, and has and will not guarantee or hold itself out to third parties as liable for the debts of any other entity.

110.    I believe that the Debtors' counterparties rely on the fact that the Non-Debtor SPVs and the Depositors will not be substantively consolidated into Ditech Financial's estate.  As with the other aspects of the Servicer Advance facilities, features of corporate separateness are deliberately structured and carefully observed.  I understand that the Debtors' counterparties and indirect financing sources would not fund the Servicer Advance facilities if they believed that there was any risk of consolidation.  Indeed, reliance on corporate separateness is customary in the mortgage servicer industry as well as in other businesses that finance receivables.  Therefore, I believe that this Court should grant the relief requested in the DIP Motion and find that there is no basis for any of the Depositors or the Non-Debtor SPVs to be substantively consolidated into the bankruptcy estate of Ditech Financial.

### e.    Sale of REO Assets to the DIP REO Subsidiary Constitutes a "True Sale" and Not a Secured Financing

111.    As further set forth in the DIP Motion, RMS proposes to repurchase all assets sold pursuant to the terms of the Prepetition Reverse Repo Facilities, to terminate the Prepetition Reverse Repo Facilities and any related program documents, and to sell all such

47

assets pursuant to the terms of the DIP Reverse Repo Facility, thereby repurchasing and repaying the Prepetition Reverse Repo Facilities with proceeds from the sale of such assets under the DIP Reverse Repo Facility Documents.  In furtherance thereof, it is contemplated that (1) RMS will cause (x) its non-debtor subsidiaries RMS REO CS, LLC and RMS REO BRC, LLC (together, the "**CS REO Subsidiaries**") to transfer all of their REO Property (as defined in the Prepetition Exit Reverse Repo Master Purchase Agreement) (collectively, the "**CS REO Assets**") to RMS and (y) RMS REO BRC II, LLC (the "**DIP REO Subsidiary**") to transfer all of its prepetition assets (the "**Prepetition DIP REO Assets**" and, together with the CS REO Assets, the "**REO Assets**") to RMS and (2) immediately following such transfer, RMS will transfer all such CS REO Assets and Prepetition DIP REO Assets to the DIP REO Subsidiary.

112.    I understand that such transfers will entail the transfer of all right, title and interest in the REO Assets on an absolute and non-recourse basis, and full risk of loss with respect to the REO Assets will pass to the DIP REO Subsidiary.  I also understand that RMS will have no right to receive any proceeds allocable to the REO Assets, and will not guarantee or otherwise pay to the DIP REO Subsidiary a specified yield (or adjust the purchase price post-sale).  Therefore, I believe that this Court should grant the relief requested in the DIP Motion and find that the sales of REO Assets to the DIP REO Subsidiary constitute "true sales" and not secured financings.

### iii. Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Continue Origination and Servicing of Forward Mortgage Loans in Ordinary Course and Granting Related Relief, (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors' Ongoing Operations, and (III) Scheduling a Final Hearing ("Ditech OCB Motion")

113.    The Debtors request entry of an order authorizing, but not directing, the Debtors to continue in the ordinary course of business:  (a) to originate and purchase mortgage

48

loans; (b) to sell and securitize loans, including by performing under certain agreements with Fannie Mae, Freddie Mac, Ginnie Mae, and private parties; (c) to service and subservice loans pursuant to terms and conditions set forth in certain agreements with Fannie Mae, Freddie Mac, Ginnie Mae, other applicable federal agencies, and private parties; (d) to make servicing advances; (e) to pay prepetition amounts owed to critical vendors on the terms and conditions described herein; (f) to fulfill compliance and regulatory obligations; and (g) to provide assurances of future performance to Fannie Mae, Freddie Mac, and Ginnie Mae and comply therewith.   Each of the activities for which the Debtors seek Court authority to continue are consistent with both the Debtors' prepetition conduct and with customary practices in the forward mortgage loan origination and servicing industry.

114.   Selling and servicing Agency Loans accounts for a significant portion of the Debtors' revenue.   Accordingly, maintaining eligibility to sell, securitize, and service Agency Loans is a vital component of the Debtors' business and essential to a successful reorganization. Indeed, the failure to comply with the terms and conditions set forth in the applicable Agency Agreements may result in the applicable agency terminating the GSE Agreements and revoking the Debtors' selling and servicing authorizations.   In the case of Ginnie Securitized Loans, for example, Ditech Financial could be placed in a default subject to the terms and conditions of that certain Cross-Default Agreement, dated as of July 17, 2015 (the "**Cross-Default Agreement**"), pursuant to which the interests of both Ditech Financial and RMS in the applicable underlying forward and reverse mortgage portfolios could be extinguished without compensation or any rights of reimbursement; and a default subject to the terms and conditions of the Ginnie Mae Agreements.   Without the ability to access the liquid agency sale and servicing markets, the Debtors will be unable to operate their businesses.   It is therefore imperative that the Debtors be

permitted to continue to perform under the Agency Agreements, which will allow them to operate their business in the ordinary course without interruption so as to preserve the value maximizing transactions contemplated by the Restructuring Support Agreement. Further, if the relief requested is not granted, the Debtors will be unable to secure debtor in possession financing and to administer these chapter 11 cases. Approval of the Ditech OCB Motion and the ability to comply with and remain an approved servicer, originator, and issuer with the GSEs and Ginnie Mae, as applicable, are conditions to the DIP Financing.

### a. Critical Vendors

115.    In connection with their general corprorate activities, as well as their origination and servicing businesses, Ditech utilizes the services of numerous third-party vendors, service providers, and professionals that are critical to operations (collectively, "**Critical Ditech Vendors**"), who perform a variety of critical functions for the Debtors.

116.    Employing these specialized vendors is more cost-effective than performing such activities in-house; indeed, replacing certain of these vendors would not only be difficult and disruptive, but also cost-prohibitive. The Debtors have developed long-standing relationships with their Critical Ditech Vendors, which has enabled them to negotiate favorable pricing, credit terms, and priority scheduling. Any failure to timely honor the Debtors' prepetition obligations to the Critical Ditech Vendors could jeopardize these relationships, and any interruption of their services for even a short period of time would impair the Debtors' operations and the value of the enterprise.

117.    Through the Ditech OCB Motion and the RMS OCB Motion, the Debtors request authority, but not direction, to continue to employ and pay the prepetition obligations of, in the Debtors' sole discretion, the Critical RMS Vendors and the Critical Ditech Vendors (as defined in the Ditech OCB Motion) (collectively, the "**Critical Vendors**"). The Debtors seek to

50

WEIL:\96914025\1\41703.0010

pay (a) up to <u>approximately $35 million</u> of such prepetition amounts to Critical Vendors during the first thirty (30) days of these chapter 11 cases, of which the Debtors expect <u>approximately $30.6 million</u> will either be prefunded or reimbursed to the Debtors and (b) up to <u>approximately $40 million</u> of such prepetition amounts to Critical Vendors on a final basis.  Without the requested relief, the Critical Vendors may refuse to continue providing services to Ditech postpetition or may impose unfavorable trade terms, such as cash in advance requirements, security deposits, and/or restrictive trade credit.

### b.   Limited Relief from the Automatic Stay

118.   In its capacity as servicer, Ditech is currently party to approximately 16,400 judicial and non-judicial foreclosure proceedings and approximately 350 evictions.  In such proceedings it is not uncommon for borrowers and tenants to raise claims, defenses and related counter-claims against RMS to preserve their respective interests in underlying property as owner or tenant.  I am advised that such claims, cross-claims, third-party claims, and counter-claims, whether asserted by borrowers in foreclosure actions or by tenants in eviction actions and whether commenced prior to, on, or after the Commencement Date, are or may become subject to the automatic stay pursuant to section 362(a) of the Bankruptcy Code.  Requiring each of these parties to obtain stay relief in order to assert such counter-claims would likely add an unnecessary degree of complexity, costs, and delay to both the foreclosure process described herein and the administration of these chapter 11 cases.

119.   In addition, certain of the borrowers on loans serviced or subserviced by the Debtors have sought, or may seek during the pendency of these cases, bankruptcy protection under chapters 7, 11, 12, or 13 of the Bankruptcy Code (such borrowers, the "**Bankrupt Borrowers**").  In connection with such cases, from time to time, the Debtors file, or direct their counsel or agents to file, documents required by the Bankruptcy Code and Bankruptcy Rules,

WEIL:\96914025\1\41703.0010

including proofs of claims, notices of payment change, notices of postpetition fees, responses to notices of final cures, motions to lift the automatic stay, and related amendments and appeals. Given the importance of allowing Bankrupt Borrowers to timely prosecute their bankruptcy cases, as well as the unnecessary degree of complexity and costs that would accrue against the Debtors' estates by requiring Bankrupt Borrowers, trustees duly appointed under the Bankruptcy Code in a Bankrupt Borrower's bankruptcy case, or the United States Trustees assigned to oversee such cases, to obtain stay relief with respect to routine actions in the prosecution of such Bankrupt Borrower's bankruptcy case, I believe that limited relief from the automatic stay is merited.

120.    Finally, the Debtors are often a party to actions involving the amount, validity, and/or priority of liens with respect to properties subject to mortgages owned or serviced by the Debtors (such actions, "**Title Disputes**").  Prosecuting such disputes allows the Debtors to clear title to the underlying property and thereby protect its rights and remedies with respect thereto.  Thus, for similar reasons of judicial economy and estate resources discussed above, the Debtors request that the Court enter a standing order modifying the automatic stay to allow Interested Parties to assert a defense, including the appeals of such, in Title Disputes.

### c.  Assurances of Future Performance

121.    Fannie Mae, Freddie Mac, and Ginnie Mae have each requested, and the Debtors have agreed, subject to Court approval, to provide certain assurances regarding the Debtors' ability to originate, sell, service, and securitize the Fannie Mae Loans, Freddie Mac Loans, and Ginnie Securitized Loans, respectively, during the course of these chapter 11 cases. The form of these assurances was negotiated at arms' length and with the assistance of independent counsel, and the Debtors believe they are fair and reasonable.  In addition, the

52

Debtors' debtor in possession financing is conditioned upon the Debtors' continued operations in the ordinary course. Thus, it is essential that the Debtors be authorized to provide such assurances to Fannie Mae, Freddie Mac, and Ginnie Mae, respectively. The Debtors have every intention of maintaining their origination, servicing, and with respect to Ginnie Securitized Loans, securitization-related, operations in accordance with the standards and requirements set forth in the Agency Agreements.

> **iv.** **Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Continue Honoring Reverse Issuer and Servicing Obligations in the Ordinary Course and Granting Related Relief, (II) Modifying Automatic Stay on a Limited Basis to Facilitate Debtors' Ongoing Operations, and (III) Scheduling a Final Hearing (the "RMS OCB Motion")**

122.     The Debtors request entry of an order authorizing, but not directing, the Debtors to continue in the ordinary course of business, among other things: (a) (i) honor and fund the Ginnie Mae Buyout Obligations, (ii) continue their activities, (iii) honor the Ginnie Mae Agreements; and (iv) remit the Ginnie Mae Commitment Fee, the Ginnie Mae Guaranty Fee, amounts due from Borrower Paydown (each as defined below), and certain administrative fees arising from RMS's securitization activities; (b) (i) honor the Servicing Obligations, including by continuing to perform under the Fannie Mae Agreements and honor their obligations under the MECA, (ii) honor and pay the Curtailment Obligations, (iii) collect and securitize the Servicing Fees, and (iv) remit the Servicer Advances (each as defined below); (c) continue submitting assignment or reimbursement claims to FHA; (d) pay prepetition and postpetition claims of the Critical Servicing Vendors in the aggregate amount; (e) continue honoring their indemnification obligations to FHA in connection with defective loans; (f) fulfill compliance and regulatory obligations; and (g) provide assurances of future performance to Ginnie Mae and Fannie Mae.

WEIL:\96914025\1\41703.0010

The Debtors also request that the Court enter a standing order modifying the automatic stay in connection with foreclosure and eviction proceedings.

123.    RMS performs mortgage servicing primarily in accordance with the FHA servicing guidelines (the "**FHA Servicing Guidelines**"), which impose numerous obligations on qualified servicers such as RMS.  Similar to the FHA Servicing Guidelines, the Ginnie Mae Agreements impose substantial obligations on qualified issuers of MBS such as RMS.  Any disruptions to RMS's ability to perform under and comply with the FHA Servicing Guidelines and the Ginnie Mae Guide in the ordinary course—whether as an issuer of Ginnie Mae guaranteed securitizations or as a servicer—could lead to a catastrophic loss of value for the Debtors' estates, major disruption in the reverse mortgage securitization market, and a temporary loss of income for thousands of reverse mortgage borrowers, most of whom are senior citizens relying on such loan payments for essential living and medical expenses.  Furthermore, if RMS fails to comply with the FHA Servicing Guidelines, it could face the possible termination of its servicing rights without compensation, which include the right to receive reimbursements from FHA.  Such termination could result in the loss of future servicing fees, cause the loss of reimbursement of servicing advances by FHA to RMS of approximately $68 million, and create substantial harm to the Debtors' estates.  Similarly, a failure to comply with the Ginnie Mae Guide may result in a default subject to the terms and conditions of the Cross-Default Agreement, pursuant to which the interests of both RMS and Ditech in the applicable underlying reverse and forward mortgage portfolios could be extinguished without compensation or any rights of reimbursement; and a default subject to the terms and conditions of Ginnie Mae Servicing Agreements.

54

124.    As a servicer and subservicer of Fannie Mae owned loans (collectively,

the "**Fannie Mae Loans**"),[12] RMS must comply with the Fannie Mae Mortgage Selling and

Servicing Contract, which includes that certain Servicing Guide: Fannie Mae Single Family and

that certain Fannie Mae Reverse Mortgage Loan Servicing Manual (collectively, the "**Fannie**

**Mae Servicing Guides**"), and RMS's obligations thereunder are secured pursuant to that certain

Pledge and Security Agreement dated as of December 19, 2014 (the "**Fannie Mae Pledge**

**Agreement**" and together with the Fannie Mae Mortgage Selling and Servicing Contract and the

Fannie Mae Servicing Guides, together with all supplements, addendums, amendments, and

related agreements, the "**Fannie Mae Agreements**").   The Fannie Mae Agreements generally

provide that Fannie Mae can terminate servicers either at will or for cause, among other reasons.

Accordingly, if RMS does not honor its servicing or subservicing obligations with respect to the

Fannie Mae loans, Fannie Mae may take the position that it has the right to unilaterally terminate

RMS's servicing and/or subservicing rights, which could result in the loss of a significant portion

of the Debtors' revenue.

125.    Further, if the relief requested in the RMS OCB Motion is not granted, the

Debtors will not be able to secure debtor in possession financing and administer these chapter 11

cases.   Approval of RMS OCB Motion and the ability to comply with and remain an approved

servicer and subservicer with Ginnie Mae and Fannie Mae are conditions to the debtor in

possession financing.

126.    It is imperative that the Debtors be permitted to continue to operate their

business in the ordinary course of business without interruption.   If the relief requested in the

---

[12]   In addition to servicing and subservicing Fannie Mae Loans, RMS also acts as the REO property manager for
       HECMs guaranteed by Fannie Mae and held in the Mortgage Equity Conversion Asset Trust 2011-1
       (the "**MECA**") and is responsible for, among other things, disposition of the related REO properties and
       remitting the sale proceeds (the "**MECA REO Sale Proceeds**") to the servicer under the MECA.

WEIL:\96914025\1\41703.0010

RMS OCB Motion is not granted, the Debtors' ability to administer their chapter 11 cases would be jeopardized.  The Debtors believe that the relief requested will preserve the value-maximizing reorganization transaction contemplated by the Restructuring Support Agreement.  Furthermore, each of the activities for which the Debtors seek authorization to continue are consistent with both the Debtors' prepetition conduct and with customary practices in the reverse mortgage loan servicing industry.

### a.  Critical Vendors

127.    In connection with its servicing activities, RMS utilizes the services of numerous third-party vendors, service providers, and professionals that are critical to operations (collectively, "**Critical RMS Vendors**"), who perform a variety of critical functions for the Debtors.

128.    Employing these specialized vendors is more cost-effective than performing such activities in-house; indeed, replacing certain of these vendors would not only be difficult and disruptive, but cost-prohibitive as well.  The Debtors has developed long-standing relationships with these vendors, which has enabled RMS to negotiate favorable pricing, credit terms, and priority scheduling.  Any failure to timely honor RMS's prepetition obligations to the Critical Vendors could jeopardize these relationships, and any interruption of their services for even a short period of time would impair RMS's business operations and the value of these businesses.

129.    Through the RMS OCB Motion and the Ditech OCB Motion, the Debtors request authority, but not direction, to continue to employ and pay the prepetition obligations of, in the Debtors' sole discretion, the Critical RMS Vendors and the Critical Ditech Vendors (as defined in the Ditech OCB Motion) (collectively, the "**Critical Vendors**").  The Debtors seek to pay (a) up to <u>approximately $35 million</u> of such prepetition amounts to Critical Vendors during

WEIL:\96914025\1\41703.0010

the first thirty (30) days of these chapter 11 cases, of which the Debtors expect <u>approximately</u> <u>$30.6 million</u> will either be prefunded or reimbursed to the Debtors and (b) up to <u>approximately</u> <u>$40 million</u> of such prepetition amounts to Critical Vendors on a final basis.

### b.  Limited Relief from the Automatic Stay

130.    RMS is currently party to approximately 6,000 judicial and non-judicial foreclosure proceedings and more than 600 eviction proceedings.  In such proceedings it is not uncommon for borrowers and tenants to raise claims, defenses and related counter-claims against RMS to preserve their respective interests in underlying property as owner or tenant.  I am advised that such claims, cross-claims, third-party claims, and counter-claims, whether asserted by borrowers in foreclosure actions or by tenants in eviction actions and whether commenced prior to, on, or after the Commencement Date, are or may become subject to the automatic stay pursuant to section 362(a) of the Bankruptcy Code.  Requiring each of these parties to obtain stay relief in order to assert such counter-claims would likely add an unnecessary degree of complexity, costs, and delay to both the foreclosure process described herein and the administration of these chapter 11 cases.

131.    In addition, certain of the borrowers on loans serviced or subserviced by the Debtors have sought, or may seek during the pendency of these cases, bankruptcy protection under chapters 7, 11, 12, or 13 of the Bankruptcy Code (such borrowers, the "**Bankrupt Borrowers**").  In connection with such cases, from time to time, the Debtors file, or direct their counsel or agents to file, documents required by the Bankruptcy Code and Bankruptcy Rules, including proofs of claims, notices of payment change, notices of postpetition fees, responses to notices of final cures, motions to lift the automatic stay, and related amendments and appeals. Given the importance of allowing Bankrupt Borrowers to timely prosecute their bankruptcy cases, as well as the unnecessary degree of complexity and costs that would accrue against the

WEIL:\96914025\1\41703.0010

Debtors' estates by requiring Bankrupt Borrowers, trustees duly appointed under the Bankruptcy Code in a Bankrupt Borrower's bankruptcy case, or the United States Trustees assigned to oversee such cases, to obtain stay relief with respect to routine actions in the prosecution of such Bankrupt Borrower's bankruptcy case, I believe that limited relief from the automatic stay is merited.

132.    Finally, the Debtors are often a party to actions involving the amount, validity, and/or priority of liens with respect to properties subject to mortgages owned or serviced by the Debtors (such actions, "**Title Disputes**").  Prosecuting such disputes allows the Debtors to clear title to the underlying property and thereby protect its rights and remedies with respect thereto.  Thus, for similar reasons of judicial economy and estate resources discussed above, the Debtors request that the Court enter a standing order modifying the automatic stay to allow Interested Parties to assert a defense, including the appeals of such, in Title Disputes.

### c. Assurances of Future Performance

133.    Ginnie Mae and Fannie Mae each requested, and the Debtors have agreed, subject to Court approval to provide certain assurances regarding RMS's ability to continue, among other things, honoring its obligations in accordance with the Ginnie Mae Guide and service the Fannie Mae Loans, respectively, during the pendency of these chapter 11 cases.  The form of these assurances was negotiated at arms' length and with the assistance of independent counsel, and the Debtors believe they are fair and reasonable.  In addition, the Debtors' access to the DIP Facility is conditioned upon the Debtors' continued operations in the ordinary course.  Thus, it is essential that the Debtors be authorized to provide such assurances to Ginnie Mae and Fannie Mae, respectively.  The Debtors have every intention of maintaining their servicing and subservicing, and with respect to Ginnie Mae securitized loans, securitization-related operations

in accordance with the standards and requirements set forth in the Ginnie Mae Agreements and

Fannie Mae Agreements, as applicable.

> ### v.    Motion of Debtors for (I) Authority to (A) Pay Employee Obligations and (B) Continue Employee Benefit Programs, and (II) Related Relief (the "Wages Motion")

134.    The Debtors request the entry of interim and final orders authorizing, but

not directing, the Debtors to pay and honor certain prepetition claims and obligations, continue

programs and maintain funding, in the exercise of their discretion, relating to, among other

things:  (i) Unpaid  Compensation;  (ii) Payroll  Taxes;  (iii) Deductions;  (iv) Supplemental

Workforce  Agencies;  (v) Reimbursable  Expenses;  (vi) Employee  Benefit  Programs;  (vii) the

Non-Insider  Severance  Program;  (viii) the  401(k) Savings  Plan;  and  (ix) Compensation

Programs, solely with respect to non-insider Employees.

135.    The relief requested includes compensation for the Debtors' full-time,

part-time, and temporary employees, and independent contractors and consultants that provide

services related to various aspects of the Debtors' operations and are vital to the Debtors'

businesses. As of the date hereof, certain prepetition obligations to such employees and

supplemental workers may be due and owing.

136.    As of the Commencement Date, the Debtors employ approximately 2,900

full-time employees, 10 part-time employees, and 15 temporary employees.  The majority of the

Debtors' workforce relies on the Debtors' compensation, benefits and reimbursement of

expenses to satisfy daily living expenses.  The workforce will be exposed to significant financial

difficulties if the Debtors are not permitted to honor obligations for unpaid compensation,

benefits and reimbursable expenses.  Moreover, if the Debtors are unable to satisfy such

obligations, morale and loyalty will be jeopardized at a time when support is critical.  In the

absence of such payments, the workforce may seek alternative employment opportunities, including with the Debtors' competitors, hindering the Debtors' ability to meet its customer obligations and, likely, diminishing stakeholder confidence in the Debtors' ability to successfully carry out their chapter 11 strategy. Loss of valuable employees would have a devastating impact on the sustainability of the Debtors' businesses and would jeopardize the success of the Debtors' chapter 11 strategy.

      **vi.**      **Motion of Debtors for Authority to Pay Certain Prepetition Taxes and Fees (the "Taxes and Fees Motion")**

137. The Debtors request authorization to pay taxes, assessments, fees, and other charges (collectively, the "**Taxes and Fees**"), in the ordinary course of business, including any such Taxes and Fees subsequently determined, upon audit or otherwise, to be owed, and whether accrued or arose before or after the Commencement Date.

138. In the ordinary course of operating their business, the Debtors collect, withhold, and incur an assortment of Taxes and Fees that they remit periodically to various federal, state, and local taxing, licensing, regulatory, and other governmental authorities (collectively, the "**Authorities**"). The Taxes and Fees generally fall into the following categories, each of which is discussed in more detail in the Motion: (i) sales and use taxes, (ii) franchise and income taxes, (iii) property taxes, (iv) other taxes, and (v) fees. The Debtors seek to pay certain prepetition Taxes and Fees in order to, among other things, forestall Authorities from taking actions that might interfere with the administration of this Chapter 11 Case, which may include bringing personal liability actions against directors, officers, and other key employees (whose full-time attention to the Debtors' Chapter 11 Cases is required to avoid business disruptions and maximize recoveries to the Debtors' creditors), asserting liens on the Debtors' property or assessing penalties and/or significant interest on past-due taxes. In

60

addition, the non-payment of such Taxes and Fees may give rise to priority claims pursuant to section 507(a)(8) of the Bankruptcy Code. Accordingly, I believe that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate their businesses.

<blockquote>

**vii.     Motion of Debtors for an Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Claims Against and Equity Interests in the Debtors (the "NOL Motion")**

</blockquote>

139.     Pursuant to sections 105(a) and 362 of title 11 of the Bankruptcy Code, the Debtors request authority to establish procedures (the "**Procedures**") to protect the potential value of the Debtors' consolidated net operating loss carryforwards ("**NOLs**") and other tax attributes, including the so-called "net unrealized built-in losses" (collectively, the "**Tax Attributes**").

140.     The Debtors estimate that, as of January 1, 2019, they had incurred, for U.S. federal income tax purposes, a consolidated NOL in excess of $40 million and, as of the Commencement Date, they have a substantial "net unrealized built-in loss" for U.S. federal income tax purposes (in significant part attributable to the tax basis of their assets). The Debtors' estimates of the amounts of these tax attributes is subject to variability, depending (among other things) on elections that the Debtors may make, available under applicable tax law, in respect of the Debtors' restructuring completed in 2018; these elections would be made with the Debtors' 2018 tax return, expected to be filed in October 2019, but, regardless of which tax elections are or are not made, the Debtors would continue to have significant tax attributes during the pendency of these chapter 11 cases, and may emerge from these cases with significant tax attributes as well.

WEIL:\96914025\1\41703.0010

141.    Title 26 of the United States Code (the "**Tax Code**") generally permits corporations to carry forward their tax attributes to reduce future taxable income.  Accordingly, the Tax Attributes are available to offset any income realized through the taxable year that includes the effective date of a chapter 11 plan, and potentially thereafter.  Accordingly, I believe the Tax Attributes could translate into future tax savings over time and any such savings could enhance the Debtor's cash position for the benefit of all parties in interest and contribute to the Debtor's efforts toward a successful reorganization.

142.    The Debtors' ability to use its Tax Attributes to offset future income or tax liability is subject to certain statutory limitations.  Specifically, sections 382 and 383 of the Tax Code limit a corporation's use of its NOLs and certain other tax attributes to offset future income or tax after the corporation experiences an ownership change.  These limitations also apply to the use of losses recognized after the change in ownership to the extent the losses were "built-in" prior to the change in ownership ("**Built-In Losses**").  For purposes of section 382 of the Tax Code, a change of ownership occurs when the percentage of a loss company's equity held by one or more "5% shareholders" (as such term is defined in section 382 of the Tax Code) increases by more than 50 percentage points over the lowest percentage of stock owned by such shareholder(s) at any time during the relevant statutory testing period (usually three years).  A section 382 change of ownership prior to the effective date of a chapter 11 plan would effectively eliminate or substantially curtail the Debtors' ability to use the Tax Attributes, thereby resulting in a significant loss of value.

143.    The limitations imposed by section 382 in the context of an ownership change pursuant to a confirmed plan of reorganization are significantly more relaxed than those applicable outside chapter 11.  *See* 26 U.S.C. §§ 382(l)(5), (6).  Under section 382(l)(5) of the

WEIL:\96914025\1\41703.0010

Tax Code, a corporation is not subject to the annual limitation ordinarily imposed by section 382 with respect to an ownership change resulting from consummation of a plan of reorganization, provided that the debtor's pre-change shareholders (i.e., persons or entities who owned the debtor's stock immediately before the relevant ownership change) and/or Qualified Creditors (as defined in the NOL Motion) emerge from the reorganization owning at least 50% of the total value and voting power of the debtor's stock immediately after the ownership change. 26 U.S.C. § 382(1)(5)(A) (the "**382 (l)(5) Safe Harbor**").

144.    The proposed procedures are necessary to preserve the Debtors' ability to use the Tax Attributes, which are valuable assets of the Debtors' estates, while providing latitude for trading in volumes of DHCP Stock (as defined in the NOL Motion) below specified levels. The Debtors' ability to meet the requirements of the tax law to preserve the Tax Attributes may be seriously jeopardized unless procedures are established to ensure that trading in DHCP Stock is closely monitored, and, where necessary, precluded, and made subject to Court approval. The trading in DHCP Stock, even by/among larger stockholders, may not, at this time, pose a serious risk to the Tax Attributes so long as such transfers are monitored and do not exceed certain levels, and thus the restrictions and procedures set forth in the Motion preserve the Debtor's ability to waive in writing, in appropriate circumstances, any and all restrictions, stays, and notification procedures contained in the Motion.

145.    It is in the best interests of the Debtors, the Debtors' estates, its creditors, and its stakeholders to restrict stock and claims trading that could result in a change of ownership under section 382 of the Tax Code before the effective date of a plan of reorganization. If such a change of ownership occurs during the pendency of the chapter 11 cases, the section 382 limitation on subsequent use of the Tax Attributes would be based on the value of the Debtors,

WEIL:\96914025\1\41703.0010

and I believe the valuation for determining the annual amount of useable NOLs and Built-In Losses would be very low.

146.    In addition, the 382(l)(5) Safe Harbor described above may create significant incremental benefit to the Debtors following emergence from bankruptcy.  Among other things, the Debtors' "net unrealized built-in losses," calculated as of the effective date of the plan of reorganization, would not be subject to the annual limitation when realized in a post-change period.  Consequently, the Debtors currently contemplate that, assuming they will be eligible therefore, they will avail themselves of the 382(l)(5) Safe Harbor.  The requested relief has been narrowly tailored to permit trading of claims in amounts expected to be below the de minimis rule, thus preserving Debtors' ability to avail itself of the 382(l)(5) Safe Harbor while allowing free trading of claims that would not jeopardize Debtors' ability to do so.

147.    Although there can be no assurance that the 382(1)(5) Safe Harbor ultimately will be available to the Debtors, it is important that the Debtors preserve the ability to take advantage of that safe harbor.  Because the determination of whether a creditor is "qualified" depends on whether such creditor has held its Claim until the effective date of the plan of reorganization, transfers of Claims by creditors before such date pose a threat to the Debtors' ability to satisfy the requirements of the safe harbor.  Likewise, because transfers of DHCP Stock by or into the hands of 5% shareholders before the effective date of the plan of reorganization could trigger a section 382 ownership change that would impose a severe annual limitation on the Debtors' use of the Tax Attributes (even if the Debtors later satisfied the requirements of the 382(1)(5) Safe Harbor in connection with a second ownership change resulting from the plan) such pre-plan transfers pose a threat to the post-reorganization value of the Tax Attributes.  I believe the requested relief will ensure that the Debtors have maximum

64

flexibility to implement a plan that meets the requirements of the 382(1)(5) Safe Harbor and thus preserves the Tax Attributes to the fullest extent.

viii.    **Motion of Debtors for (I) Authorization to (A) Continue to Maintain Their Insurance Policies and Programs and Surety Bond Program and (B) Honor All Obligations with Respect Thereto and (II) Modification of the Automatic Stay with Respect to the Workers' Compensation Program. (the "Insurance Motion")**

148.    The Debtors request (i) authority, but not direction, to (a) maintain and renew, in their sole discretion, the Insurance Policies and Programs (including the Workers' Compensation Program) and the Surety Bond Program (each as defined in the motion), (b) continue honoring their Insurance and Surety Obligations (each as defined herein), including posting any collateral in connection therewith, on a postpetition basis in the ordinary course of business, and (c) pay accrued and outstanding prepetition amounts due in connection with the Surety Obligations; and (ii) modification of the automatic stay to the extent necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program.

149.    Postpetition, the Debtors' insurance policies and workers' compensation programs will be essential to the preservation of the value of the Debtors' business, properties and assets, and, in certain instances, are required by law.  If any of the Debtors' insurance policies are terminated or lapse, the Debtors would be exposed to substantial liability to the detriment of all parties in interest and could be in violation of law.  State law may prohibit the Debtors from operating without certain insurance.  Additionally, given that the Debtors' insurance carriers and insurance broker are intimately familiar with the Debtors' insurance policies, even the temporary loss of their services would be detrimental to the Debtors'

65

estates. Accordingly, authorization to continue to honor all insurance-related obligations is critical to the continued operation of the Debtors' business.

150.    With respect to the Surety Bond Program, to continue their business operations during these chapter 11 cases, the Debtors must be able to provide financial assurances to various third parties, including municipalities, state and federal governmental units, and public agencies. This requires the Debtors to maintain their existing Surety Bond Program, including the payment of the Surety Premiums as and when they come due, providing the Sureties with collateral, and renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of the Debtors' business. A failure to maintain the Surety Bond Program may result in violations of applicable law, which could be disruptive to the Debtors' operations. Obtaining authority to honor obligations arising in connection with the Surety Bond Program is essential to preserving the Debtors' business and the value of the Debtors' estates for all parties in interest.

### ix.    Application of Debtors Requesting Authority to Retain and Employ Epiq as Claims and Noticing Agent *Nunc Pro Tunc* to the Commencement Date (the "Epiq Retention Motion")

151.    The Debtors request authority to appoint Epiq Corporate Restructuring, LLC ("**Epiq**") as claims and noticing agent ("**Claims and Noticing Agent**") in accordance with the terms and conditions specified in the Engagement Agreement by and between the Debtors and Epiq (the "**Engagement Agreement**"), effective as of the Commencement Date. Epiq's duties will include assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim, filed in the Debtors' chapter 11 cases.

66

152.    I believe the Debtors' selection of Epiq to serve as its Claims and Noticing Agent has satisfied the Bankruptcy Court's Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c).  Specifically, the Debtors have solicited and reviewed engagement proposals from at least two other Court-approved claims and noticing agents to ensure selection through a competitive process.  I believe that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.  The terms of Epiq's retention are set forth in the Engagement Agreement attached to, and filed contemporaneously therewith, the Claims and Noticing Agent Retention Application.  Appointing Epiq as the Debtors' Claims and Noticing Agent will maximize the efficiency of the distribution of notices and the processing of claims, as well as relieve the Office of the Clerk of the Bankruptcy Court of the administrative burden of processing an overwhelming number of claims.

## VI.
## Information Required by Local Rule 1007

153.    In accordance with Local Rule 1007-2, the schedules attached hereto provide certain information related to the Debtors.

154.    Pursuant to Local Rule 1007-2(a)(3), **Schedule 1** hereto lists the names and addresses of the members of, and attorneys for, any official committee organized prior to the Commencement Date and a brief description of the circumstances surrounding the formation of the committee and the date of its formation.

155.    Pursuant to Local Rule 1007-2(a)(4), **Schedule 2** hereto lists the holders of the Debtors' forty (40) largest unsecured claims on a consolidated basis, excluding claims of insiders.

156.    Pursuant to Local Rule 1007-2(a)(5), **Schedule 3** hereto lists the holders of the five (5) largest secured claims against the Debtors on a consolidated basis.

WEIL:\96914025\1\41703.0010

157.     Pursuant to Local Rule 1007-2(a)(6), **Schedule 4** hereto provides a summary of the (unaudited) consolidated assets and liabilities for the Debtors and their non-Debtor affiliates.

158.     Pursuant to Local Rule 1007-2(a)(7), **Schedule 5** hereto provides the following information: the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held and the number of record holders thereof; and the number and classes of shares of stock, debentures, and other securities of the Debtors that are held by the Debtors' directors and officers, and the amounts so held.

159.     Pursuant to Local Rule 1007-2(a)(8), **Schedule 6** hereto provides a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending.

160.     Pursuant to Local Rule 1007-2(a)(9), **Schedule 7** hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

161.     Pursuant to Local Rule 1007-2(a)(10), **Schedule 8** hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

162.     Pursuant to Local Rule 1007-2(a)(11), **Schedule 9** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the

WEIL:\96914025\1\41703.0010

Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

163.    Pursuant to Local Rule 1007-2(a)(12), **Schedule 10** hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

164.    Pursuant to Local Rule 1007-2(b)(1)-(2)(A), **Schedule 11** hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, stockholders, and partners) and the estimated amount to be paid to officers, stockholders, directors, members of any partnerships, and financial and business consultants retained by the Debtors for the thirty (30) day period following the filing of the Debtors' chapter 11 cases as the Debtors intend to continue to operate their businesses.

165.    Pursuant to Local Rule 1007-2(b)(3), **Schedule 12** hereto provides, for the thirty (30) day period following the filing of the chapter 11 cases, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue that remain unpaid, other than professional fees.

## Conclusion

166.    This declaration illustrates the factors that have precipitated the commencement of the chapter 11 cases and the critical need for the Debtors to implement the Transaction.

[Execution Page Follows]

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 11th day of February, 2019

/s/ Gerald A. Lombardo
Gerald A. Lombardo
Chief Financial Officer
Ditech Holding Corporation

WEIL:\96914025\1\41703.0010

**<u>Exhibit A</u>**

**Corporate Organizational Chart**



Ditech Holding Corporation
Mid-State Capital, LLC
Walter Reverse Acquisition LLC
Hanover SPC-A, Inc.
Green Tree Credit Solutions LLC
Marix Servicing LLC
WIMC Real Estate Investment LLC
Reverse Mortgage Solutions, Inc.
Green Tree Insurance Agency of Nevada, Inc.
Walter Management Holding Company LLC
DF Insurance Agency LLC
Green Tree Investment Holdings III LLC
Mortgage Asset Systems, LLC
REO Management Solutions, LLC
RMS REO BRC, LLC
RMS REO CS, LLC
RMS REO BRC II, LLC
RMS 2018-09, LLC
Green Tree Credit LLC
Green Tree Servicing Corp.
(non-economic member of Ditech Financial LLC)
Ditech Financial LLC
Green Tree Advance Receivables III LLC
Ditech Agency Advance Depositor LLC
Ditech PLS Advance Depositor LLC

## Exhibit B

**Restructuring Support Agreement**

EXECUTION VERSION

# RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, and including any exhibits or schedules hereto, this "***Agreement***"), dated as of February 8, 2019, is entered into by and between:

(i)     Ditech Holding Corporation and its direct and indirect subsidiaries (the "***Company***"); and

(ii)    each undersigned entity, in each such entity's respective capacity as lender under, or as nominee, investment adviser, sub-adviser, or investment manager, as applicable, to certain funds, accounts, and other entities (including subsidiaries and affiliates of such funds, accounts, and entities) that is a lender (in its respective capacity as such, each, a "***Term Lender***," and, collectively, the "***Term Lenders***" and, together with their respective successors and permitted assigns and any subsequent Term Lender that becomes party hereto in accordance with the terms hereof, each, a "***Consenting Term Lender***," and, collectively, the "***Consenting Term Lenders***") party to that certain Second Amended and Restated Credit Agreement, dated as of February 9, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "***Credit Agreement***," and the term loan facility thereunder, the "***Term Loan Facility***"), by and among the Company, as the borrower, Credit Suisse AG, Cayman Islands Branch (formerly Credit Suisse AG), as administrative agent (together with any successor administrative agent, in each case, in such capacity, the "***Administrative Agent***"), the other term lenders party thereto and the other lenders party thereto.

The Company, each Consenting Term Lender, and any subsequent Person that becomes a party hereto in accordance with the terms hereof are referred to herein as the "***Parties***" and individually as a "***Party***."

**WHEREAS**, the Parties have agreed to the Restructuring consistent with the terms and subject to the conditions set forth herein, including in the Term Sheet, which are the product of arm's-length, good faith discussions between the Parties and their respective professionals;

**WHEREAS**, as of the date hereof, the Consenting Term Lenders in the aggregate hold, or act as the nominee, investment adviser, sub-adviser, or investment manager to entities that hold, as of the date hereof, more than $66^{2/3}\%$ of the aggregate outstanding principal amount of the Loans and Commitments (each as defined in the Credit Agreement);

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Term Sheet and hereunder.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

### 1.    Certain Definitions.

Capitalized terms used but not defined herein shall have the meaning ascribed to them in the restructuring term sheet attached hereto as **Exhibit A** (together with all schedules, exhibits, and annexes attached thereto, and as may be modified in accordance with Section 9 hereof, the "**_Term Sheet_**"), or as the context otherwise requires.

As used in this Agreement, the following terms have the following meanings:

(a)    "**_Alternative Transaction_**" means any plan, dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company or its assets other than the Restructuring, as set forth herein, including in the Term Sheet;

(b)    "**_Bankruptcy Code_**" means title 11 of the United States Code, 11 U.S.C. §§ 101, _et seq._, as amended from time to time.

(c)    "**_Bankruptcy Court_**" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, pursuant to 28 U.S.C. § 151, the United States District Court for the Southern District of New York.

(d)    "**_Bidding Procedures Motion_**" means a motion filed by the Debtors with the Bankruptcy Court for entry of a Bidding Procedures Order.

(e)    "**_Bidding Procedures Order_**" means any order (1) approving Bidding Procedures, and (2) setting dates for the submission of bids and the auction (if any), and (3) granting related relief.

(f)    **_Commencement Date_**" means the date that Debtors commence the Chapter 11 Cases.

(g)    "**_Confirmation Order_**" means an order of the Bankruptcy Court confirming the Plan.

(h)    "**_Definitive Documents_**" means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are contemplated by the Term Sheet and that are otherwise necessary or desirable to implement, or otherwise relate to the Restructuring and the Restructuring Transactions, including:  (A) the Plan; (B) the Bidding Procedures; (C) the Bidding Procedures Motion; (D) the Bidding Procedures Order; (E) each of the documents comprising the Plan Supplement; (F) the Disclosure Statement; (G) any motion seeking the approval of the adequacy of the Disclosure Statement and solicitation of the Plan; (H) the Confirmation Order; (I) the motion for use of cash collateral and to incur postpetition financing and any credit agreement with

2

respect thereto (the "*Financing Motion*"); (J) any Financing Orders, and (K) any asset purchase agreement for the Sale Transaction or an Asset Sale Transaction. Each of the Definitive Documents shall contain terms and conditions consistent in all material respects with this Agreement and the Term Sheet, and, except to the extent such Definitive Documents must be acceptable to the Requisite Term Lenders in accordance with the Term Sheet, shall otherwise be reasonably acceptable in all material respects to the Required Parties, including with respect to any modifications, amendments, or supplements to such Definitive Documents at any time during the Support Period; provided, that the terms of the Plan and Confirmation Order with respect to the treatment of the Term Loans and the treatment of any matters with respect to the Credit Agreement or any economic interest of the Term Lenders, and the Financing Motion and the Financing Orders shall be acceptable in all material respects to the Requisite Term Lenders.

(i)      "*Effective Date*" means the date on which the Plan is consummated.

(j)      "*Financing Orders*" means any orders authorizing Debtors to continue to access cash collateral and incur any postpetition financing on an interim basis or final basis consistent with the Term Sheet.

(k)      "*Outside Commencement Date*" means February 15, 2019.

(l)      "*Person*" means any "person" as defined in section 101(41) of the Bankruptcy Code, including, without limitation, any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof or other entity.

(m)      "*Plan Supplement*" means the plan supplement to the Plan, comprising the following documents, as applicable:  (A) the Amended and Restated Credit Facility Agreement, (B) new organizational documents, (C) the Exit Working Capital Facility documentation, (D) the Management Incentive Plan, (E) shareholders agreement, (F) a schedule of executory contracts and unexpired leases to be assumed and an associated notice of cure amount, (G) a schedule of retained causes of action, (H) any other documents the Company and the Requisite Term Lenders agree shall comprise the Plan Supplement.

(n)      "*Required Lenders*" means the "Required Lenders" as defined in the Credit Agreement.

(o)      "*Required Parties*" means each of (A) the Company and (B) the Requisite Term Lenders.

(p)      "*Requisite Term Lenders*" means, as of the date of determination, Consenting Term Lenders holding at least a majority in aggregate principal amount outstanding of the Term Loans held by the Consenting Term Lenders as of such date.

3

(q)      "**Restructuring Transactions**" means all acts, events, and transactions contemplated by, required for, and taken to implement the Restructuring, the Definitive Documents, the Plan Supplement, this Agreement, and the Elected Transaction (as defined below), each in the singular and collectively, as applicable.

(r)      "**SEC**" means the Securities & Exchange Commission.

(s)      "**Securities Act**" means the Securities Act of 1933, as amended.

(t)      "**Support Effective Date**" means the date on which the counterpart signature pages to this Agreement shall have been executed and delivered by the Company and Consenting Term Lenders (A) holding at least $66^{2/3}$% in aggregate principal amount outstanding of the Term Loans and (B) representing the Required Lenders.

(u)      "**Support Period**" means the period commencing on the Support Effective Date and ending on the earlier of the (A) date on which this Agreement is terminated in accordance with Section 5 hereof and (B) the Effective Date.

## 2.      Term Sheet and Plan.

The Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein.  The Term Sheet, including the schedules, annexes and exhibits thereto, sets forth certain material terms and conditions of the Restructuring. Notwithstanding anything else in this Agreement to the contrary, in the event of any inconsistency between this Agreement and the Term Sheet, the Term Sheet shall control.

## 3.      Agreements of the Consenting Term Lenders.

(a)      Agreement to Support.  During the Support Period, subject to the terms and conditions hereof, each of the Consenting Term Lenders agrees, severally and not jointly, that it shall:

(i)      use its commercially reasonable efforts to support the Restructuring and the Restructuring Transactions, and to act in good faith and take any and all reasonable actions necessary to consummate the Restructuring and the Restructuring Transactions, in a manner consistent with this Agreement;

(ii)      refrain from initiating (or directing or encouraging the Administrative Agent or any other party to initiate) any actions, including legal proceedings, that are inconsistent with, or that would delay, prevent, frustrate or impede the approval, confirmation or consummation, as applicable, of the Restructuring or Restructuring Transactions;

(iii)      timely vote (pursuant to the Plan) or cause to be voted all of its Claims (including on account of the Second Lien Notes, or any securities, owned or controlled by such Consenting Term Lender) to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely

4

basis following commencement of the solicitation of acceptances of the Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code;

(iv)    negotiate in good faith with the Company the forms of the Definitive Documents (to the extent such Consenting Term Lender is a party thereto) and subject to the consent thresholds specified herein execute the Definitive Documents;

(v)    not change or withdraw its votes to accept the Plan (or cause or direct such vote to be changed or withdrawn); provided, however, that such vote shall, without any further action by the applicable Consenting Term Lender, be deemed automatically revoked (and, upon such revocation, deemed void *ab initio*) by the applicable Consenting Term Lender at any time following the expiration of the Support Period with respect to such Consenting Term Lender;

(vi)    not directly or indirectly, through any Person, take any action that would reasonably be expected to prevent, interfere with, delay or impede the consummation of the Restructuring or Restructuring Transactions, including the approval of any Bidding Procedures Motion, the entry of any Bidding Procedures Order, the approval of the Disclosure Statement, or the solicitation of votes on, and confirmation of, the Plan;

(vii)    use its commercially reasonable efforts to support and take all actions as are reasonably necessary and appropriate for such Consenting Term Lender to obtain any and all required regulatory and/or third-party approvals for such Consenting Term Lender to consummate the Restructuring Transactions; and

(viii)    support and take all reasonable actions necessary or reasonably requested by the Company to confirm such Consenting Term Lender's support for the Bankruptcy Court's approval of the Bidding Procedures Motion, the entry of any Bidding Procedures Order, the approval of the Plan and Disclosure Statement, the solicitation of votes on the Plan by the Company, and the confirmation and consummation of the Plan and the Restructuring Transactions.

(b)    Transfers.

(i)    Each Consenting Term Lender agrees that, for the duration of the Support Period, such Consenting Term Lender shall not sell, transfer, loan, issue, participate, pledge, hypothecate, assign or otherwise dispose of (other than ordinary course pledges and/or swaps) (each, a "*Transfer*"), directly or indirectly, in whole or in part, any of its Claims, including any beneficial ownership in any such Claims,[1] or any option thereon or any right or interest therein, unless the transferee thereof either (A) is a Consenting Term Lender (with respect to a transfer by a Consenting Term Lender) or (B) prior to such Transfer, agrees in writing for the benefit of the Parties to become a

---

[1] As used herein, the term "*beneficial ownership*" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, any Claims subject to this Agreement or the right to acquire such Claims.

WEIL:\96911452\1\41703.0010

Consenting Term Lender and to be bound by all of the terms of this Agreement applicable to Consenting Term Lenders (including with respect to any and all Claims it already may hold against or in the Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as **Exhibit B** (a "*Joinder Agreement*"), and delivering an executed copy thereof within two (2) business days of such execution, to (1) Weil, Gotshal and Manges LLP ("*Weil*"), as counsel to the Company, (2) Kirkland & Ellis LLP, as counsel to an ad hoc group of Consenting Term Lenders ("*Kirkland*"), and (3) Davis Polk & Wardwell LLP ("*Davis Polk*"), as counsel to the Administrative Agent, in which event (x) the transferee shall be deemed to be a Consenting Term Lender hereunder to the extent of such transferred Claims and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred Claims (such transfer, a "*Permitted Transfer*" and such party to such Permitted Transfer, a "*Permitted Transferee*"). Each Consenting Term Lender agrees that any Transfer of any Claim that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Term Lender shall have the right to enforce the voiding of such Transfer.

(ii)    Notwithstanding anything to the contrary herein, (A) a Qualified Marketmaker[2] that acquires any Claims subject to this Agreement held by a Consenting Term Lender with the purpose and intent of acting as a Qualified Marketmaker for such Claims, shall not be required to become a party to this Agreement as a Consenting Term Lender, if (x) such Qualified Marketmaker transfers such Claims (by purchase, sale, assignment, or other similar means) within the earlier of ten (10) business days of its acquisition and the plan voting deadline to a Permitted Transferee and the transfer otherwise is a Permitted Transfer and (y) such Consenting Term Lender shall be solely responsible for the Qualified Marketmaker's failure to comply with this Section 3(b) and (B) to the extent any Party is acting solely in its capacity as a Qualified Marketmaker, it may Transfer any ownership interests in the Claims that it acquires from a holder of Claims that is not a Consenting Term Lender to a transferee that is not a Consenting Term Lender at the time of such Transfer without the requirement that the transferee be or become a signatory to this Agreement or execute a Joinder Agreement.

(iii)    This Section 3(b) shall not impose any obligation on the Company to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Term Lender to Transfer any Claims. Notwithstanding anything to the contrary herein, to the extent the Company and another Party have entered into a separate agreement with respect to the issuance of a "cleansing letter" or other public disclosure of information, the terms of such confidentiality agreement shall continue to apply and remain in full force and effect according to its terms.

---

[2] As used herein, the term "*Qualified Marketmaker*" means an entity that (a) holds itself out to the public, the syndicated loan market, and/or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against, and/or equity interests in, the Company, including Term Loans, or enter with customers into long and short positions in claims against the Company), in its capacity as a dealer or market maker in such claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including term, loans, and/or debt or equity securities).

6

(c)    Additional Claims.    This Agreement shall in no way be construed to preclude the Consenting Term Lenders from acquiring additional Claims; provided that, to the extent any Consenting Term Lender (i) acquires additional Claims, (ii) holds or acquires any other claims against the Company entitled to vote on the Plan or (iii) holds or acquires any equity interests in the Company entitled to vote on the Plan, then, in each case, each such Consenting Term Lender shall promptly notify Weil, Kirkland and Davis Polk, and each such Consenting Term Lender agrees that all such Claims shall be subject to this Agreement, and agrees that, for the duration of the Support Period and subject to the terms of this Agreement, it shall vote in favor of the Plan (or cause to be voted) any such additional Claims and/or equity interests entitled to vote on the Plan (to the extent still held by it on or on its behalf at the time of such vote), in a manner consistent with Section 3(a) hereof.  For the avoidance of any doubt, any obligation to vote for the Plan or any other plan of reorganization shall be subject to sections 1125 and 1126 of the Bankruptcy Code.

(d)    Preservation of Rights.    Notwithstanding the foregoing, nothing in this Agreement, and neither a vote to accept the Plan by any Consenting Term Lender, nor the acceptance of the Plan by any Consenting Term Lender, shall:  (i) be construed to limit consent and approval rights provided in this Agreement, the Term Sheet, and the Definitive Documentation; (ii) be construed to prohibit any Consenting Term Lender from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement, or exercising rights or remedies specifically reserved herein; (iii) be construed to prohibit any Consenting Term Lender from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of (or could not reasonably be expected to) hindering, delaying, or preventing the consummation of the Restructuring Transactions; (iv) impair or waive the rights of any Consenting Term Lender to assert or raise any objection expressly permitted under this Agreement in connection with any hearing in the Bankruptcy Court, including, without limitation, any hearing on confirmation of the Plan; or (v) subject to Section 3(f), limit the ability of any Consenting Term Lender to assert any rights, claims, and/or defenses under the Credit Agreement, the Security Agreement (as defined in the Credit Agreement), and any related documents or agreements (including, without limitation, the right of any Consenting Term Lender to assert that any potential action of the Company or any Credit Party (as defined in the Credit Agreement) that is inconsistent with, or any potential omission of the Company or any Credit Party (as defined in the Credit Agreement) to take any action required, by the Credit Agreement and/or that a potential Default or Event of Default has occurred under the Credit Agreement).

(e)    Negative Covenants.    The Consenting Term Lenders agree that, for the duration of the Support Period, each Consenting Term Lender shall not take any action inconsistent with, or omit to take any action required by the Credit Agreement, except to the extent that any such action or inaction is expressly contemplated or permitted by this Agreement, the Plan, or any of the other Definitive Documents.

7

## 4.    Agreements of the Company.

(a)    <u>Covenants</u>.  The Company agrees that, for the duration of the Support Period, the Company shall:

(i)    (A) support and use commercially reasonable efforts to consummate and complete the Restructuring, the Restructuring Transactions, and all transactions contemplated under this Agreement (including, without limitation, those described in the Term Sheet and once filed, any Bidding Procedures Motion, and the Plan) including, without limitation, (1) take any and all reasonably necessary actions in furtherance of the Restructuring, the Restructuring Transactions, and the transactions contemplated under this Agreement, including, without limitation, as set forth in the Term Sheet and, once filed, any Bidding Procedures Motion and the Plan, (2) commence the Chapter 11 Cases on or before the Outside Commencement Date and complete and file, within the timeframes contemplated herein, the Plan, the Disclosure Statement, and the other Definitive Documents, and (3) use commercially reasonable efforts to obtain orders of the Bankruptcy Court approving any Bidding Procedures Motion, and the Disclosure Statement and confirming the Plan within the timeframes contemplated by this Agreement; (B) use commercially reasonable efforts to obtain any and all required regulatory approvals for the Restructuring Transactions embodied in the Definitive Documents, including the Plan; and (C) not take any action that is inconsistent with, or to alter, delay, impede, or interfere with, approval of any Bidding Procedures Order, or the Disclosure Statement, confirmation of the Plan, or consummation of the Plan and the Restructuring Transactions, in the case of each of clauses (A) through (C) to the extent consistent with, upon the advice of counsel, the fiduciary duties of the boards of directors of the Company;

(ii)    not commence an avoidance action or other legal proceeding that challenges the validity, enforceability, or priority of the Term Loans or obligations under the Credit Agreement;

(iii)    if the Company receives an unsolicited bona fide proposal or expression of interest in undertaking an Alternative Transaction that the boards of directors, members, or managers (as applicable) of the Company, determine in their good-faith judgment provides a higher or better economic recovery to the Company's stakeholders than that set forth in this Agreement and such Alternative Transaction is from a proponent that the boards of directors, members, or managers (as applicable) of the Company has reasonably determined is capable of timely consummating such Alternative Transaction, the Company will within 48 hours of the receipt of such proposal or expression of interest, notify Kirkland and Davis Polk of the receipt thereof, with such notice to include the material terms thereof, including the identity of the Person or group of Persons involved;

(iv)    provide draft copies of all material motions or applications and other documents (including all "first day" and "second day" motions and orders, any Bidding Procedures Motion, any Bidding Procedures Order, the Plan, the Disclosure Statement, the ballots and other solicitation materials in respect of the Plan, and the

8

Confirmation Order) the Debtors intend to file with the Bankruptcy Court to Kirkland and to Davis Polk, if reasonably practical, at least three (3) business days prior to the date when the Company intends to file any such pleading or other document (provided that if delivery of such motions, orders or materials (other than any Bidding Procedures Motion, the Plan, the Disclosure Statement, the Confirmation Order or an adequate protection order) at least three (3) business days in advance is not reasonably practicable, such motion, order or material shall be delivered as soon as reasonably practicable prior to filing) and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(v)      file such "first day" motions and pleadings reasonably determined by the Debtors, in form and substance reasonably acceptable to the Requisite Term Lenders, to be necessary, and to seek interim and final (to the extent necessary) orders, in form and substance reasonably acceptable to the Debtors and the Requisite Term Lenders, from the Bankruptcy Court approving the relief requested in such "first day" motions;

(vi)      subject to appropriate confidentiality arrangements, provide to the Consenting Term Lenders' professionals, upon reasonable advance notice to the Company:  (A) reasonable access (without any material disruption to the conduct of the Company's business) during normal business hours to the Company's books, records, and facilities; (B) reasonable access to the respective management and advisors of the Company for the purposes of evaluating the Company's finances and operations and participating in the planning process with respect to the Restructuring or Restructuring Transactions; (C) prompt access to any information provided to any existing or prospective financing sources (including lenders under any debtor-in-possession and/or exit financing); and (D) prompt and reasonable responses to all reasonable diligence requests;

(vii)      use their commercially reasonable efforts to support and take all actions as are reasonably necessary and appropriate to obtain any and all required regulatory and/or third-party approvals to consummate the Restructuring;

(viii)      promptly pay all prepetition and postpetition reasonable and documented fees and expenses of (x) Kirkland, FTI Consulting Inc. ("*FTI*"), and one firm acting as local counsel for the Requisite Term Lenders, if required, in each case in accordance with the terms of their respective engagement letters with the Company and (y) the Administrative Agent, Davis Polk, and one firm acting as local counsel for the Administrative Agent, if required, in each case, in accordance with the Credit Agreement and the Term Sheet;

(ix)      not, nor encourage any other person or entity to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance, confirmation, or consummation of the Plan or implementation of the Restructuring;

9

(x)      subject to applicable laws, use commercially reasonable efforts to, consistent with the pursuit and consummation of the Restructuring and the Restructuring Transactions, preserve intact in all material respects the current business operations of the Company (other than as consistent with applicable fiduciary duties), keep available the services of its current officers and material employees (in each case, other than voluntary resignations, terminations for cause, or terminations consistent with applicable fiduciary duties) and preserve in all material respects its relationships with customers, sales representatives, suppliers, distributors, and others, including the warehouse lenders, in each case, having material business dealings with the Company (other than terminations for cause or consistent with applicable fiduciary duties);

(xi)      provide prompt written notice to the Requisite Term Lenders between the date hereof and the Effective Date of (A) receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the Restructuring Transactions, (B) receipt of any written notice from any governmental body in connection with this Agreement or the Restructuring Transactions, and (C) receipt of any written notice of any proceeding commenced, or, to the actual knowledge of the Company, threatened against the Company, relating to or involving or otherwise affecting in any material respect the Restructuring Transactions; and

(xii)      unless otherwise agreed by the Company and the applicable firm, on the date that is at least one (1) calendar day prior to the Commencement Date, pay to (A) Kirkland, (B) one firm acting as local counsel for the Requisite Term Lenders, if any, (C) FTI, (D) the Administrative Agent, (E) Davis Polk and (F) one firm acting as local counsel for the Administrative Agent, if any, in each case (x) all reasonable and documented fees and expenses accrued but unpaid as of such date, whether or not such fees and expenses are then due, outstanding, or otherwise payable in connection with this matter and (y) fund or replenish, as the case may be, any retainers reasonably requested by Kirkland or FTI, in each case in accordance with the terms of their respective engagement letters with the Company.

(b)      <u>Automatic Stay</u>.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice); <u>provided</u> that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

(c)      <u>Negative Covenants</u>.  The Company agrees that, for the duration of the Support Period, the Company shall not take any action inconsistent with, or omit to take any action required by the Credit Agreement, except to the extent that any such action or inaction is expressly contemplated or permitted by this Agreement, the Term Sheet, the Plan or any of the other Definitive Documents.

10

**5.**     **Termination of Agreement.**

(a)     This Agreement shall terminate upon the receipt of written notice to the other Parties, delivered in accordance with <u>Section 19</u> hereof, from (x) the Requisite Term Lenders at any time after and during the continuance of any Lender Termination Event or (y) the Company at any time after and during the continuance of any Company Termination Event, as applicable.

(b)     A "***Lender Termination Event***" shall mean any of the following:

(i)     the breach by the Company of (a) any covenant contained in this Agreement or (b) any other obligations of the Company set forth in this Agreement, in each case, in any material respect and, in either respect, such breach remains uncured for a period of five (5) business days following the Company's receipt of written notice pursuant to <u>Sections 5(a)</u> and <u>19</u> hereof (as applicable);

(ii)     any representation or warranty in this Agreement made by the Company shall have been untrue in any material respect when made or shall have become untrue in any material respect, and such breach remains uncured for a period of five (5) business days following the Company's receipt of notice pursuant to <u>Sections 5(a)</u> and <u>19</u> hereof (as applicable);

(iii)     the Definitive Documents and any amendments, modifications, or supplements thereto filed by the Company include terms that are materially inconsistent with the Term Sheet and are not otherwise acceptable to the Requisite Term Lenders, and such event remains unremedied for a period of three (3) business days following the Company's receipt of notice pursuant to <u>Sections 5(a)</u> and <u>19</u> hereto (as applicable);

(iv)     a Definitive Document alters the treatment of the Term Lenders specified in the Term Sheet without complying with Section 9 hereof and the Requisite Term Lenders have not otherwise consented to such Definitive Document;

(v)     solely in the context of a Reorganization Transaction, the failure of the Company to secure commitments to fund the Exit Working Capital Facility prior to the Confirmation Hearing on terms acceptable to the Company and to holders of at least $66^{2/3}$% in aggregate principal amount outstanding of the Term Loans;

(vi)     the Company, after delivery of an Election Notice (as defined below), fails to pursue consummation of the Elected Transaction or pursues consummation of a transaction other than the Elected Transaction;

(vii)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been not stayed, reversed or vacated within fifteen (15) calendar days after such issuance;

11

(viii)    the Support Effective Date shall not have occurred on or before the Commencement Date;

(ix)    the Commencement Date shall not have occurred on or before the Outside Commencement Date;

(x)    the Debtors shall not have complied with Milestones set out in the Term Sheet;

(xi)    the Bankruptcy Court enters an order that is not stayed (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, (D) denying confirmation of the Plan, the effect of which would render the Plan incapable of consummation on the terms set forth herein or (E) granting relief that is inconsistent with this Agreement or the Plan in any materially adverse respect to the Consenting Term Lenders, in each case;

(xii)    the Confirmation Order is reversed or vacated by a Final Order;

(xiii)    any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable;

(xiv)    if either (A) the Company (or any person or entity on behalf of the Company or its bankruptcy estate with proper standing) files a motion, application or adversary proceeding (or supports or fails to timely object to such a filing) (1) challenging the validity, enforceability, perfection or priority of, or seeking invalidation, avoidance, disallowance, recharacterization or subordination of, the obligations or Claims under the Credit Agreement or (2) challenging the seniority of the obligations or Claims under the Credit Agreement over any obligations or Claims under the Second Lien Notes Indenture or (B) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order providing relief against the interests of the Term Lenders with respect to any of the foregoing causes of action or proceedings, including, but not limited to, invalidating, avoiding, disallowing, recharacterizing, subordinating, or limiting the enforceability of any of the obligations or Claims arising under or related to the Credit Agreement;

(xv)    the terms and conditions of the debtor-in-possession financing (including, but not limited to, any Definitive Documents memorializing such facility) are not acceptable to the Requisite Term Lenders in all material respects;

(xvi)    the debtor-in-possession financing contemplated by the Term Sheet is not approved by the Bankruptcy Court or terminated;

(xvii)    the Company (unless the Company is acting at the direction or instruction or with the consent of the Requisite Term Lenders, including any of their respective employees, agents, or representatives) files or seeks approval of, or supports (or fails to timely object to) another party in filing or seeking approval of an Alternative Transaction;

12

(xviii) the commencement of an involuntary bankruptcy case against the Company under the Bankruptcy Code, if such involuntary case is not dismissed within sixty (60) calendar days after the filing thereof, or if a court order grants the relief sought in such involuntary case;

(xix)   if the Company (A) withdraws the Plan, (B) publicly announces its intention not to support the Restructuring or the Plan, (C) files a motion with the Bankruptcy Court seeking the approval of an Alternative Transaction or (D) agrees to pursue (including, for the avoidance of doubt, as may be evidenced by a term sheet, letter of intent, or similar document) or publicly announces its intent to pursue an Alternative Transaction;

(xx)   the Bankruptcy Court enters an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization (including the Plan); or

(xxi)   if the Company or any other Credit Party (as defined in the Credit Agreement) makes, or causes to be made, any payment of principal or interest on any indebtedness constituting Second Lien Notes.

(c)   A "*Company Termination Event*" shall mean any of the following:

(i)   the breach in any material respect by one or more of the Consenting Term Lenders, of any of the undertakings, representations, warranties, or covenants of the Consenting Term Lenders set forth herein in any material respect which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to <u>Sections 5(a)</u> and <u>19</u> hereof (as applicable), but only if the non-breaching Consenting Term Lenders own less than $66^{2/3}$% of the Claims;

(ii)   the board of directors, members, or managers (as applicable) of the Company reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; <u>provided</u>, that the Company shall provide notice of such determination to Kirkland and Davis Polk via email within one (1) business day after the date thereof;

(iii)   the Company shall not have obtained votes accepting the Plan from holders of the Term Loans sufficient to satisfy the conditions for acceptance set forth in section 1126(c) of the Bankruptcy Code on or before the voting deadline set forth in the solicitation materials distributed in connection with the Plan;

(iv)   the Support Effective Date shall not have occurred on or before the Commencement Date;

(v)   if the Effective Date shall not have occurred on or before 125 days following the Commencement Date;

13

(vi)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment or order has not been not stayed, reversed or vacated within fifteen (15) calendar days after such issuance; or

(vii)    solely in the context of a Reorganization Transaction, the failure of the Company to secure commitments to fund the Exit Working Capital Facility prior to the Confirmation Hearing on terms acceptable to the Company and to holders of at least $66^{2/3}$% in aggregate principal amount outstanding of the Term Loans;

(d)    <u>Mutual Termination</u>.    This Agreement may be terminated by mutual agreement of the Company and the Requisite Term Lenders upon the receipt of written notice delivered in accordance with <u>Section 19</u> hereof.

(e)    <u>Automatic Termination</u>.    This Agreement shall terminate automatically, without any further action required by any Party, upon the occurrence of the Effective Date.

(f)    <u>Effect of Termination</u>.    Upon the termination of this Agreement in accordance with this <u>Section 5</u> (other than pursuant to <u>Section 5(e)</u>) if the Restructuring has not been consummated, and except as provided in <u>Section 13</u> hereof, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the Credit Agreement and any ancillary documents or agreements thereto; <u>provided</u>, <u>however</u>, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.  Upon any such termination of this Agreement, each vote or any consents given by any Consenting Term Lender prior to such termination shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement, in each case, without further confirmation or other action by such Consenting Term Lender.  If this Agreement has been terminated as to any Consenting Term Lender in accordance with this <u>Section 5</u> (other than pursuant to <u>Section 5(e)</u>) at a time when permission of the Bankruptcy Court shall be required for a Consenting Term Lender to change or withdraw (or cause to change or withdraw) its vote to accept the Plan, the Company shall support and not oppose any attempt by such Consenting Term Lender to change or withdraw (or cause to change or withdraw) such vote at such time, subject to all remedies available to the Company at law, equity, or otherwise, including those remedies set forth in <u>Section 12</u> hereof.  The Consenting Term Lender shall have no liability to the Company or to each other in respect of any termination of this Agreement in accordance with the terms of this <u>Section 5</u> and <u>Section 19</u> hereof.

14

(g)    If the Restructuring has not been consummated prior to the date of termination of this Agreement, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.    Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

### 6.    Definitive Documents; Good Faith Cooperation; Further Assurances.

Subject to the terms and conditions described herein, during the Support Period, each Party, severally and not jointly, hereby covenants and agrees to reasonably cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, implementation, and consummation of the Plan and the Restructuring, as well as the negotiation, drafting, execution (to the extent such Party is a party thereto), and delivery of the Definitive Documents.    Furthermore, subject to the terms and conditions hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings and voting any claims against or securities of the Company in favor of the Restructuring, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement; provided that no Consenting Term Lender shall be required to incur any material cost, expense, or liability in connection therewith.

### 7.    Representations and Warranties.

(a)    Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or, with respect to a Consenting Term Lender that becomes a party hereto after the date hereof, as of the date such Consenting Term Lender becomes a party hereto):

(i)    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)    the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

15

(iii)    the execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required by the SEC; and

(iv)    this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)    Each Consenting Term Lender severally (and not jointly), represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Term Lender becomes a party hereto), such Consenting Term Lender (i) is the beneficial owner of the aggregate principal amount of Term Loans set forth below its name on the signature page hereof (or below its name on the signature page of a Joinder Agreement for any Consenting Term Lender that becomes a party hereto after the date hereof) and does not beneficially own any other Term Loans and/or (ii) has, with respect to the beneficial owners of such Term Loans, (A) sole investment or voting discretion with respect to such Term Loans, (B) full power and authority to vote on and consent to matters concerning such Term Loans or to exchange, assign and transfer such Term Loans and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(c)    Each Consenting Term Lender severally (and not jointly) makes the representations and warranties set forth in this Section 7, in each case, to the other Parties.

## 8.    Disclosure; Publicity.

(a)    Subject to the provisions set forth in Section 8(b) hereof, the Company shall disseminate publication on Form 8-K or a press release disclosing the existence of this Agreement and the terms hereof (including any schedules and exhibits thereto that are filed with the Bankruptcy Court on the Commencement Date) with such redactions as may be reasonably requested by Kirkland to maintain the confidentiality of the items identified in Section 8(b) hereof, except as otherwise required by law.  In the event that the Company fails to make the foregoing disclosures in compliance with the terms specified herein, any such Consenting Term Lender may publicly disclose the foregoing, including, without limitation, this Agreement and all of its exhibits and schedules (subject to the redactions called for by Section 8 hereof), and the Company hereby waives any claims against the Consenting Term Lenders arising as a result of such disclosure by a Consenting Term Lender in compliance with this Agreement.

(b)    The Company shall submit drafts to Kirkland of any press releases, public documents and any and all filings with the SEC that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement, or any

16

other matter relating to the Term Loans, at least one (1) business day prior to making any such disclosure, and any such press releases, public documents, and other SEC filings shall be reasonably acceptable in all material respects to the Requisite Term Lenders. Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Term Lender, no Party or its advisors shall disclose to any person (including, for the avoidance of doubt, any other Consenting Term Lender), other than advisors to the Company, the principal amount of the Term Loans held by the Consenting Term Lender, without such Consenting Term Lender's prior written consent; provided, however, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall, to the extent permitted by law, afford the relevant Consenting Term Lender a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant Consenting Term Lender) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate outstanding principal amount of the Term Loans held by all the Consenting Term Lenders collectively.

**9.      Amendments and Waivers; Term Lender Election.**

(a)      This Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended or supplemented except with the written consent of the Company and the Requisite Term Lenders; provided, however, that any waiver, modification, amendment or supplement to this Section 9 shall require the written consent of all of the Parties; provided, further, that any modification, amendment or change to the definition of Requisite Term Lenders shall require the written consent of each Consenting Term Lender; provided, further, that any change, modification or amendment to this Agreement, the Term Sheet, or the Plan that treats or affects any Consenting Term Lender in a manner that is disproportionately adverse, on an economic or non-economic basis, to the manner in which any of the other Consenting Term Lenders are treated (after taking into account each of the Consenting Term Lender's respective holdings and interests in the Company and the recoveries contemplated by the Term Sheet (as in effect on the date hereof)) shall require the written consent of such Consenting Term Lender; provided, further, that if any change, modification or amendment to this Agreement, the Term Sheet or the Plan does not materially, adversely affect the rights of a Consenting Term Lender, the consent of such Consenting Term Lender shall not be required.  In the event that an adversely affected Consenting Term Lender ("***Non-Consenting Term Lender***") does not consent to a waiver, change, modification or amendment to this Agreement requiring the consent of each Consenting Term Lender, but such waiver, change, modification or amendment receives the consent of Consenting Term Lenders owning at least $66^{2/3}$% of the aggregate outstanding principal amount of the Term Loans, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Term Lender, but this Agreement shall continue in full force and effect in respect to all other Consenting Term Lenders who have so consented, in a way consistent with (or otherwise reasonably acceptable to the Requisite Term Lenders) this Agreement and the Term Sheet as waived, changed, modified, or amended, as applicable.

17

(b)    Unless extended by the Company, within five (5) business days following the earlier of (a) the conclusion of the Company's post-Commencement Date marketing and sale process and (b) 95 days after the Commencement Date (the earliest such date, the "***Election Date***"), holders of at least 662/3% in aggregate principal amount outstanding of the Term Loans (the "Electing Term Lenders") shall deliver a notice (the "***Election Notice***") to the Company stating that the Electing Term Lenders wish to consummate a transaction (the "***Elected Transaction***"), being a: (i) Reorganization Transaction, or (ii) Master Servicing Transaction (as part of a Reorganization Transaction), or (iii) Sale Transaction, and, if applicable, (iv) in connection and together with an election of (i), (ii), or (iii), any Asset Sale Transaction(s); <u>provided</u> that inclusion of any such Asset Sale Transaction(s) is not incompatible with the successful consummation of the elected transaction in (i), (ii), or (iii).

## 10.    Effectiveness.

This Agreement shall become effective and binding on the Parties on the Support Effective Date, and not before such date; <u>provided</u> that signature pages executed by Consenting Term Lenders shall be delivered to (a) the other Consenting Term Lenders in a redacted form that removes such Consenting Term Lenders' holdings of the Term Loans or any other Claims against or interests in the Company and any schedules to such Consenting Term Lenders' holdings (if applicable) and (b) the Company, Weil and Kirkland in an unredacted form (and to be kept confidential by the Company, Weil and Kirkland).

## 11.    Governing Law; Jurisdiction; Waiver of Jury Trial.

(a)    This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to the conflict of laws principles thereof.

(b)    Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in any federal or state court in the State of New York, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring.  Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the courts described above in New York, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court in New York as described herein.  Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring, (i) any claim that it is not personally subject to the jurisdiction of the courts in New York as described herein for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of

18

notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.  Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this <u>Section 11(b)</u> shall be brought in the Bankruptcy Court.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

## 12.    Specific Performance/Remedies.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.

## 13.    Survival.

Notwithstanding the termination of this Agreement pursuant to <u>Section 5</u> hereof, the agreements and obligations of the Parties in this <u>Section 13</u>, and <u>Sections 4(b)</u>, <u>5(f)</u>, <u>8</u>, <u>10</u>, <u>11</u>, <u>12</u>, <u>14</u>, <u>15</u>, <u>16</u>, <u>17</u>, <u>18</u>, <u>19</u>, and <u>20</u> hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; <u>provided</u>, <u>however</u>, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

## 14.    Headings.

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

## 15.    Successors and Assigns; Severability; Several Obligations.

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives;

provided, however, that nothing contained in this Section 15 shall be deemed to permit Transfers of the Term Loans or claims arising under the Term Loans other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.  The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

## 16.    No Third-Party Beneficiaries.

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties (and their respective successors, permitted assigns, heirs, executors, administrators and representatives) and no other Person shall be a third-party beneficiary hereof.

## 17.    Prior Negotiations; Entire Agreement.

This Agreement, including the exhibits and schedules hereto (including the Term Sheet) constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Term Lender shall continue in full force and effect.

## 18.    Counterparts.

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by facsimile or by electronic mail in portable document format (pdf), which shall be deemed to be an original for the purposes of this paragraph.

## 19.    Notices.

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers:

(1)    If to the Company or Debtors, to:

Ditech Holding Corporation
3000 Bayport Drive, Suite 985
Tampa, FL 33607
Attn:  John Haas, General Counsel, Chief Legal Officer and Secretary

20

Email:  JHaas@ditech.com

With a copy to (which shall not constitute notice):

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:  Ray C. Schrock, P.C.
Email:  Ray.Schrock@weil.com
Attn:  Sunny Singh, Esq.
Email:  Sunny.Singh@weil.com
Attn: Alexander Welch, Esq.
Email: Alexander.Welch@weil.com

(2)     If to a Consenting Term Lender, or a transferee thereof, to the addresses or
        facsimile numbers set forth below following the Consenting Term
        Lender's signature (or as directed by any transferee thereof), as the case
        may be, with copies to:

        Kirkland & Ellis LLP
        300 North LaSalle
        Chicago, Il 606545
        Attn:  Patrick J Nash Jr., P.C.
        Email:  Patrick.Nash@kirkland.com
        Attn:  John Luze
        Email:  John.Luze@kirkland.com

(3)     If to the Administrative Agent:

        Credit Suisse AG
        11 Madison Avenue,
        New York, NY 10010
        Attn:  Megan Kane
        Email:  Megan.Kane@credit-suisse.com
        Attn:  Peter Winstanley
        Email:  Peter.Winstanley@credit-suisse.com

        With a copy to (which shall not constitute notice):

        Davis Polk & Wardwell LLP
        450 Lexington Avenue
        New York, NY 10017
        Attn: Brian M. Resnick
        Email:  Brian.Resnick@davispolk.com
        Attn: Michelle McGreal
        Email:  Michelle.Mcgreal@davispolk.com

21

Any notice given by delivery, mail or courier shall be effective when received. Any notice given by facsimile or electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

### 20. Reservation of Rights; No Admission.

(a)    Nothing contained herein shall:  (i) limit (A) the ability of any Party to consult with other Parties or (B) the rights of any Party under any applicable bankruptcy, insolvency, foreclosure, or similar proceeding, including the right to appear as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as such consultation or appearance is consistent with such Party's obligations hereunder, or under the terms of the Plan; (ii) limit the ability of any Consenting Term Lender to sell or enter into any transactions in connection with the Second Lien Notes owned or controlled by such Consenting Term Lender, or any other claims against or interests in the Company, subject to the terms of Section 3(b) hereof; (iii) limit the rights of any Consenting Term Lender under the Credit Agreement or any agreements executed in connection with the Credit Agreement; or (iv) constitute a waiver or amendment of any provision of the Credit Agreement or any agreements executed in connection with the Credit Agreement.

(b)    Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in any bankruptcy case filed by the Company or any of its affiliates and subsidiaries.  This Agreement, the Term Sheet and the Plan are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.  This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

### 21. Relationship Among Consenting Term Lenders.

It is understood and agreed that no Consenting Term Lender has any duty of trust or confidence in any kind or form with any other Consenting Term Lender, and, except as expressly provided in this Agreement, there are no commitments among or between them.  In this regard, it is understood and agreed that any Consenting Term Lender may trade in the Second Lien Notes or other debt of the Company without the consent of the Company or any other Consenting Term Lender, subject to applicable securities laws, the terms of this Agreement, and any confidentiality agreement entered into with the Company; provided that no Consenting Term Lender shall have any responsibility for any such trading to any other person or entity by virtue of this Agreement.  No prior history, pattern, or practice of sharing

22

confidences among or between the Consenting Term Lender shall in any way affect or negate this understanding and agreement.

### 22.    No Solicitation; Representation by Counsel; Adequate Information.

(a)    This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases by the Term Lenders or a solicitation to tender or exchange any of the Term Loans.  The acceptances of the Consenting Term Lenders with respect to the Plan will not be solicited until such Consenting Term Lender has received the Disclosure Statement and related ballots and solicitation materials, each as approved or ratified by the Bankruptcy Court.

(b)    Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)    Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation or acceptance of a chapter 11 plan of reorganization or an offering of securities, each Consenting Term Lender acknowledges, agrees and represents to the other Parties that it (i) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act or a non-US person participating in the offering outside the United States in reliance on Regulation S under the Securities Act, (ii) is an accredited investor (as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act), (iii) understands that the securities to be acquired by it (if any) pursuant to the Restructuring have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Term Lender's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available and (iv) has such knowledge and experience in financial and business matters that such Consenting Term Lender is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to Restructuring and understands and is able to bear any economic risks with such investment.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

23

## EXHIBIT A

## RESTRUCTURING TERM SHEET

**DITECH HOLDING CORPORATION**
**RESTRUCTURING TERM SHEET**

**This Term Sheet is attached as <u>Exhibit A</u> to the restructuring support agreement dated February 8, 2019 (as amended and restated), by and among holders (the "*Consenting Term Lenders*") of outstanding Term Loans (as defined in the Credit Agreement (defined below)) and Ditech Holding Corporation (the "*RSA*").  Capitalized terms used in this Term Sheet not defined shall have the meaning ascribed to them in <u>Annex A</u>.**

**This Term Sheet is not an offer or a solicitation with respect to any securities of the Company, nor is it a solicitation of acceptances of a plan of reorganization as contemplated by sections 1125 and/or 1126 of the Bankruptcy Code.  Any such offer or solicitation shall comply with all applicable securities laws and/or provisions of the Bankruptcy Code.**

**This Term Sheet is a settlement proposal in furtherance of settlement discussions.  Accordingly, this Term Sheet is protected by rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential settlement discussions.**

**This Term Sheet is for discussion purposes only and does not purport to summarize all of the terms, conditions, representations, warranties, and other provisions with respect to the transactions described herein, which transactions will be subject to the completion of definitive documents incorporating the terms set forth herein and the closing of any transaction shall be subject to the terms and conditions set forth in such definitive documents.  No binding obligations will be created by this Term Sheet unless and until binding definitive documents are executed and delivered by all applicable parties.**

| Introduction | |
|---|---|
| **Overview** | This Term Sheet summarizes the terms of a restructuring (the "***Restructuring***") of the Company to be effectuated pursuant to the Plan. |
| **The Company** | Ditech Holding Corporation ("***Ditech***") and its subsidiaries that will be debtors and debtors in possession (the "***Debtors***" or collectively, the "***Company***"). |
| **Claims and Interests to be Restructured** | <u>First Lien Senior Secured Term Loan Claims</u>:  Claims on account of term loans ("***Term Loan Claims***") under that certain Second Amended and Restated Credit Agreement, dated as of February 9, 2018 (and as amended by that certain Amendment No. 1 to Second Amended and Restated Credit Agreement, dated as of March 29, 2018) (the "***Credit Agreement***"), among Ditech, the lenders party thereto (each, a "***Term Lender***"), and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent for the Term Lenders (the "***Administrative Agent***").  Term Loan Claims shall be allowed in the outstanding principal amount of $961,355,635.34, plus any amounts owing on account of call protections contained in the Credit Agreement, plus all accrued interest, costs, fees, and expenses under the Credit Agreement.<br><br><u>Second Lien Notes Claims</u>:  Claims on account of the 9.0% Second Lien Senior Subordinated PIK Toggle Notes due 2024 (the "***Second Lien Notes***"), |

| Introduction | |
|---|---|
| | issued by Ditech pursuant to the Indenture dated as of the Effective Date (as amended, restated, supplemented or otherwise modified from time to time), under which the Second Lien Notes were issued, among Ditech, as issuer, certain of the subsidiary guarantors party thereto, as guarantors, and Wilmington Savings Fund Society, FSB, as trustee and collateral agent (the "***Second Lien Notes Trustee***"). |
| | <u>General Unsecured Claims</u>: Consisting of any Claim against the Company (other than any Intercompany Claims or Go-Forward Trade Claims (as defined below) as of the Commencement Date that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court including any deficiency claim under section 506(a) of the Bankruptcy Code (collectively, the "***General Unsecured Claims***"). |
| | <u>Go-Forward Trade Claims</u>: Consisting of any Claim against the Company (other than any Intercompany Claims or General Unsecured Claims) as of the Commencement Date that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court identified by the Company (with the consent of the Requisite Term Lenders) as being integral to and necessary for the ongoing operations of New Ditech (the "***Go-Forward Trade Claims***"). |
| | <u>Existing Equity Interests</u>: Consisting of any common stock, preferred stock, warrants, or other ownership interest of or in Ditech pursuant to the Ditech Certificate of Incorporation or otherwise that are issued and outstanding as of the Commencement Date (the "***Existing Equity Interests***"). |
| **Transaction Overview** | |
| **Implementation** | The Company will commence the Chapter 11 Cases and implement the Restructuring pursuant to the Plan as provided in the RSA.  The transactions in this Term Sheet may be effectuated pursuant to the Plan as (a) a standalone reorganization and/or credit bid of Allowed Term Loan Claims by the Term Lenders; or (b) a sale to a third party. |
| **DIP Financing** | The Company will execute certain new refinancing agreements to be entered into by Ditech Financial LLC and Reverse Mortgage Solutions Inc., as borrowers (the "***DIP Warehouse Facility***"), which shall provide for the refinancing of existing warehouse, repurchase, and advance facilities of Ditech Financial LLC and Reverse Mortgage Solutions Inc., including the Existing Warehouse and Repurchase Facilities; *provided* that, the terms and conditions of the DIP Warehouse Facility (including, but not limited to, any Definitive Documents memorializing the DIP Warehouse Facility) shall be acceptable to the Requisite Term Lenders in all material respects; *provided further*, that, exit financing refinancing the DIP Warehouse Facility shall be raised following the Commencement Date but prior to the Effective Date (if necessary). |
| **Exit Working Capital Facility** | On the Effective Date, the Company, subject to the consent of the Requisite Term Lenders, shall enter into a new-money revolver or delayed-draw term loan facility in an amount equal to $150 million (the "***Exit Working Capital*** |

2

| Introduction |
|---|
| | *Facility*"), or such lesser amount as is acceptable to the Company and the Requisite Term Lenders; *provided*, that, $30 million of the Exit Working Capital Facility may be reserved for a letter of credit sub-facility or synthetic letter of credit sub-facility (or shall have a reserve for any separately incurred letter of credit facility not to exceed $30 million). The terms of the Exit Working Capital Facility shall be otherwise in form and substance acceptable to the Requisite Term Lenders and the Company; provided, that, the Exit Working Capital Facility shall be co-terminus with the Amended and Restated Term Loan Facility.<br><br>The Exit Working Capital Facility will be funded by: (i) some or all of the Term Lenders providing a revolving credit facility or similar financing, subject to ongoing diligence and acceptable documentation; (ii) third party senior financing; (iii) asset sales, or (iv) some combination of the foregoing (i), (ii) and (iii), each of (i)-(iv) on customary terms and otherwise acceptable to the Company and Requisite Term Lenders; *provided* that with respect to any third party senior financing, the Consenting Term Lenders shall have the option to fund any such financing on substantially the same terms in place of any third party financing source. |
| **Use of Cash Collateral** | The Company will be authorized to use cash collateral (as defined in section 363(a) of the Bankruptcy Code) of the Term Lenders with the consent of the Administrative Agent, acting at the direction of the Requisite Term Lenders, subject to the following terms and conditions and such other terms and conditions that are mutually acceptable to the Company and the Requisite Term Lenders; provided that notwithstanding anything to the contrary herein, the following shall be subject in all respects to the terms of the orders approving the DIP Warehouse Facility:<br><br>• Adequate Protection Lien. The Administrative Agent (on behalf of itself and the Term Lenders) shall receive a replacement security interest in and lien on (the "**Term Loan AP Liens**") all assets and property of the Debtors, whether arising prepetition or postpetition of any nature whatsoever, which liens and security interests shall be subordinate only to (i) Permitted Liens (as defined in the Credit Agreement) to the extent any such Permitted Liens are senior in priority under applicable non-bankruptcy law to the liens securing the Obligations under the Credit Agreement and (ii) the liens granted under the DIP Warehouse Facility (the "**DIP Liens**") and (iii) a customary professional fee "carve-out" in an amount to be agreed upon by the Company and the Requisite Term Lenders (the "*Carve Out*"). The Term Loan AP Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or (ii) subordinated to or made pari passu with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, except as expressly provided in the Financing Orders. |

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| | • <u>507(b) Claim</u>. The Administrative Agent (on behalf of itself and the Term Lenders) shall receive an administrative expense claim pursuant to Bankruptcy Code section 507(b) with priority over all other administrative expenses, subject to the Carve Out and adequate protection granted on account of the DIP Warehouse Facility. |
| | • <u>Adequate Protection Payments</u>. The Debtors' prompt payment of, whether incurred prior to or following the Commencement Date, all reasonable fees and expenses of the Administrative Agent (in accordance with the Credit Agreement), including but not limited to Kirkland and FTI, as provided herein; *provided*, that, subject to the terms of the Intercreditor Agreement, the right of any party in interest (other than, so long as the RSA is in effect, the Company) to file a complaint with the Bankruptcy Court to recharacterize any such payments as payments against principal on the ground that the Allowed Term Loans are under-collateralized is reserved, subject to the rights of the Administrative Agent and Term Lenders to oppose such complaint and raise any and all defenses thereto. |
| | • <u>Financial Reporting</u>. Until the Effective Date, the Debtors shall continue to provide the Administrative Agent, Kirkland, and FTI with financial and other reporting in compliance with the Prepetition Documents and any reporting described in the Financing Orders, including monthly financial reporting in form and substance reasonably acceptable to the Requisite Term Lenders. |
| | The Company will be authorized to use any collateral, including cash collateral (as defined in section 363(a) of the Bankruptcy Code), of the holders of Second Lien Notes, and the Second Lien Notes Trustee (on behalf of itself and the holders of Second Lien Notes) shall receive a replacement security interest in and lien on all assets and property of the Debtors, whether arising prepetition or postpetition of any nature whatsoever, which liens and security interests shall be subordinate to (i) the DIP Liens; (ii) the Term Lenders AP Liens; (iii) the prepetition liens of the Term Lenders; (iv) permitted liens under the indenture governing the Second Lien Notes to the extent any such liens are senior in priority under applicable non-bankruptcy law to the liens securing the Second Lien Notes and (v) the Carve Out. The second lien adequate protection liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or (ii) subordinated to or made pari passu with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, except as expressly provided in the Financing Orders. Neither the Second Lien Notes Trustee nor holders of Second Lien Notes shall receive any other form of adequate protection. |
| **Amended and Restated Credit Facility Agreement** | On the Effective Date, New Ditech and the Term Lenders will enter into or shall be deemed to have entered into, pursuant to the Plan, the Third Amended and Restated Credit Facility Agreement, included as an exhibit to the Plan Supplement in form and substance consistent with this Term Sheet and otherwise acceptable to the Requisite Term Lenders and the Company (the |

4

| Introduction |
|---|
| |

"*Amended and Restated Credit Facility Agreement*").

The Amended and Restated Credit Facility Agreement shall provide for new term loans (the "*New Term Loans*"), which New Term Loans shall provide for the following material terms:

- Principal Amount:  $400,000,000

- Maturity Date:  5 Years post-Effective Date.

- Interest Rate:  LIBOR + 6.0% cash interest per annum, plus 2.0% PIK interest per annum.

- Amortization:
  - 2019: None
  - 2020: [TBD]
  - 2021: [TBD]

- Call Protection: callable at 103%, 102%, 101% for the first, second, and third years, respectively, following the Effective Date.

- Covenants:  no less favorable to the Term Lenders than as provided for in the Credit Agreement or as otherwise acceptable to the Requisite Term Lenders and Company, and to include the following:

  - Minimum Tangible Net Worth: [TBD]

  - Asset Coverage Tests: [TBD]

  - Monthly MSR Detailed Information: [TBD]

  - All covenant levels and thresholds to be otherwise acceptable to the Requisite Term Lenders and the Company.

- Cash Sweep:  [TBD]

- Closing Conditions: customary closing conditions (including, but not limited to, customary legal opinions from borrower's counsel (including local counsel)) and otherwise as acceptable to the Requisite Term Lenders and the Company.

The Amended and Restated Credit Facility Agreement shall provide for other financial covenants, other covenants, representations, warranties, and Events of Default (taken as a whole) no less favorable to the Term Lenders than as provided for in the Credit Agreement or as otherwise acceptable to the Requisite Term Lenders and Company.

| | |
|---|---|
| **New Common Stock** | On the Effective Date, New Ditech will issue new common stock of the Company (the "**New Common Stock**"), and which will be in a form and manner acceptable to the Requisite Term Lenders. |
| **No Substantive Consolidation** | The Plan will be implemented without any substantive consolidation. |

WEIL:\96911480\1\41703.0010

| Introduction |
| --- |

| Marketing Process | "**Reorganization Transaction**" means, collectively, (a) the issuance of the New Common Stock; (b) the entry into the New Term Loans; (c) the entry into the Exit Working Capital Facility; (d) the execution of any new organizational documents; (e) the vesting of the Company's assets in New Ditech pursuant to the Plan; (f) the consummation of any transactions with respect to the foregoing, as determined by the Requisite Term Lenders in their reasonable discretion in accordance with the RSA; and (g) if applicable and only if the terms there of are acceptable to the Requisite Term Lenders, a Master Servicing Transaction. |
| | "**Master Servicing Transaction**" means, as part of a Reorganization Transaction to the extent the terms thereof are acceptable to the Requisite Term Lenders, entry by the Company into an agreement or agreements with an approved subservicer or subservicers (the "**New Subservicer**") whereby, following the Effective Date, all or substantially all of the Company's mortgage servicing rights are subserviced by the New Subservicer. The Debtors shall conduct request for proposal process for the Master Servicing Transaction in accordance with the Bid Procedures. |
| | "*Sale Transaction*" means the sale of substantially all of the Company's assets, as contemplated by one or more Successful Bids, in each case, as provided in the RSA. |
| | "*Successful Bid*" means one or more bids to purchase all or substantially all of the Company's assets that the Company determines, in an exercise of its business judgment: (a) provides sufficient cash consideration to satisfy the following Claims in full in cash in accordance with the priorities set forth in the plan: (i) Allowed Other Secured Claims (except to the extent the applicable purchase agreement provides for a different method of rendering such Claims unimpaired); (ii) Allowed Administrative Claims; (iii) Allowed Professional Fee Claims; (iv) Allowed Priority Tax Claims (unless paid in another manner permitted by section 1129(a)(9)(c) of the Bankruptcy Code); (v) Allowed Other Priority Claims; (vi) pays in full in cash the prepetition warehouse facilities and the DIP Warehouse Facility Claims; and (vii) Allowed Term Loan Claims (or such lesser amount as is acceptable to the Requisite Term Lenders in their sole and absolute discretion); (b) provides consideration that the Company and the Requisite Term Lenders determine is sufficient to pay or reserve for payments pursuant to and in accordance with the Plan, including consideration sufficient to wind down the estates following the closing of the Sale Transaction; and (c) includes such other terms and conditions as the Company and the Requisite Term Lenders may reasonably require. |
| | "*Asset Sale Transaction*" means the sale of a portion of the Company's assets other than a Sale Transaction consummated on or as soon as is reasonably practicable after the Effective Date; provided such sale shall only be conducted with the consent of the Requisite Term Lenders. Net proceeds of any Asset Sale Transaction shall be "*Asset Sale Proceeds*." |
| | Following the Commencement Date, the Company shall oversee and manage the sale process and solicit bids for a potential Sale Transaction, Master Servicing Transaction, and if applicable, an Asset Sale Transaction, in good- |

6

| Introduction | |
|---|---|
| | faith consultation with the Requisite Term Lenders. The sale and plan solicitation process shall generally be conducted in accordance with the procedures and timeline set forth on in the Bidding Procedures and the order approving the Disclosure Statement, subject to approval of the Bankruptcy Court. The Requisite Term Lenders and their advisors shall have the right to review all information, diligence, and materials provided by the investment banker retained by the Company to any bidder or prospective bidder with respect to the sale and to consult with such investment banker with respect to any potential Sale Transaction, Asset Sale Transaction, or Master Servicing Transaction. The Company and the advisors for the Requisite Term Lenders shall consult in good faith regarding the sale process, including any diligence and other information requested by the Requisite Term Lenders and their advisors with respect thereto.<br><br>The Company shall solicit bids on any and all bases, including soliciting bids that do not pay Allowed Term Loans in full. The Company shall only consummate the Sale Transaction on the Effective Date, if the Company receives a bid with respect to a possible Sale Transaction that would satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Term Loan Claims (or such lesser amount as is acceptable to the Requisite Term Lenders in their sole and absolute discretion) in full in Cash and would satisfy the DIP Warehouse Facility in full in Cash. |
| **Milestones** | The Consenting Term Lenders' support for the Restructuring shall be subject to the timely satisfaction of the following milestones (the "***Milestones***"), which may be extended with the prior written consent of the Requisite Term Lenders:<br><br>• File the Plan, Disclosure Statement, and a motion seeking Bankruptcy Court approval of the Bidding Procedures: not later than 15 days after the Commencement Date;<br><br>• Entry of Orders approving the Disclosure Statement and Bidding Procedures: not later than 50 days after the Commencement Date;<br><br>• Deadline to commence the Auction: not later than 95 days after the Commencement Date;<br><br>• Deadline to commence the Confirmation Hearing: not later than 115 days after the Commencement Date; and<br><br>• Deadline for Effective Date under the Plan to Occur; not later than 125 days from the Commencement Date. |

| Treatment of Claims and Interests | |
|---|---|
| **Class** | **Treatment** |
| **DIP Warehouse** | **Unimpaired; Non-Voting.** The DIP Warehouse Facility Claim shall be paid |

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| **Facility Claims** | in full in Cash on the Effective Date. |
| **Other Priority Claims, Priority Tax Claims, Other Secured Claims** | **Unimpaired; Non-Voting.** All Priority Tax Claims, other priority Claims, and other secured Claims, other than those Claims otherwise referenced herein, will be unimpaired under the Plan and/or paid in full in the ordinary course of business. |
| **Term Loan Claims** | **Impaired; Voting.** Term Loan Claims shall be allowed in the outstanding principal amount of $961,355,635.34, plus all accrued interest, costs, fees, and expenses under the Credit Agreement.<br><br>a) **If the Company consummates the Reorganization Transaction, including a Master Servicing Transaction (if applicable)**, on the Effective Date, the holders of Term Loan Claims will receive their pro rata share of (i) New Term Loans under the Amended and Restated Credit Facility Agreement; (ii) 100% of the New Common Stock; *provided* that the New Common Stock will be subject to dilution by the Management Incentive Plan, and (iii) if applicable, Asset Sale Proceeds; or<br><br>b) **If the Company consummates the Sale Transaction**, on the Effective Date, the holders of Term Loan Claims will receive their pro rata share of Cash in an amount equal to all Allowed Term Loan Claims, and if applicable, Asset Sale Proceeds. |
| **Second Lien Notes Claims** | **Impaired; Non-Voting.**<br><br>a) **If the Company consummates the Reorganization Transaction, including a Master Servicing Transaction (if applicable)**, the holders of such Claims will not receive any distribution; or<br><br>b) **If the Company consummates the Sale Transaction**, on the Effective Date the holders of Second Lien Notes will receive their pro rata share of Cash in an amount equal to the Cash proceeds as such holders are entitled to under applicable nonbankruptcy law (subject to the Intercreditor Agreement) after the Term Loan Claims are paid in full in Cash, plus the payment in full in Cash of other accrued administrative and priority costs. |
| **General Unsecured Creditors** | **Impaired; Non-Voting.** Holders of all General Unsecured Claims shall not be entitled to any recovery under the Plan; provided, that, in a Sale Transaction, holders of General Unsecured Claims will receive their pro rata share of Cash in an amount equal to the Cash proceeds as such holders are entitled to receive after the Term Loan Claims and Second Lien Notes Claims are paid in full in Cash, plus the payment in full in Cash of other accrued administrative and priority costs. |
| **Go-Forward Trade Claims** | **Impaired; Non-Voting.**<br><br>a) **If the Company consummates the Reorganization Transaction, including a Master Servicing Transaction (if applicable)**, holders of |

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| | all Go-Forward Trade Claims shall receive a distribution in Cash in an amount equaling not less than [●]% of their Claim, subject to an aggregate cap of $[●], after which any further payments on account of Go-Forward Trade Claims will be subject to the consent of the Requisite Term Lenders; or<br><br>b) **If the Company consummates the Sale Transaction**, holders of Go-Forward Trade Claims shall receive the same treatment as General Unsecured Creditors. |
| **Intercompany Claims** | **Impaired or Unimpaired; Non-Voting**.  Intercompany Claims shall be canceled, reinstated, or receive such other treatment that is acceptable to the Company and the Requisite Term Lenders in their respective reasonable discretion. |
| **Intercompany Interests** | **Impaired or Unimpaired; Non-Voting**. Intercompany Interests shall be canceled, reinstated, or receive such other treatment that is acceptable to the Company and the Requisite Term Lenders in their respective reasonable discretion. |
| **Subordinated Security Claims** | **Impaired; Deemed to Reject**.  Any Claim or Interest subject to subordination pursuant to section 510 of the Bankruptcy Code shall be cancelled and deemed to reject the Plan, and the holders of any such Claims or Interests will not receive any recovery with respect thereto under the Plan. |
| **Existing Equity Interests** | **Impaired; Deemed to Reject**.  Holders of Existing Equity Interests issued and outstanding as of the Effective Date will not receive any recovery on account of their Existing Equity Interests under the Plan and such Existing Equity Interests shall be cancelled and deemed to reject the Plan. |

| Other Key Terms | |
|---|---|
| **Term** | **Description** |
| **Management Incentive Plan** | Following the Effective Date, New Ditech will enter into a post-Restructuring management incentive plan ("**Management Incentive Plan**"), under which up to 10% of the New Common Stock (after taking into account the shares to be issued under the Management Incentive Plan) will be reserved for issuance as awards under the Management Incentive Plan.  If the Company pursues a Reorganization Transaction, the Company shall file a term sheet with proposed terms of the Management Incentive Plan, including initial allocations, no later than the Plan Supplement filing date. |
| **Private Company** | New Ditech will be privately held and shall not be subject to any United States Securities and Exchange Commission reporting obligations. |
| **Government Entities Contracts** | All contracts with government entities such as Ginnie Mae, FNMA, and FHLMC will be assumed or honored as part of the Company's first day relief. |

WEIL:\96911480\1\41703.0010

| Introduction | |
|---|---|
| **Intercreditor Agreement** | The Intercreditor Agreement shall remain in full force and effect and shall be fully enforceable according to its terms. |
| **Credit Bidding** | Upon the direction of the Term Lenders, the Administrative Agent or its designee shall have the right to credit bid all or any portion of the Term Loan Claims in accordance with section 363(k) of the Bankruptcy Code in connection with any transaction, including a Sale Transaction or the Reorganization Transaction, if structured as a sale transaction. |
| **Executory Contracts** | Unless the Company is pursuing a Sale Transaction, subject to the prior written consent of the Requisite Term Lenders, all executory contracts and unexpired leases, other than those expressly identified by the Company for assumption, will be deemed rejected. |
| **Employee Compensation and Benefit Plans** | To be discussed. |
| **Board of Directors of New Ditech** | Upon the Effective Date, the Board of New Ditech will consist of five (5) members, four (4) of whom shall be nominated by the Requisite Term Lenders and one (1) of whom shall be the chief executive officer of New Ditech, Thomas F. Marano. |
| | Corporate governance for New Ditech, including charters, bylaws, operating agreements, or other organization documents, as applicable, shall be consistent with this Term Sheet and section 1123(a)(6) of the Bankruptcy Code (as applicable) and documentation therefor shall be otherwise acceptable to the Requisite Term Lenders. |
| **Charter; Bylaws** | The charter, bylaws, limited liability company agreements and other organizational documents of New Ditech and each of its subsidiaries will be amended or amended and restated by New Ditech consistent with section 1123(a)(6) of the Bankruptcy Code, if applicable, and otherwise in accordance with the Plan, and the RSA. |
| **Cancellation of Notes, Interest, Instruments, Certificates and other Documents** | Except as provided herein and in connection with the Credit Agreement, on the Effective Date, all notes, instruments, certificates evidencing debt to, or Interests in, the Company, including, without limitation, the Second Lien Notes and Existing Equity Interests, will be cancelled and obligations of the Company thereunder will be discharged. In addition, on the Effective Date, any registration rights or similar agreements with respect to Existing Equity Interests will also be cancelled and any obligations of the Company thereunder will be discharged. |
| **Vesting of Assets** | On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets of the Company's Estate will vest in New Ditech free and clear of all claims, liens, encumbrances, charges and other interests, except as otherwise provided in the Plan. |

10

| Introduction | |
|---|---|
| **Compromise and Settlement** | The Plan will contain provisions for the compromise and settlement of Claims stating that, except as provided herein, the allowance, classification and treatment of Allowed Claims and Interests and their respective distributions take into account and conform to the relative priority and rights of such Claims and Interests in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise. |
| **Released Parties** | "*Released Parties*" means, collectively:  (a) the Consenting Term Lenders; (b) the Administrative Agent; (c) such other entities as agreed between the Company and the Requisite Term Lenders; and (d) with respect to each of the Company, New Ditech, and each of the foregoing entities in clauses (a) through (c), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, and all of their respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees. |
| **Releases** | To the extent the Restructuring is consummated, the Plan will provide for releases with language substantially to the effect of the following: |
| | Releases by the Company:  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Company and the implementation of the Restructuring, and except as otherwise provided in the Plan or in the confirmation order for the Plan, the Released Parties will be deemed forever released and discharged, to the maximum extent permitted by law, by the Company, New Ditech, and Estate and all affiliates or subsidiaries managed or controlled thereby, from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Company, or New Ditech (as the case may be), or the Estate, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Company, or New Ditech (as the case may be), or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or interest or other person, based on or relating to, or in any manner arising prior to the Effective Date from, in whole or in part, the Company, the chapter 11 cases, the purchase, sale, or rescission of the purchase or sale of any security of the Company, the subject matter of, or the transactions or events giving rise to, any Claim or interest that is treated in the Plan, the business or contractual arrangements between any of the Company and any Released Party, the Restructuring, the restructuring of any Claim or interest before or during the Chapter 11 Cases, the Disclosure Statement, the RSA, and the Plan |

11

| Introduction |
|---|
| and related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, other than claims or causes of action arising out of or related to any act or omission of a Released Party that constitutes fraud or willful misconduct, as determined by a Final Order.<br><br>Releases by holders of Impaired Claims: As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date or (ii) as otherwise expressly provided in the Plan or in confirmation order for the Plan, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by<br><br>(1)    the holders of Impaired Claims who voted to accept the Plan;<br><br>(2)    the parties to the RSA, in accordance with and subject to the terms of the RSA; and<br><br>(3)    with respect to any entity in the foregoing clauses (1) and (2), such Entity's (a) predecessors, successors and assigns, (b) any subsidiaries, affiliates, managed accounts or funds, managed or controlled by such entity and (c) all persons entitled to assert claims through or on behalf of such entities with respect to the matters for which the releasing entities are providing releases,<br><br>in each case, from any and all Claims, interests or Causes of Action whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising prior to the Effective Date from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or New Ditech, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan (including the Plan Supplement), the RSA, the Definitive Documents, or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided* that nothing in this the Plan shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order. |

12

| Introduction | |
|---|---|
| **Injunction** | The Plan will provide for an injunction solely with respect to any Claim or Interest extinguished, discharged, or released pursuant to the Plan, with language substantially to the effect of the following:<br><br>(a)      Upon entry of the confirmation order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.<br><br>(b)      Except as expressly provided in the Plan, the confirmation order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.<br><br>(c)      By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in the Plan.<br><br>(d)      The injunctions in the Plan shall extend to any successors of the Debtors and New Ditech and their respective property and interests in property. |
| **Exculpation** | The Plan will provide that "***Exculpated Parties***" will have the same meaning as Released Parties. |

| Introduction |
|---|
| | The Plan will contain exculpation provisions with language substantially to the effect of the following:<br><br>To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Company; the negotiation and pursuit of the Disclosure Statement, the RSA, the Restructuring Transactions, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except for fraud or willful misconduct, as determined by a Final Order. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability. |
| **Tax Treatment** | The Restructuring contemplated by this Term Sheet shall be structured, with the reasonable consent of the RSA Parties, (1) to preserve favorable tax attributes of the Company to the extent practicable and (2) in a tax efficient manner for the Consenting Term Lenders and the Company. |
| **Conditions to Effectiveness** | The Plan will be subject to usual and customary conditions to confirmation and effectiveness (as applicable), as well as such other conditions that are reasonably satisfactory to the Company and the Requisite Term Lenders including the following:<br><br>1.  the Definitive Documents will contain terms and conditions consistent in all respects with this Term Sheet and the RSA and will otherwise be satisfactory or reasonably satisfactory in form and substance to the Requisite Term Lenders and the Company to the extent set forth in the RSA or this Term Sheet;<br><br>2.  the Bankruptcy Court will have entered the confirmation order for the Plan, and such confirmation order will not have been reversed, stayed or modified;<br><br>3.  the RSA will not have been terminated, and will be in full force and effect;<br><br>4.  all Restructuring Expenses will have been paid in full in Cash;<br><br>5.  the conditions to closing of the Amended and Rested Credit Facility Agreement and Exit Working Capital Facility shall have been satisfied; and<br><br>6.  all governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by this Term Sheet will have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable |

14

| Introduction | |
|---|---|
| | waiting periods will have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions. The conditions to effectiveness may be waived in writing by the Company together with the Requisite Term Lenders. |
| **Securities Exemptions** | The issuance and distribution under the Plan of the New Common Stock, if applicable, to the Term Lenders will be exempt from registration under the Securities Act or other applicable securities laws without further act or action by any Person pursuant to section 1145(a) of the Bankruptcy Code and/or any other applicable exemptions. |
| **Fees and Expenses** | The Company shall pay or reimburse all reasonable and documented fees and out-of-pocket expenses (regardless of whether such fees and expenses were incurred before or after the Commencement Date) of Kirkland & Ellis LLP and FTI Consulting, in connection with the subject matter of this Term Sheet and the Restructuring pursuant to the economic terms of their respective engagement letters.  The Company will also pay the fees and expenses of the Administrative Agent (including its counsel) in the manner set forth in, and to the extent required by, the Credit Agreement. |
| **Retention of Jurisdiction** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (a) resolution of claims, (b) allowance of compensation and expenses for pre-Effective Date services, (c) resolution of motions, adversary proceedings or other contested matters, (d) entering such orders as necessary to implement or consummate the Plan and any related documents or agreements and (e) other purposes. |
| **Resolution of Disputed Claims** | The Plan will provide customary procedures for the resolution of disputed Claims, including the ability (but not requirement) to establish a claims bar date pursuant to an order of the Bankruptcy Court.  Once resolved, the claimants will receive distributions, if any, in accordance with the provisions of the Plan and the classification of their Allowed Claim. |
| **Definitive Documents** | This Term Sheet is indicative, and any final agreement will be subject to the Definitive Documents.  The Definitive Documents will contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein consistent with the terms of this Term Sheet, and in accordance with the RSA. |
| **Other Terms** | Acceptable to the RSA Parties in accordance with the RSA. |

WEIL:\96911480\1\41703.0010

## ANNEX A

**Certain Defined Terms**

WEIL:\96911480\1\41703.0010

| Defined Terms | |
|---|---|
| *"Administrative Expense Claim"* | Means any right to payment constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Fee Claims; (c) Restructuring Expenses; and (d) any Claim under the DIP Warehouse Facility, against a Debtor. |
| *"Allowed"* | Means, with reference to any Claim or Interest, a Claim or Interest (a) arising on or before the Effective Date as to which (i) no objection to allowance or priority, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, or (ii) any objection has been determined in favor of the holder of the Claim or Interest by a Final Order, (b) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or New Ditech, (c) as to which the liability of the Debtors or New Ditech, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction, or (d) expressly allowed hereunder; provided, however, that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) New Ditech shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan. |
| *"Bankruptcy Code"* | Has the same meaning as in the RSA. |
| *"Bankruptcy Court"* | Has the same meaning as in the RSA. |
| *"Bidding Procedures"* | Means the procedures governing the auction and sale process relating to any potential Sale Transaction, Asset Sale Transaction, or Master Servicing Transaction, as approved by the Bankruptcy Court and as may be amended from time to time in accordance with their terms and otherwise as acceptable to the Company and the Requisite Term Lenders. |
| *"Cash"* | Means legal tender of the United States of America. |
| *"Cause of Action"* | Means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedies, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or |

17

| **Defined Terms** | |
|---|---|
| | unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws). Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim. |
| *"Chapter 11 Cases"* | Means the cases under chapter 11 of the Bankruptcy Code to be commenced by the Company by no later than the Outside Commencement Date, in the Bankruptcy Court and styled *In re Ditech Holding Corp.*; *provided*, that, to the extent that any other subsidiary or affiliate of the Company commences a case under chapter 11 of the Bankruptcy Code, the Company will seek to have such case jointly administered on a procedural basis with the Company's chapter 11 cases, and any reference to the Chapter 11 Cases shall be deemed to include such other cases (if any) filed by the Company's subsidiaries and affiliates. |
| *"Claim"* | A "claim," as defined in section 101(5) of the Bankruptcy Code, as against any Debtor. |
| *"Class"* | Any group of Claims or Interests classified by the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code. |
| *"Confirmation Hearing"* | A hearing at which the Bankruptcy Court will confirm the Plan, as applicable. |
| *"Definitive Documents"* | Shall have the same meaning as in the RSA, as applicable. |
| *"Disclosure Statement"* | The disclosure statement filed by the Debtors in support of the Plan. |
| *"Effective Date"* | Shall have the same meaning as in the RSA. |
| *"Estate(s)"* | Individually or collectively, the estate or estates of a Debtor created under section 541 of the Bankruptcy Code. |
| *"Existing Warehouse and Repurchase Facilities"* | Means, each of and collectively, the (i) Second Amended and Restated Master Repurchase Agreement, dated as of November 30, 2017, by and among Reverse Mortgage Solutions, Inc., as seller, the seller parties party thereto, Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, and the buyers party thereto, (ii) Amended and Restated Master Repurchase Agreement, dated November 18, 2016, by and among Ditech Financial LLC, as seller, Credit Suisse First Boston Mortgage Capital LLC, as administrative agent, and the buyers party |

18

| **Defined Terms** |
|---|

| | thereto, (iii) Master Repurchase Agreement, dated as of April 23, 2018, between Reverse Mortgage Solutions, Inc. as seller and Barclays Bank PLC, as purchaser and agent, (iv) Participation Interest Sale and Contribution Agreement, dated as of October 1, 2018, by and among Reverse Mortgage Solutions, Inc. and one of its subsidiaries, and the related Note Purchase Agreement of even date therewith, between such subsidiary and National Founders LP, (v) the Indenture and the supplement thereto, each dated as of February 9, 2018, among Ditech Agency Advance Trust, Wells Fargo, as indenture agent, calculation agent, paying agent and securities intermediary, Ditech Financial LLC, as servicer and administrator, and Credit Suisse, as administrative agent and (vi) the Indenture and the supplement thereto, each dated as of February 9, 2018, among Ditech DPAT II Advance Trust II, Wells Fargo, as indenture trustee, calculation agent, paying agent and securities intermediary, Ditech Financial LLC, as servicer and administrator, and Credit Suisse, as administrative agent (in each case, as amended, restated, amended and restated, supplemented or otherwise modified from time to time). |
| *"Fee Claim"* | Means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Effective Date by professional persons retained by the Debtors by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, or 503(b) of the Bankruptcy Code in the Chapter 11 Case. |
| *"Final Order"* | Means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment. |
| *"Impaired"* | Means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the |

| Defined Terms | |
|---|---|
| | Bankruptcy Code. |
| *"Intercompany Claim"* | Any Claim against any of the Company's entities held by another of the Company's entities. |
| *"Intercompany Interest"* | An Interest in any of the Company's direct or indirect subsidiaries held by another of the Company's entities or an Interest in the Company held by an affiliate of the Company (other than any Preferred Stock or Existing Equity Interest in Holdings). |
| *"Intercreditor Agreement"* | Shall have the same meaning as ascribed to it in the Credit Agreement. |
| *"Interests"* | Means any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, whether fully vested or vesting in the future, including, without limitation, equity or equity-based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Debtors, to acquire any such interests in the Debtors that existed immediately before the Effective Date. |
| *"New Ditech"* | Means, on or after the Effective Date, Ditech and each of the other Debtors, as reorganized, pursuant to and under the Plan or any successor thereto, and/or one or more acquiring entities, in each case, after giving effect to the Reorganization Transaction, whether structured as a debt-for-equity exchange or credit bid and asset sale transaction. |
| *"Other Secured Claim"* | Means a Secured Claim, other than an Administrative Expense Claim, a Claim in connection with the DIP Warehouse Facility, a Priority Tax Claim, or a Term Loan Claim. |
| *"Commencement Date"* | Has the same meaning as in the RSA. |
| *"Plan Supplement"* | Has the same meaning as in the RSA. |
| *"Priority Non-Tax Claim"* | Means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code. |
| *"Priority Tax Claim"* | Means any Secured Claim or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
| *"Reinstate", "Reinstated", or* | Means leaving a Claim Unimpaired under the Plan. |

WEIL:\96911480\1\41703.0010

| Defined Terms | |
|---|---|
| *"Reinstatement""* | |
| *"Rejecting Class"* | Means a Class that does not vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code. |
| *"Requisite Term Lenders"* | Has the same meaning as in the RSA. |
| *"Restructuring Expenses"* | Means, with respect to, (a) the Requisite Term Lenders, the reasonable and documented fees, costs, and expenses of (i) Kirkland & Ellis LLP, (ii) one law firm acting as local counsel (if any), and (iii) FTI Consulting Inc.; (b) the Administrative Agent, to the extent provided under the Credit Agreement, pursuant to the economic terms of their respective engagement letters with the Company or, in the case of the Administrative Agent, the Credit Agreement. |
| *"Restructuring Transactions"* | Has the same meaning as in the RSA. |
| *"RSA Parties"* | Means the Consenting Term Lenders (as defined in the RSA). |
| *"Unimpaired"* | Means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code. |

21

**EXHIBIT B**

**FORM OF JOINDER AGREEMENT FOR CONSENTING TERM LENDERS**

This Joinder Agreement to the Restructuring Support Agreement, dated as of [●] (as amended, supplemented or otherwise modified from time to time, the "***Agreement***"), by and among Ditech Holding Corporation, and the holders of the Term Loans (together with their respective successors and permitted assigns, the "***Consenting Term Lenders***" and each, a "***Consenting Term Lender***") is executed and delivered by _____ (the "***Joining Party***") as of _____ __, 2019.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.  Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as **Annex I** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting Term Lender" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

2.  Representations and Warranties.  With respect to the aggregate principal amount of Term Loans set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Term Lenders set forth in Section 7 of the Agreement to each other Party to the Agreement.

3.  Governing Law.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

[Signature Page Follows]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**CONSENTING TERM LENDER**

By:_____

Name:

Title:

Notice Address:

_____

_____

_____

Fax: _____

Attention:

Email: _____

_____

Acknowledged:

**DITECH HOLDING CORPORATION**
on its own behalf and on behalf of its direct and indirect subsidiaries

By:_____

Name:
Title:

SIGNATURE PAGE TO JOINDER AGREEMENT

**Schedule 1**

**Committees**

Pursuant to Local Bankruptcy Rule 1007-2(a)(3), prior to the Commencement Date, the Debtors are aware of the following ad hoc groups that were formed to engage with the Debtors in an effort to participate in the Debtors' ongoing restructuring efforts.

| Committee Description | Committee Representative |
|---|---|
| Ad hoc group of holders of the 2018 Term Loan under the Second Amended and Restated Credit Agreement | Kirkland & Ellis LLP, 300 North LaSalle, Chicago, IL 60654 (Attn: Patrick J. Nash and Gregory F. Pesce) |
| Ad hoc group of holders of the 9.0% Second Lien Senior Subordinated PIK Toggle Notes due 2024 | Milbank, Tweed, Hadley & McCloy LLP, 2029 Century Park East, Los Angeles, CA 90067 (Attn: Gregory A. Bray and Melanie K. Mansfield) |

### Schedule 2

### Consolidated List of 40 Largest Unsecured Claims (Excluding Insiders)[1]

Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding, as of February 9, 2019, the forty (40) largest, unsecured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim — If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | ISGN Solutions Inc. Attn.: E. Rock Primas 2330 Commerce Park Drive, NE, Suite 2 Palm Bay, Florida 32905 | Attn.: E. Rock Primas Phone: (609) 932-4712 Email: rock.primas@isgnsolutions.com | Trade Debt | | | | $1,531,484.00 |
| 2 | Black Knight Tech Solutions Attn.: Darlene Ledet 601 Riverside Avenue Jacksonville, FL 32204 | Attn.: Darlene Ledet Phone: (904) 854-3153 Email: darlene.ledet@bkfs.com | Trade Debt | | | | $1,458,204.00 |
| 3 | Servicelink Attn.: Joe Greve 9600 Reserve Run Brecksville, Ohio 15108 | Attn.: Joe Greve Phone: (216) 374-1888 Email: joe.greve@svclnk.com | Trade Debt | | | | $1,222,945.00 |
| 4 | Corelogic Tax Services LLC Attn.: Tom Blauvelt 4 First American Way Santa Ana, California 92707 | Attn.: Tom Blauvelt Phone: (512) 977-3716 Email: tblauvelt@corelogic.com | Trade Debt | | | | $1,155,282.00 |
| 5 | Safeguard Properties Mgmt. LLC Attn.: Gregory Sharp 7887 Safeguard Cir. Valley View, Ohio 44125 | Attn.: Gregory Sharp Phone: (216) 739-2900 Email: gregory.sharp@safeguardproperties.com | Trade Debt | | | | $1,150,138.00 |
| 6 | Tata Consultancy Services Ltd. Attn.: Prashant Panghal 379 Thornall Street Edison, New Jersey 08837 | Attn.: Prashant Panghal Phone: (732) 986-6921 Email: prashant1.p@tcs.com | Trade Debt | | | | $1,135,384.00 |
| 7 | Cognizant Technology Solutions Attn.: Janine Lj Durham 2512 Dunlap Avenue Phoenix, Arizona 32905 | Attn.: Janine Lj Durham Phone: (602) 315-0481 Email: janine.durham@cognizant.com | Trade Debt | | | | $1,023,481.00 |
| 8 | Corelogic Information Solutions Attn.: Tom Blauvelt 4 First American Way Santa Ana, California 92707 | Attn.: Tom Blauvelt Phone: (512) 977-3716 Email: tblauvelt@corelogic.com | Trade Debt | | | | $800,585.00 |
| 9 | Black Knight Financial Services Attn.: Darlene Ledet 601 Riverside Avenue Jacksonville, Florida 32204 | Attn.: Darlene Ledet Phone: (904) 854-3153 Email: darlene.ledet@bkfs.com | Trade Debt | | | | $586,915.00 |

---

[1]    The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  All claims are subject to customary offsets, rebates, discounts, reconciliations, credits, and adjustments, which are not reflected on this Schedule.

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 10 Verizon Business Attn.: Lona Gruebele 22001 Loudoun County Pkwy Ashburn, Virgina  20147 | Attn.: Lona Gruebele Phone: (612) 805-1034 Email: lona.j.gruebele@verizon.com | Trade Debt | | | | $555,663.00 |
| 11 Nationwide Title Clearing Inc. Attn.: Debbie Lastoria 2100 Alt 19 North Palm Harbor, Florida  34683 | Attn.: Debbie Lastoria Phone: (727) 771-4000 Email: debbie_lastoria@nwtc.com | Trade Debt | | | | $554,418.00 |
| 12 NCP Solutions LLC Attn.: Tom Hart 5200 East Lake Boulevard Birmingham, Alabama  35217 | Attn.: Tom Hart Phone: (205) 421-7254 Email: thart@ncpsolutions.com | Trade Debt | | | | $492,500.00 |
| 13 Pegasystems Inc. Attn.: Kirk Faustman One Rogers Street Cambridge, Massachusetts  02142 | Attn.: Kirk Faustman Phone: (617) 777-3229 Email: kirk.faustman@pega.com | Trade Debt | | | | $480,180.00 |
| 14 Padgett Law Group Attn.: Timothy D. Padgett 6267 Old Water Oak Road, Suite 203 Tallahassee, Florida  32312 | Attn.: Timothy D. Padgett Phone: (850) 422-2520 Email: accounting@padgettlaw.net | Professional Services | | | | $471,337.00 |
| 15 McCalla Raymer Leibert Pierce LLC Attn.: Michael Allgood 1544 Old Alabama Road Roswell, Georgia  30076 | Attn.: Michael Allgood Phone: (770) 643-7202 Email: michael.allgood@mccalla.com | Trade Debt | | | | $462,992.00 |
| 16 RAS Crane LLC Attn.: John Crane 10700 Abbott's Bridge Road; Suite 170 Duluth, Georgia  30097 | Attn.: John Crane Phone: (972) 757-1486 Email: jcrane@rascrane.com | Professional Services | | | | $446,268.00 |
| 17 Locke Lord LLP Attn.: Lori Barton 2200 Ross Avenue, Suite 2800 Dallas, Texas  75201 | Attn.: Lori Barton Phone: (214) 740-8000 Email: lori.barton@lockelord.com | Professional Services | | | | $443,666.00 |
| 18 Ellie Mae Inc. Attn.: John Coppa 4420 Rosewood Drive, Suite 500 Pleasanton, CA 94588 | Attn.: John Coppa Phone: (925) 227-2060 Email: john.coppa@elliemae.com | Professional Services | | | | $347,728.00 |
| 19 Quattro Direct LLC Attn.: Dan Lawler 200 Berwyn Park, Suite 310 Berwyn, Pennsylvania  19312 | Attn.: Dan Lawler Phone: (610) 993-0070 Email: dlawler@quattrodirect.com | Trade Debt | | | | $342,006.00 |
| 20 KML Law Group PC Attn.: Lisa Lee 701 Market Street, Suite 5000 Philadelphia, Pennsylvania  19106 | Attn.: Lisa Lee Phone: (215) 627-1322 Email: llee@kmllawgroup.com | Professional Services | | | | $332,535.00 |
| 21 Phelan Hallinan LLP Attn.: Jay Jones 1617 JFK Blvd., Suite 1400 Philadelphia, Pennsylvania  19103-1814 | Attn.: Jay Jones Phone: (215) 563-7000 Email: jay.jones@phelanhallinan.com | Professional Services | | | | $305,245.00 |
| 22 Insight Direct/ Datalink Attn.: Michael Schmidt 6820 South Harl Avenue Tempe, Arizona 85283 | Attn.: Michael Schmidt Phone: (651) 260-4017 Email: Michael.schmidt@insight.com | Trade Debt | | | | $300,279.00 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 23 | TCS America<br>Attn.:  Prashant Panghal<br>379 Thornall Street<br>Edison, New Jersey  08837 | Attn.:  Prashant Panghal<br>Phone: (732) 986-6921<br>Email:  prashant1.p@tcs.com | Trade Debt | | | | $297,383.00 |
| 24 | Robertson Anschutz & Schneid PL<br>Attn.:  Eric L. Bronfeld<br>6409 Congress Avenue, Suite 100<br>Boca Raton, Florida  33487 | Attn.:  Eric L. Bronfeld<br>Phone:  (561) 241-6901<br>Email:  arcollections@rasflaw.com | Professional Services | | | | $290,502.00 |
| 25 | American Bankers Insurance<br>Attn.:  Michelle Griffith<br>11222 Quail Roost Drive<br>Miami, Florida  33157 | Attn.:  Michelle Griffith<br>Phone:  (305) 253-2244<br>Email:  michelle.griffith@assurant.com | Trade Debt | | | | $285,213.00 |
| 26 | Indecomm Holdings Inc.<br>Attn.:  Teddi Horan<br>205 Regency Executive Park Drive, Suite 500<br>Charlotte, North Carolina  28217 | Attn.:  Teddi Horan<br>Phone:  (215) 962-7212<br>Email:  teddi.horan@indecomm.net | Trade Debt | | | | $284,830.00 |
| 27 | Wells Fargo Bank N.A<br>Attn.:  Holly Monday<br>420 Montgomery Street<br>San Francisco, California  94104 | Attn.:  Holly Monday<br>Phone:  (703) 865-7740<br>Email:  holly.monday@wellsfargo.com | Trade Debt | | | | $271,624.00 |
| 28 | Newcourse Communications Inc.<br>Attn.:  Valerie Griffin<br>5010 Linbar Dr., Ste. 100<br>Nashville, Tennessee  37211 | Attn.:  Valerie Griffin<br>Phone:  (615) 921-6656<br>Email:  valerie.giffin@newcoursecc.com | Trade Debt | | | | $270,000.00 |
| 29 | Xome Valuation Services<br>Attn.:  Allen Illgen<br>444 East Washington Street<br>Indianapolis, Indiana  46204 | Attn.:  Allen Illgen<br>Phone:  (612) 207-4012<br>Email:  allen.illgen@assurant.com | Trade Debt | | | | $249,474.00 |
| 30 | Rean Cloud LLC<br>Attn.:  Rupa Vasireddy<br>2201 Cooperative Way #250<br>Herndon, Virginia 20171 | Attn.:  Rupa Vasireddy<br>Phone:  (844) 377-7326<br>Email:  rupa@reancloud.com | Trade Debt | | | | $240,667.00 |
| 31 | US Real Estate Services Inc.<br>Attn.:  Becca Nottberg<br>25520 Commerce Centre Drive; 1st Floor<br>Lake Forest, California  92630 | Attn.:  Becca Nottberg<br>Phone:  (949) 206-5353<br>Email:  becca.nottberg@res.net | Trade Debt | | | | $233,284.00 |
| 32 | Operational Excellence<br>Attn.:  Tony Galluzzo<br>19712 MacArthur Blvd., Suite 110<br>Irvine, California  92612 | Attn.:  Tony Galluzzo<br>Phone:  (949) 988-7229<br>Email:  tgalluzzo@ca-usa.com | Trade Debt | | | | $231,378.00 |
| 33 | US Bank Trust NA<br>Att.:  Kirk Larson<br>300 East Delaware; 8th Floor<br>Wilmington, Delaware  19809 | Attn.:  Kirk Larson<br>Phone:  (651) 466-5666<br>Email:  kirk.larson1@usbank.com | Trade Debt | | | | $230,809.00 |
| 34 | Wolfe & Wyman LLP<br>Attn.:  Stuart B. Wolfe<br>11811 N. Tatum, Suite 3031<br>Phoenix, Arizona  85028-1621 | Attn.:  Stuart B. Wolfe<br>Phone:  (602) 953-0100<br>Email:  sbwolfe@wolfewyman.com | Professional Services | | | | $228,398.00 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim  If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 35 | Five Brothers Mortgage Servs Attn.:  Dawn Whiteaker 12220 E. 13 Mile Road; Suite 100 Warren, Missouri  48093 | Attn.:  Dawn Whiteaker Phone:  (586) 354-2017 Email:  dawnrw@fiveonline.com | Trade Debt | | | | $224,947.00 |
| 36 | Servicelink Default Title & Closing Attn.:  Joe Greve 1355 Cherrington Parkway Moon Township, Pennsylvania  15108 | Attn.:  Joe Greve Phone:  (216) 374-1888 Email:  joe.greve@svclnk.com | Trade Debt | | | | $218,298.00 |
| 37 | Level 3 Communications LLC Attn.:  Timothy McGraw 600 W. Chicago Avnue, Suite 325 Chicago, Illinois  60654 | Attn.:  Timothy McGraw Phone:  (612) 392-7364 Email:  timothy.mcgraw@level3.com | Trade Debt | | | | $209,330.00 |
| 38 | Xome Field Services LLC Attn.:  Allen Illgen 444 East Washington Street Indianapolis, Indiana  46204 | Attn.:  Allen Illgen Phone:  (612) 207-4012 Email:  allen.illgen@assurant.com | Trade Debt | | | | $206,077.00 |
| 39 | RAS Boriskin LLC Attn.:  Sara Borskin 900 Merchants Concourse Westbury, New York  11590 | Attn.:  Sara Boriskin Phone:  (516) 280-7675 Email:  sboriskin@rasboriskin.com | Trade Debt | | | | $202,336.00 |
| 40 | ISGN Corporation Attn.:  E. Rock Primas 2330 Commerce Park Drive, NE, Suite 2 Palm Bay, Florida  32905 | Attn.:  E. Rock Primas Phone:  (609) 932-4712 Email:  rock.primas@isgnsolutions.com | Trade Debt | | | | $200,850.00 |

## Schedule 3

### Consolidated List of the Holders of 5 Largest Secured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following is a list of creditors holding the five largest non-contingent, secured claims against the Debtors, on a consolidated basis, as of the Commencement Date.

| # | Creditor | Contact, Mailing Address & Telephone Number | Nature of Claim | Amount of Claim[1] | Collateral Description | Estimated Value of Collateral[2] | Contingent, Unliquidated, or Disputed |
|---|----------|---------------------------------------------|-----------------|----------------|------------------------|----------------------------------|----------------------------------------|
| 1 | Credit Suisse AG, Cayman Islands Branch | Megan E Kane Credit Suisse Services (USA) LLC One Madison Avenue New York, NY 10010 +1 (212) 325-1690 | Term Loan | $961,355,635.37 | Secured by substantially all of the Debtors' assets | Unknown | |
| 2 | Credit Suisse First Boston Mortgage Capital LLC | Margaret D Dellafera Credit Suisse Securities (USA) LLC 11 Madison Ave New York, NY 10010 +1 (212) 325-6471 | Mortgage Loan Warehouse Facility | $471,129,677.00 | Purchase Mortgage Loans | $495,933,033.00 | |
| 3 | Credit Suisse First Boston Mortgage Capital LLC | Margaret D Dellafera Credit Suisse Securities (USA) LLC 11 Madison Ave New York, NY 10010 +1 (212) 325-6471 | Reverse Mortgage Warehouse Facility | $414,895,327.00 | HECMs and real estate owned | $519,869,881.00 | |
| 4 | Barclays Bank PLC | Ellen Kiernan Barclays Bank PLC – Mortgage Finance 745 Seventh Avenue, 4th Floor New York, NY 10019 +1 (212) 412-7990 | Reverse Mortgage Warehouse Facility | $340,846,274.00 | HECMs and real estate owned | $445,811,205.00 | |

---

[1]    Outstanding balances as of February 1, 2019.

[2]    Reflects the face amount of the collateral pledged as of February 1, 2019.

| 5 | Wilmington Savings Fund Society, FSB | Geoffrey J Lewis Wilmington Savings and Fund Society 500 Delaware Ave Wilmington, DE 19801 +1 (302) 573-3218 | Second Lien Notes | $253,895,875.00 | Secured by substantially all of the Debtors' assets | Unknown | |

## Schedule 4

Pursuant to Local Bankruptcy Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis, as consolidated with their affiliated non-Debtors as of September 30, 2018.

**DITECH HOLDING CORPORATION AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(in thousands, except share and per share data)**

| | | September 30, 2018 |
|---|---|---|
| | | (unaudited) |
| **ASSETS** | | |
| Cash and cash equivalents | $ | 187,197 |
| Restricted cash and cash equivalents | | 86,774 |
| Residential loans at amortized cost, net (includes $920 and $6,347 in allowance for loan losses at September 30, 2018 and December 31, 2017, respectively) | | 389,756 |
| Residential loans at fair value | | 10,017,770 |
| Receivables, net (includes $2,457 and $5,608 at fair value at September 30, 2018 and December 31, 2017, respectively) | | 101,417 |
| Servicer and protective advances, net (includes $25,372 and $164,225 in allowance for uncollectible advances at September 30, 2018 and December 31, 2017, respectively) | | 467,694 |
| Servicing rights, net (includes $658,122 and $714,774 at fair value at September 30, 2018 and December 31, 2017, respectively) | | 710,728 |
| Goodwill | | — |
| Intangible assets, net | | 32,351 |
| Premises and equipment, net | | 70,504 |
| Deferred tax assets, net | | 560 |
| Other assets (includes $19,201 and $29,394 at fair value at September 30, 2018 and December 31, 2017, respectively) | | 270,256 |
| Total assets | $ | 12,335,007 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| Payables and accrued liabilities (includes $1,441 and $1,282 at fair value at September 30, 2018 and December 31, 2017, respectively) | $ | 864,947 |
| Servicer payables | | 128,320 |
| Servicing advance liabilities | | 226,591 |
| Warehouse borrowings | | 1,549,694 |
| Corporate debt | | 1,202,998 |
| Mortgage-backed debt (includes $496,124 and $348,682 at fair value at September 30, 2018 and December 31, 2017, respectively) | | 496,124 |
| HMBS related obligations at fair value | | 7,810,508 |
| Deferred tax liabilities, net | | 643 |
| Total liabilities not subject to compromise | | 12,279,825 |
| Liabilities subject to compromise | | — |
| Total liabilities | | 12,279,825 |
| Commitments and contingencies (Note 23) | | |
| Stockholders' equity (deficit): | | |
| Preferred stock, $0.01 par value per share (Successor and Predecessor): | | |
| Authorized - 10,000,000 shares, including 100,000 shares of mandatorily convertible preferred stock (Successor) and 10,000,000 shares (Predecessor) | | |
| Issued and outstanding - 94,421 shares at September 30, 2018 (Successor) and 0 shares at December 31, 2017 (Predecessor) (liquidation preference $98,724 at September 30, 2018) | | 1 |
| Common stock, $0.01 par value per share (Successor and Predecessor): | | |
| Authorized - 90,000,000 shares (Successor and Predecessor) | | |
| Issued and outstanding - 4,982,002 shares at September 30, 2018 (Successor) and 37,373,616 shares at December 31, 2017 (Predecessor) | | 50 |
| Additional paid-in capital | | 186,345 |
| Accumulated deficit | | (131,256) |
| Accumulated other comprehensive income | | 42 |
| Total stockholders' equity (deficit) | | 55,182 |
| Total liabilities and stockholders' equity (deficit) | $ | 12,335,007 |

### Schedule 5

### Publicly Held Securities

Pursuant to Local Bankruptcy Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held ("Securities") and the number of holders thereof.  The Securities held by the Debtors' directors and officers are listed separately.

### Ditech Holding Corporation Common and Preferred Stock

| Type of Security | Approximate Number of Shares | Approximate Number of Record Holders[1] | As of |
|---|---|---|---|
| Common stock, $0.01 par value per share | 5,328,417 | 87 | December 31, 2018 |
| Preferred stock, $0.01 par value per share | 91,408 | 1 | December 31, 2018 |

### Ditech Holding Corporation Common and Preferred Stock Held by the Debtors' Non-Employee Directors

| Name of Director | Approximate Number of Shares | As of |
|---|---|---|
| David S. Ascher | 18,872 share of common stock | February 6, 2019 |
| George M. Awad | 42,972 share of common stock | February 6, 2019 |
| Seth L. Bartlett | 18,872 share of common stock | February 6, 2019 |
| Daniel G. Beltzman | 38,620 share of common stock | February 6, 2019 |
| John R. Brecker | N/A | |
| Neal P. Goldman | 5,746 share of common stock | February 6, 2019 |
| Thomas G. Miglis | 31,454 share of common stock | February 6, 2019 |
| Samuel T. Ramsey | N/A | |

### Ditech Holding Corporation Common and Preferred Stock Held by the Debtors' Executive Officers

| Name of Executive Officer | Approximate Number of Shares | As of |
|---|---|---|
| Thomas F. Marano | N/A | |
| Gerald A. Lombardo | N/A | |
| John J. Haas | 205 shares of common stock | February 6, 2019 |
| Alfred W. Young, Jr. | N/A | |
| Elizabeth F. Monahan | N/A | |
| Jeffrey P. Baker | N/A | |
| Kimberly A. Perez | 2,361 shares of common stock | February 6, 2019 |

---

[1] The approximate number of record holders listed does not reflect the number of beneficial holders.  The information is provided to the best of the Debtors' knowledge and belief as of the Commencement Date.

**Ditech Holding Corporation 9.0% Second Lien Notes**

| Type of Security | Outstanding Balance | Approximate Number of Beneficial Holders[2] | As of |
|---|---|---|---|
| 9.0% Second Lien Senior Subordinated PIK Toggle Notes due 2024 | $253,895,875.00 | Undetermined | February 1, 2019 |

---

[2]    The Debtors are unable to approximate the number of beneficial holders of their public notes as only information regarding the registered holder is available.

## Schedule 6

**Debtors' Property Held by Third Parties**

Pursuant to Local Bankruptcy Rule 1007-2(a)(8) the following lists the Debtors' property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.

In the ordinary course of business, on any given day, property of the Debtors (including security deposits or other collateral with counterparties to certain commercial relationships) is likely to be in the possession of various third parties, including, but not limited to, custodians, mortgagees, secured creditors, governmental sponsored entities, or agents, where the Debtors' ownership interest is not affected.  Because of the constant movement of this property, identification of all of their addresses, telephone numbers, and the location of any court proceeding affecting the property would be impractical.

## Schedule 7

### Listing of Leased and Owned Properties

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the property or premises owned, leased, or held under other arrangement from which the Debtors operates their business.

### Owned Property

None

### Leased Property

| Current Tenant/Subtenant Entity | Guarantor | Address | City | State | Postal Code |
|---|---|---|---|---|---|
| Ditech Financial LLC | | 1240 1st Street North, Suite 204 | Alabaster | AL | 35007 |
| Ditech Financial LLC | | 256 Honeysuckle Rd, Suite 22 | Dothan | AL | 36305 |
| Ditech Financial LLC | | 3322 Memorial Pkwy SW, Suite 203 | Huntsville | AL | 35801 |
| Ditech Financial LLC | | 2820 Fairlane Dr, Building A, Suite 14 | Montgomery | AL | 36116 |
| Ditech Financial LLC | | 1123 S University Ave, Suite 235 | Little Rock | AR | 72204 |
| Ditech Financial LLC | | 2100 East Elliot Rd | Tempe | AZ | 85284 |
| Ditech Financial LLC | | 5214 SW 91 Way, Suite 130 | Gainesville | FL | 32608 |
| Ditech Financial LLC | | 301 W Bay St | Jacksonville | FL | 32202 |
| Reverse Mortgage Solutions, Inc. | | 4800 Riverside Dr, Suites 102, 103, and 104 | Palm Beach Gardens | FL | 33410 |
| Ditech Financial LLC | | 3250 W Navy Blvd, Suites 202 and 208 | Pensacola | FL | 32505 |
| Ditech Holding Corporation | | 3000 Bayport Dr, Suites 880 and 985 | Tampa | FL | 33607 |

| Ditech Financial LLC | | 733 Bishop St, Suite 152 | Honolulu | HI | 96813 |
|---|---|---|---|---|---|
| Ditech Financial LLC | GTCS LLC | 345 St Peter Street, 5th Floor | Saint Paul | MN | 55102 |
| Ditech Financial LLC | | 180 East 5th St, Floors 4, 5, 9, and 11 | Saint Paul | MN | 55101 |
| Ditech Financial LLC | | 11885 Lackland Road, Suite 312 | Maryland Heights | MO | 63146 |
| Ditech Financial LLC | | 402 Wilkins Wise Road, Suite 4 | Columbus | MS | 39705 |
| Ditech Financial LLC | | 303-C West Park Ave | Greenwood | MS | 38930 |
| Ditech Financial LLC | | 2010 Oak Grove Rd, Suite 1 | Hattiesburg | MS | 39402 |
| Ditech Financial LLC | | 612 Delaware Ave, Suite 28 | McComb | MS | 39648 |
| Ditech Financial LLC | | 877 Northpark Dr, Building 4, Suite 200 | Ridgeland | MS | 39157 |
| Ditech Financial LLC | | 915 Ferncliff Cove, Suite 2A | Southaven | MS | 38671 |
| Ditech Financial LLC | | 9205 West Russell Blvd, Suite 240, Office 228 | Las Vegas | NV | 89148 |
| Ditech Financial LLC | | 4867 S Sheridan Rd, Suite 704 | Tulsa | OK | 74145 |
| Ditech Holding Corporation | | 1100 Virginia Drive, Suite 100 | Fort Washington | PA | 19034 |
| Ditech Financial LLC | | 2137 Hoffmeyer Rd, Suite A | Florence | SC | 29501 |
| Ditech Financial LLC | | 1710 Sunset Blvd, Suite A | West Columbia | SC | 29169 |
| Ditech Financial LLC | Ditech Holding Corporation | 1400 Turbine Drive, Suites 100, 150, and 200 | Rapid City | SD | 57703 |
| Ditech Financial LLC | | 4704 & 4708 Mercantile Drive | Fort Worth | TX | 76137 |

| | | | | | |
|---|---|---|---|---|---|
| Ditech Financial LLC | | 652 N Sam Houston Pkwy E, Suite 180 | Houston | TX | 77060 |
| Reverse Mortgage Solutions, Inc. | | 14405 Walters Rd, Suite 110, Floors 2, 3, 4, and 5 | Houston | TX | 77014 |
| Ditech Financial LLC | | 500 Grapevine Hwy, Suite 450 | Hurst | TX | 76054 |
| Ditech Financial LLC | | 1555 Walnut Hill Lane, Suite 100 and 200 | Irving | TX | 75038 |
| Ditech Financial LLC | | 911 North Bishop St, Suite C-204 | Texarkana | TX | 75501 |

## Schedule 8

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

As of September 30, 2018, the Debtors had assets of approximately $12.335 billion, as provided in Schedule 4, with substantial assets located across the country.

### Books and Records

The Debtors' books and records are located at the Ditech Holding Corporation headquarters at 1100 Virginia Drive, Suite 100, Fort Washington, PA, 19034 as well as in Saint Paul, MN, Tampa, FL, Houston, TX and their various operational centers throughout the United States.

### Debtors' Assets Outside the United States

The Debtors do not have significant assets located outside of the territorial limits of the United States.

## Schedule 9

**Summary of Legal Actions Against the Debtors**

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), to the best of the Debtors' knowledge, belief, and understanding, there are no actions or proceedings pending or threatened against the Debtors or their property, as of the Commencement Date, where a judgment against the Debtors or a seizure of their property may be imminent.

## Schedule 10

### Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors and certain of their non-Debtor affiliates, and a brief summary of their relevant responsibilities and experience.

| Name & Position | Responsibilities & Experience |
|---|---|
| Thomas F. Marano – Chief Executive Officer and President | Thomas F. Marano has served as a director and Chairman of the Board since February 2018, and was appointed to the Chief Executive Officer and President role in April 2018. From 2014 until 2017, Mr. Marano served as Chief Executive Officer of Intrawest Resorts Holdings, Inc. strategically leading the company to grow until its acquisition in 2017. Prior to Intrawest Resorts, Mr. Marano was the Managing Member of OldePike Associates LLC, a mortgage consulting business from 2013 to 2014. From 2009 until 2013, Mr. Marano served in numerous capacities for GMAC, Inc./Ally Financial, Inc., focusing on mortgage lending. His involvement in GMAC, Inc./Ally Financial, Inc. includes serving as Chief Executive Officer of Mortgage Operations, Chief Capital Markets Officer, and Chief Executive Officer and Chairman of GMAC ResCap, Inc. From 2008 until 2009, Mr. Marano served as a Managing Director at Cerberus Capital Management, LLC where he consolidated commercial and residential mortgage trading operations and helped establish a mortgage fund. Until 2008, Mr. Marano worked at Bear Stearns & Co. Inc. for 25 years as a trader and as the U.S. and Global Head of Mortgage-Backed and Asset-Backed Securities. Mr. Marano holds a bachelor's degree from Columbia College. |
| Gerald A. Lombardo – Chief Financial Officer | Gerald A. Lombardo joined the Company and began serving as Chief Financial Officer in February 2018. Prior to joining the Company, Mr. Lombardo served as a Managing Director & Treasurer of the Consumer and Community Bank at JPMorgan Chase & Co. from 2013 to 2017 where he managed and had responsibilities for all treasury-related functions for each of the firm's five consumer businesses including mortgage, auto finance, card, consumer banking and business banking. Prior to serving in a senior leadership position with JPMorgan Chase & Co., Mr. Lombardo served as the Global Head of Funding & Liquidity for Ally Financial from 2009 to 2012, where he assisted in the transformation of the firm's global treasury organization. Prior to that, Mr. Lombardo held a financial executive role at Cerberus Capital Management, where he supported portfolio companies in the transformation of their business planning, forecasting and liquidity |

| | functions. Mr. Lombardo also held senior finance roles including Senior Managing Director of FTI Consulting and Chief Financial Officer of Refco. Mr. Lombardo is a Certified Public Accountant and received his Bachelor of Business Administration in Accounting from Pace University. |
|---|---|
| John J. Haas – General Counsel, Chief Legal Officer and Secretary | John J. Haas has served as General Counsel, Chief Legal Officer and Secretary since April 12, 2017. Mr. Haas joined the Company in June 2014 as Assistant General Counsel. Mr. Haas has over 15 years of experience, including both as a corporate and securities attorney and as an investment banker. Before joining the Company, Mr. Haas most recently was Of Counsel at Foley & Lardner LLP from 2013 to 2014 and Executive Director at UBS Investment Bank from 2010 to 2013. Prior to this, Mr. Haas worked as a Director at Merrill Lynch and as an Associate at Skadden, Arps, Slate, Meagher & Flom LLP. Mr. Haas holds a Bachelor of Arts degree from the University of Florida and a Juris Doctorate from New York University School of Law. |
| Alfred W. Young, Jr. – Chief Risk and Compliance Officer | Alfred W. Young, Jr. has served as the Chief Risk and Compliance Officer since October 2016. From 2015 until joining the Company, Mr. Young served as Director of Risk Analytics at the Office of Comptroller of the Currency (the "OCC"), an independent bureau of the U.S. Department of the Treasury charged with regulating and supervising U.S. national banks and federal savings associations. In this role, Mr. Young was responsible for various risk-related supervisory functions and analyses, identifying risks to the national banking system and measuring the effectiveness of certain risk supervisory efforts, among other things. From 2008 to 2015, Mr. Young served as Consumer Credit Examination Lead at the OCC, where he was responsible for large and complex bank supervision and directed a multi-year review of the mortgage servicing activities of a global consumer bank. Mr. Young has a deep background in risk governance and federal regulatory experience, with particular experience in credit risk management, portfolio management, loan servicing, portfolio and bank acquisitions, modeling and analytics. In addition to his regulatory experience, from 1993 to 2008 Mr. Young held various compliance- and risk-related roles at midsize and large national banks. Mr. Young holds a Master of Business Administration from the University of Cincinnati and a Bachelor of Science in Business Administration from Fitchburg State University. |
| Elizabeth F. Monahan – Chief Human Resources Officer | Elizabeth F. Monahan has served as the Company's Chief Human Resources Officer since November 2016. From 2015 until joining the Company, Ms. Monahan served as the Leader of Human Resources of Assero Services, LLC, a national field service company providing property preservation, maintenance and other residential property services to financial institutions. In this |

| | |
|---|---|
| | capacity, Ms. Monahan was responsible for creating the human resources and related administrative functions, including management development and labor safety programs. Ms. Monahan served as Vice President and Global Head of Human Resources at Quintiq, a software company providing supply chain planning and optimization software solutions, from 2013 to 2015, and Senior Vice President and Director of Human Resources for Homeward Residential Inc. from 2011 to 2013. Prior to this, Ms. Monahan held various human resources leadership positions with CorpTalk, De Lage Landen and GMAC Residential Finance Group. During her time at GMAC Residential Finance Group, Ms. Monahan served as the senior human resources leader on acquisition teams for a number of acquisitions, including that of ditech.com. Ms. Monahan holds a Masters of Counseling Psychology from Rider University and a Bachelor of Science from Penn State University. |
| Jeffrey P. Baker – President of Reverse Mortgage Solutions, Inc. | Jeffrey P. Baker has served as President of Reverse Mortgage Solutions, Inc., a subsidiary of the Company, since October 2016 and has served in various other capacities since 2016, including as the Interim Chief Executive Officer and President and as the Chief Operations Officer. Mr. Baker came to the Company with more than 18 years of experience as a senior executive and board member of both public and private companies. Prior to joining the Company, Mr. Baker was the co-founder and Chief Executive Officer of Mayday Capital Advisors, LLC, a restructuring firm. From 2011 to 2015, Mr. Baker served as the Turnaround and Restructuring Practice Leader for Wipfli LLP, a business consulting, accounting and professional services firm. Mr. Baker received his Bachelors of Business Administration from Texas A&M University and completed the Executive Program, M&A at Kellogg Graduate School of Management. |

## Schedule 11

**Payroll**

Pursuant to Local Bankruptcy Rule 1007-2(b)(1), the following provides the estimated amount of bi-weekly payroll to the Debtors' employees (not including officers, directors and stockholders).

| Estimated amount of bi-weekly payroll to Employees (Not Including Officers, Directors and Stockholders) | ($9.4M) |
|---|---|

Pursuant to Local Bankruptcy Rule 1007-2(b)(2)(A) and (C), the following provides the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by the Debtors for the 30-day period following the filing of the chapter 11 petitions.

| Payments to Officers, Stockholders and Directors | ($2.3M) |
|---|---|
| Payments to Financial and Business Consultants | $0.0M |

## Schedule 12

**Cash Receipts and Disbursements, Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the chapter 11 petition, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $96.0M |
| **Cash Disbursements** | ($80.0M) |
| **Net Cash Gain / (Loss)** | $16.0M |
| **Unpaid Obligations** | ($35.9M) |
| **Unpaid Receivables** | $21.7M |